UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THE UNITED STATES OF AMERICA *ex rel.*
DEBORAH SOUZA,

                                    *Plaintiff,*

v.

EMBRACE HOME LOANS, INC., DENNIS
HARDIMAN, KURT NOYCE, and ROBERT LAMY,

                                    *Defendants.*
_____

U.S. DISTRICT COURT - N.D. OF N.Y.
**F I L E D**

FEB 1 4 2019

John M. Domurad, Clerk - Albany

**QUI TAM COMPLAINT
AND
DEMAND FOR A JURY TRIAL**

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §§ 3729** *et seq.*

Civil Action No.

1:19-Cv-201
GTS/CFH

1.      Relator Deborah Souza ("Relator") brings this qui tam action in the name of the

United States of America, by and through her undersigned attorneys Thomas & Solomon LLP,

and alleges as follows:

## INTRODUCTION

2.      This is a civil fraud action by qui tam Relator on behalf of the United States of

America ("the Government"), against Embrace Home Loans, Inc., Dennis Hardiman, Kurt

Noyce, and Robert Lamy (collectively "Embrace" or "Defendants") to recover treble damages

and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, for damages

sustained by the United States Department of Housing and Urban Development ("HUD"),

the Federal Housing Administration ("FHA"), the United States Department of Veteran Affairs

("VA"), and the United States Department of Agriculture Rural Development ("USDA") in

connection with Embrace's origination, underwriting, and quality control of FHA, VA, and

USDA loans (collectively "government loans") under the FHA, VA, and USDA programs

(individually and collectively, the "Government Programs").

3.      The FCA provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

4.      Under the FCA, liability attaches when a defendant submits or causes another to submit a claim for payment from Government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.

5.      Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

6.      The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for himself as the Relator and for the Government and allow him to share in any recovery.

7.      The FHA promotes American homeownership through its Direct Endorsement ("DE") Lender Program or "DE Program."

8.      FHA is a part of HUD and is one of the largest mortgage insurers in the world.

9.      Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured millions of home loans since FHA's inception.

10.     Similarly, the VA promotes home ownership for veterans, active duty personnel, certain surviving spouses, and reservists through the VA Home Loan Guaranty Program ("VA Program").

11.     Under the VA Home Loan Guaranty Program, the VA provides a guarantee of

up to 50% of the loan, which protects the lender against loss up to the amount guaranteed.

12.    Additionally, the USDA promotes home ownership through its Single Family Housing Guaranteed Loan Program ("SFHGLP," or "USDA Program") for low to moderate income borrowers in rural areas.

13.    Under the USDA Program, the USDA will guarantee an amount equal to 90 percent of the loan, which protects the lender against loss up to the amount guaranteed.

14.    Under the Government Programs, if a homeowner defaults on a government loan and the mortgage holder forecloses on the property, the Government Programs will pay the mortgage holder the balance of the loan (or in the case of VA loans, up to 50% of the loan, and USDA loans, up to 90%) and assume ownership and possession of the property.

15.    By protecting mortgage holders against defaults on mortgages, the Government Programs encourage lenders to make loans to millions of creditworthy citizens who might not otherwise be able to secure a home loan under conventional underwriting criteria.

16.    Government insurance is also valuable in the secondary markets, as government loans are expected to have met stringent underwriting requirements and because they are backed by the full faith and credit of the United States.

17.    Thus, for each loan underwritten, the government extends its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

18.    In addition, the taxpayer has been required to fund the insurance premiums for the Government Programs.

19.    Further, the government incurs significant administrative costs in running the Government Programs and accepting endorsed loans by Embrace.

20.     In addition, the government paid claims on any loan that defaulted, including loss mitigation costs associated with the foreclosure or resale of properties, such as marketing expenses, real estate taxes, and maintenance costs.

21.     The government insures the government program loans only if the Direct Endorsement Lender certifies to the government that the loan specifically, and the Direct Endorsement Lender's loan program in its entirety, meet the requirements set forth by the government.

22.     For these loans, the government guarantees that mortgage holders will be reimbursed by the government (in full for FHA loans, up to 50% for VA loans, and up to 90% for USDA loans) if the borrower ultimately does not repay the loan.

23.     The Government Programs encourage lenders to extend loans to creditworthy low- and moderate-income families, as well as first-time homebuyers.

24.     As part of insuring mortgage loans, the government has outsourced to FHA, VA, and USDA lenders (individually and collectively, "Government Lenders") the underwriting services for the loan application; the government no longer performs its own underwriting services for governmentally insured mortgage programs.

25.     In addition to performing underwriting services as part of the program, the Government Lenders also profit from any loan approved.

26.     Further, because the government insured each loan endorsed by the Government Lenders, the Government Lenders suffer essentially no risk of loss if the loan fails.

27.     That means that built into the government mortgage program is a strong incentive for a Government Lender to endorse as many loans as possible, even those that are not qualified, in order to maximize profits, provided the Government Lender is not caught

approving bad loans.

28.   Endorsing fewer loans (even unqualified loans) only reduces a lender's profitability and puts it at a competitive disadvantage in relation to other Government Lenders who endorse more loans whether qualified or not.

29.   Therefore, given these incentives, ensuring that Government Lenders only endorse loans that meet government mortgage requirements is an essential part of the program.

30.   Because Government Lenders are permitted to endorse loans for government insurance without prior government review, the government requires Government Lenders to conduct due diligence on loans before endorsing them for government insurance, and relies on the Government Lenders' certifications to the government in regards to their conduct.

31.   The Government Lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with the government; to follow the government's requirements; and to certify annually, as well as on each loan file, that the lender is in compliance with government requirements.

32.   These are the basic checks that exist to check a Government Lender's self-interest to underwrite as many loans as possible, regardless to the qualifications of the files.

33.   Embrace, a Government Lender approved by the government to originate and underwrite single-family residential mortgages insured by the government, knowingly approved loans that violated government rules while falsely certifying compliance with those rules.

34.   From at least February 2013 to the present (the "Relevant Time Period"), Embrace engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to the government that these loans were eligible for government insurance.

35.    Embrace's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.

36.    As the risk was entirely on the government, when the non-complaint loans inevitably defaulted, this materialized into substantial losses to the government.

37.    Embrace failed to live up to its obligations under the Government Programs.

38.    Embrace's management instituted and encouraged practices that led underwriters to break HUD, VA, and USDA rules and to approve ineligible loans.

39.    Some examples of these policies and practices include: improperly pressuring employees to approve ineligible loans, instructing underwriters to not decline loan files, requiring an approved file to always be approved even when Embrace knew there were material violations of government guidelines, improperly documenting loan files in conformance with government guidelines by hiding documentation, deleting documentation, and accepting inadequate documentation, excessively running the AUS in order to strike a financial balance to obtain an approval, allowing the sales employees to have control over underwriters, and failing to maintain an adequate quality control program

40.    As a result of these policies, Embrace endorsed government loans with material violations of government requirements. Specifically, Embrace endorsed government loans with improper overtime income being used, no two-year histories of employment for income calculations, required documents that were removed from the file, improper documents placed in the file, delinquent federal tax debt, unsourced and undocumented gift funds, unsourced and undocumented large deposits in excess of one percent of the sale price, no documentation required to exclude cosigned liabilities, no documentation to verify garnishments were paid, use of the higher of the sale and appraisal price to calculate loan value, and underwriting

decisions based solely on an AUS approval.

41.     Even with knowledge that files contained serious material violations of government loan requirements, Embrace nonetheless falsely certified to the government annually, and with the endorsement of each individual loan, that Embrace had exercised its due diligence and abided by all statutory and regulatory requirements.

42.     Embrace established a culture that valued getting a loan endorsed for government insurance over complying with the government's rules.

43.     Embrace's aim was to get loans insured by the United States and sold for a profit—even when Embrace could not truthfully certify to the government that the loan qualified for government insurance.

44.     As a result, Embrace submitted material false representations to the government that its government loans were compliant with government underwriting, origination, and quality control requirements.

45.     Therefore, the United States seeks treble damages and penalties under the False Claims Act for the insurance claims paid by the government for mortgages wrongfully approved for government insurance by Embrace.

## JURISDICTION AND VENUE

60.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

61.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

62.     This Court has personal jurisdiction over Embrace because Embrace transacts business in the Northern District of New York. *See* 31 U.S.C. § 3732(a) ("[a]ny action under

section 3730 may be brought in any judicial district in which the defendant . . . transacts business[.]").

63. In fact, Embrace has consistently transacted business in the Northern District of New York during the Relevant Time Period through its underwriting and endorsement of numerous government loans located within the district.

64. For example, Embrace has endorsed FHA loans for government insurance in Albany, New York every year on a consistent basis during the Relevant Time Period, *e.g.*, a property on October 25, 2017 for $224,867, a property on May 6, 2016 for $181,623, a property on April 20, 2015 for $98,595, a property on October 10, 2014 for $155,168, and a property on July 12, 2013 for $98,697.

65. Additionally, Embrace also has underwritten loans for governmental insurance within this district that were foreclosed upon resulting in a claim for insurance submitted to the Government.

66. For example, FHA case number 371-4848007 located at 185 Jockey Hill Road, Kingston, NY is situated in Ulster County within the Northern District of New York and was foreclosed upon in 2013.

67. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1391(b), (c)(2), 28 U.S.C. § 1395, and because Embrace transacts business within the Northern District of New York.

68. This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news

media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but upon rather information from Relator.

69.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.

70.     Relator has direct and independent knowledge of Embrace's fraudulent activities.

71.     Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

72.     Relator shall serve on the United States a copy of this Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

### *Defendants*

73.     Defendant Embrace Home Loans, Inc. is a Direct Endorsement Lender and is authorized to, and in fact does conduct business in the Northern District of New York.

74.     Defendant Embrace Home Loans, Inc. is headquartered at 25 Enterprise Center, Middletown, RI 02842.

75.     Defendant Embrace's Lender ID with the HUD FHA program is 14435.

76.     According to its website, Embrace has 54 branches throughout the United States and employs over 800 employees.

77.     Embrace has branches in Alabama, Connecticut, Delaware, Florida, Maine, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, South Carolina, Virginia, and West Virginia.

78.    Defendant Dennis Hardiman is the President, Chief Executive Officer, and Founder of Embrace.

79.    Upon information and belief, Mr. Hardiman, in concert with others, develops and manages Embrace's policies and practices regarding underwriting and origination of government loans.

80.    Defendant Kurt Noyce is currently the President of the Financial Institutional Services Division and had previously been President at Embrace for eighteen years prior.

81.    Upon information and belief, Mr. Noyce, in concert with others, developed and managed Embrace's policies and practices regarding underwriting and origination of government loans.

82.    Defendant Robert Lamy is the Director of Risk Management at Embrace.

83.    Upon information and belief, Mr. Lamy, in concert with others, developed and managed Embrace's policies and practices regarding underwriting of government loans.

84.    For example, Relator identifies instances where problematic loan files were escalated, and Mr. Lamy instructed the underwriters to approve files with material deficiencies.

*Relator*

85.    Relator is a resident of the United States.

86.    Relator worked for Embrace as an underwriter from September 2016 and was terminated on February 5, 2019.

87.    During her employment, Relator primarily worked on underwriting governmental loans, including under the FHA, VA, and USDA programs.

88.    Relator has been employed in the mortgage industry for over twenty years and, as such, has extensive knowledge of the rules and regulations applicable to FHA, VA, and USDA loans.

89.    Relator is Direct Endorsement certified underwriter through HUD and her CHUMS number is CQ96. Relator received her CHUMS number in approximately 2009.

90.    Relator is also a certified Staff Appraisal Reviewer (SAR) through the VA and her SAR number is 021867.

## FACTUAL BACKGROUND

### *Civil Statutes to Combat Mortgage Fraud*

91.    The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

92.    The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2010).

93.    The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010).

94.    The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

95.    The False Claims Act defines the term "claim" to mean, in relevant part: "any

request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

96.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

97.     Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(G).

### HUD's FHA Mortgage Insurance Program

98.     HUD is a cabinet-level agency of the United States.

99.     HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.

100.    HUD works to strengthen the housing market to bolster the economy and

protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

101.    FHA is a part of HUD and is one of the largest mortgage insurers in the world.

102.    Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 47.5 million home loans since FHA's inception.

103.    Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

104.    If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.

105.    HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default and has in fact done so repeatedly for Embrace's loans.

106.    Embrace, or whoever may purchase the loan from Embrace, therefore suffers no loss when a borrower is unable to repay a government loan – only the government suffers the loss.

107.    This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase.

108.    Government mortgage insurance programs therefore help many creditworthy

low- and moderate-income families as well as first-time homebuyers become homeowners.

109.    A lender, like Embrace, must apply to be a Government Lender and must be approved by the government to underwrite government-insured mortgage loans on the government's behalf.

110.    This is an important responsibility because the government "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a).

111.    Instead, the Government Lender underwrites mortgage loans on the government's behalf and is to truthfully certify to the government that the borrower presents an acceptable credit risk for the government.

112.    Thus, in underwriting the mortgage loan, the lender is to certify that the borrower and the mortgage loan meet the government's requirements for insurance and that the "proposed mortgage is eligible for insurance under the applicable program regulations[.]" *Id.*

113.    The Government Lender must decide whether or not to approve the borrower for a government-insured mortgage loan.

114.    After the Government Lender approves a borrower for a government-insured mortgage loan, the lender may submit the mortgage loan for government insurance (referred to as "endorsing" the loan) and as part of the submission process must also certify that the mortgage loan itself, as well as the lender's entire mortgage loan program, is fully compliant with government requirements and thus can be insured by the government insurance fund in the event that the borrower cannot repay the loan.

115.    Thus, the Government Lender must certify that the loan meets all of the government's requirements and the government relies on the DE certification to endorse the

loan for government insurance.

116.    Certain Government Lenders, such as Embrace, apply to, and participate in, the DE Program in which the mortgagees themselves endorse the mortgage for government insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6.

117.    The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to the government only upon request. *See* Mortgagee Letter 2005-36; HUD Handbook 4000.1, II.A.1.a.i; HUD Handbook 4155.2, 8.B.1.d.

118.    A Government Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with the government.

119.    "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966)).

120.    As a result, in addition to the specific regulatory duties addressed below, the Government Lender owes both a fiduciary duty and a duty of reasonable care to the government.

***HUD's Direct Endorsement Program***

121.    The success of the DE Program depends upon proper underwriting of loan files.

122.    The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of HUD programming and FHA insurance.

123.    Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

124.    Under the DE Program, HUD relies on the expertise and knowledge of the lenders.

125.    A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.

126.    The government relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for government insurance.

127.    As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

128.    Thus, the DE Lender, in exchange for the government's loan guarantee, provides underwriting mortgage services for HUD and determines whether a borrower presents an acceptable credit risk for HUD.

129.    After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.

130.    A DE Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.

131.    That responsibility includes performing due diligence and ensuring accuracy.

132. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of the government when underwriting loans for government insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims. *See* HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 1.B.8.a; 1.B.8.b; 1.B.8.c.

133. Embrace, as a Government Lender always remains responsible for the actions of its employees that participate in government transactions. *See* FHA Annual Certifications, *infra* ¶¶ 163–68; *see also* HUD Handbook 4000.1, I.A.6.i; HUD Handbook 4155.2, 9.D.6.b.

134. Embrace, like any Government Lender, certified to the government that it was responsible for the actions of its employees. *See* FHA Annual Certifications, *infra* ¶¶ 163–77.

### The FHA's Due Diligence Requirements

135. Proper due diligence is a critical component of the Direct Endorsement Program.

136. It is required by federal regulation and HUD Handbooks.

137. It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD. See 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law.").

138. "The entire scheme of government mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." *Bernstein*, 533 F.2d at 797.

139.   In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.

140.   HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

141.   As a result of this fiduciary relationship, the Direct Endorsement Lenders owe the government a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with the government.

142.   A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1; *see also* HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2, 2.A.4.b.

143.   Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.

144.   In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

145.   HUD has established specific rules for due diligence predicated on sound underwriting principles.

146.   In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed

instructions and requirements for Government Lenders and for which the government expects the Government Lender to fully comply. *See* HUD Handbook 4000.1, V.A.2.b.i(A)(1)(a); HUD Handbook 4155.2, 2.A.4.b.

147.   At various times, the government has promulgated several handbooks detailing the rules and regulations for lenders underwriting government loans.

148.   Currently, the operative handbook is the HUD Handbook 4000.1-FHA Single Family Housing Policy ("HUD Handbook 4000.1") which went into effect on approximately September 14, 2015.

149.   Prior to the implementation of HUD Handbook 4000.1, the operative handbook was the HUD Handbook 4155.1 *Mortgage Credit Analysis for Mortgage Insurance on One-to-Four Family Properties* ("HUD Handbook 4155.1") which was issued in approximately May 2009.

150.   As they say, these requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. 24 C.F.R. § 203.5(c).

151.   HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C; *see also* HUD Handbook 4000.1, I.B.3.a; HUD Handbook 4155.2, 2.A.3.a.

152.   When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing requirements, such as those set forth in the HUD Handbooks. *See* HUD Handbook 4000.1, II.A.5.a; HUD Handbook 4155.2, I.A.2.a.

153. The rules set forth in HUD Handbook 4155.1;4000.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

154. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

155. The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer's capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

156. Additionally, Direct Endorsement lenders are required to comply with the following HUD guidelines:

  a. Direct endorsement lenders may only engage in business practices that conform to generally accepted practices of prudent mortgage lenders. See FHA Title II Mortgagee Approval Handbook 4060.1, Section 2-10(D) (REV-2, August 14, 2006).

  b. Direct endorsement lenders may not engage in practices that demonstrate irresponsibility. *Id.*

    c.  Direct endorsement lenders may only pay fees for services permitted by HUD program policy. *Id.* at Section 2-22.

    d.  Direct endorsement lenders are required to function so as to protect the FHA from unacceptable risk. *Id.* at Section 7-2.

157.   The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d). Mortgagees must also employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 2.A.4.b.

158.   The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters. *See* HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii); HUD Handbook 4060.1 REV-2,1I2-9(A).

### Certifications and Endorsements for FHA Insurance

159.   HUD requires Government Lenders to certify their compliance with the fiduciary, due diligence, quality control, and reporting requirements discussed herein.

160.   Direct Endorsement Lenders are required to certify their compliance with the FHA's programmatic and individual loan rules by certifying their compliance with government requirements, as well as governmental rules and regulations during their initial application to the government, on an annual basis, and on an individual loan-by-loan basis.

### FHA Initial Certifications to HUD

161. First, Embrace as a lender applies to participate in the Government Lender program and to endorse loans for government insurance on the government's behalf, Embrace certified that it would fully comply with all governmental guidelines, regulations, and requirements:

> I [Embrace] certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

162. Unless Embrace submits a truthful initial certification to the government, Embrace would not be entitled to obtain or maintain its status as a Government Lender or to endorse loans for government insurance.

### FHA Annual Certification Requirements

163. Even once Embrace was initially certified, Embrace must re-certify, every year, that it is complying with the government's program requirements, including due diligence in underwriting, following all governmental underwriting requirements, and the implementation of a mandatory quality control plan.

164. As of 2010, Embrace was required to annually certify:

> I [Embrace] certify that I know, or am in the position to know, whether the operations of [Embrace] conform[s] to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of [Embrace]. I certify that [Embrace] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, [Embrace] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [Embrace] is fully responsible for all actions of its principals, owners,

> officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [Embrace] . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

165.   As of approximately August 1, 2016, a corporate officer of Embrace was required to annually certify:

> I certify that I . . . have known, or have been in the position to know, whether the operations of [Embrace] conformed to all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval as codified by 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by the Mortgagee Letter, and any agreements entered into between [Embrace] and HUD.

166.   Embrace also certifies that it is responsible for the actions of its employees, including managers, supervisors, originators, underwriters and processors:

> I acknowledge that [Embrace] is responsible for all actions of its officers, partners, directors, principals, managers, supervisors, loan processors, loan underwriters, loan originations, and other employees of [Embrace], and for the actions of any Affiliates participating in the FHA programs for or on behalf of [Embrace].

167.   Currently, Embrace is additionally required to certify:

> I certify that, to the best of my knowledge and after conducting a reasonable investigation, [Embrace] does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain [Embrace's] FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between [Embrace] and HUD, except for those instances of non-compliance, if any, that [Embrace] reported to HUD and for which [Embrace] received explicit clearance from HUD to continue with the certification process. Each of my certifications is true and accurate to the best of my knowledge. I understand that if I have made any false, fictitious, or fraudulent statement(s), representation(s), or certification(s) knowingly on this form, I may be subject to administrative, civil and/or criminal sanctions, including damages, penalties, fines, imprisonment, and debarment under applicable federal law. I acknowledge that [Embrace] is now, and was at all times throughout the Certification Period, subject to all applicable HUD

regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964.

168.    These annual certifications require compliance with the basic eligibility requirements for Government Lenders, which include compliance with the due diligence, quality control, and reporting requirements.

### Embrace's annual certifications to the FHA on its operations

169.    Absent a truthful annual certification, Embrace is not entitled to endorse FHA loans for government insurance.

170.    Absent the applicable certifications in the annual certification described above, Embrace cannot endorse loans for government insurance.

171.    Unless Embrace had submitted a truthful annual certification, Embrace is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

172.    The annual certification is material to the government's payment of any claim submitted under the Government Lender Programs.

173.    The government does not generally review lenders' operations; instead, it relies on lenders such as Embrace to comply with the government's operational requirements and to ensure that the operational requirements are met.

174.    The certifications are required for Embrace to enter and remain in the Government Programs.

175.    Embrace's certifications are critical to the government's ability to ensure that only qualified and eligible loans are endorsed for government insurance.

176. Embrace's certifications are essential for a claim on a loan to be submitted for government insurance.

177. And Embrace's certifications are needed to protect the government insurance fund from undue risk and loss.

### FHA Individual Loan Certifications

178. Embrace must also submit a certification to the government for each loan for which it endorses for government insurance ("loan-level certifications").

179. This is a certification to HUD that the individual loan complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD 92900-A.

180. This loan-level certification can occur in two ways.

181. One, Embrace may use a government-approved automated underwriting system to review loan applications.

182. An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."

183. Numerous requirements promulgated by the government explain how Embrace must calculate each data point and what documentation it needs to support each data point.

184. For each loan that was underwritten with an AUS, Embrace must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *See* FHA TOTAL Mortgage Scorecard User Guide; HUD Handbook 4000.1 II.A.4.a.iii(A)(1); HUD Handbook 4155.2 2.A.3.d.

185.    Embrace must further certify that "there was no defect in connection with the approval of this mortgage such that the result reached in TOTAL should not have been relied upon and the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900-A.

186.    The automated underwriting system processes information entered by Embrace and rates loans as either "accept/approve" or a "refer/caution."

187.    Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide.

188.    It is Embrace's responsibility to ensure the integrity of the data relied upon by TOTAL. *See* Mortgagee Letter 2004-1. In cases where Embrace used a government-approved automated underwriting system, and the system rates a loan as an "accept" or "approve," Embrace made the following certification:

> This mortgage was rated as an "accept" or "approve" by FHA's Total Mortgage Scorecard. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

189.    However, in cases where Embrace uses a government-approved automated underwriting system, and the system rates a loan as "refer" or "caution," or when Embrace does not use a government-approved automated underwriting system, Embrace must make the following certification, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by FHA's Total Mortgage Scorecard, and/or was manually underwritten by a Direct

Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

190.    The certifications in HUD Handbook 4000.4, incorporated by reference in the certifications above, include Embrace's certification that the mortgage complies with the government's underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters.

191.    Specifically, Embrace certified that:

    i.    The proposed mortgage meets the income and credit requirements of the governing law in the lender's judgment.

    ii.    Embrace used due diligence in underwriting the mortgage.

    iii.    That the statements made in its application for insurance are true and correct.

    iv.    Embrace's statements made in the Lender's Certificate as part of the Direct Endorsement Approval for a HUD/FHA Insured Mortgage are true and correct.

    v.    Embrace's underwriter makes all certifications required by Direct Endorsement Handbook, which include:

        1.    The mortgagor's monthly mortgage payments will not be in excess of his or her reasonable ability to pay. 24 C.F.R. § 203.21.

        2.    The mortgagor's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance. 24 C.F.R. § 203.33.

        3.    The mortgagor's general credit standing is satisfactory. 24 C.F.R. § 203.34.

**_The VA's Home Loan Guaranty Program_**

192.    Pursuant to the Servicemen's Readjustment Act of 1944, the VA offers mortgage assistance through the VA Program.

193.    Like FHA loans, VA-guaranteed loans are made by private lenders, such as banks and mortgage companies.

194.    To obtain a VA loan, a veteran must apply to a Government Lender.

195.    If the loan is approved, the VA will guarantee a portion of the loan, which protects the VA Lender against loss up to the amount guaranteed. The maximum amount that the VA guarantees is 50% of the loan.

196.    By partially guaranteeing loans against default, the VA loan guarantee encourages lenders to make loans to veterans, and makes the resulting loans valuable on the secondary market.

197.    Many VA Lenders, including Embrace, are authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for the VA, and approve loans for the VA guarantee without prior review or approval by the VA.

198.    To qualify for the VA guarantee, a mortgage must meet all of the applicable VA underwriting requirements.

199.    Much like the HUD underwriting requirements, the VA underwriting requirements relate to such things as the borrower's income and assets, the borrower's credit history, and the valuation of the subject property.

200.    In underwriting loans and evaluating whether to approve loans for the VA guarantee, VA Lenders are required to follow the VA's applicable underwriting guidelines. *See* VA Lenders' Handbook, VA Pamphlet 26-7 at Ch. 4, *see also* 38 C.F.R. § 36.4340.

201.    The VA's underwriting guidelines contain rules that must be followed to ensure

that each borrower's "present and anticipated income and expenses, and credit history[,] are satisfactory" such that the borrower "is a satisfactory credit risk." 38 C.F.R. § 36.4340.

202. Further, for a loan to be entitled to coverage under the VA program, the VA requires that all loans be underwritten by an underwriter with a SAR number, signifying that she is a VA-approved underwriter in the VA program.

203. Under the VA regulations, a SAR underwriter must have at least three years in process, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, §4.a.

204. Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. *Id*.

### VA Loan Certifications

205. The VA relies on Government Lenders to conduct due diligence on loans before approving them for the VA guarantee. *See id. §* 36.4340(j).

206. To satisfy this due diligence requirement, VA Lenders must, among other things, develop all credit information; obtain all required verifications and a credit report; ensure the accuracy of all information on which the loan decision is based; and comply with all of the applicable VA underwriting guidelines. *Id.; see* VA Pamphlet 26-7 at 4-3; VA Form 26-1820.

207. To initially participate in the VA Program, each VA lender is required to certify compliance with the VA regulations for underwriting VA loans by submitting VA Form 26-8736.

208. VA Form 26-8736 is an application for a lender to underwrite VA loans on an

automatic non-supervised basis.

209. As part of the express certifications made in this form, each VA lender agreed and certified that it would, amongst other things, that it would comply with Title 38 of the United States Code, VA regulations and other directives issued by the VA; it would notify the VA of any change in its corporate structure, operations, or financial condition which would have a bearing on its qualifications to automatically underwrite loans; that it will not close loans on an automatic basis as a courtesy or accommodation for other mortgage lenders regardless of whether or not such lenders are approved themselves to close on an automatic basis, nor will it close loans on the automatic basis for any builder, real estate brokerage firm or other entity which it owns, is owned by, is affiliated with or has a financial interest in, without the express approval of the Department of Veterans Affairs; that it will not process loans that it does not itself intend to make; that all prospective VA loans to be closed on an automatic basis will be reviewed and either approved or rejected by an approved underwriter; and that the lender will take responsibility for all credit information; i.e., credit report, verifications of employment and deposit, and disclose the sources of such information.

210. VA Form 26-8736 must be signed by the president or principal officer for each VA lender.

211. Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must certify that it conducted due diligence to ensure that the mortgage complies with the applicable VA underwriting rules. *See* 38 C.F.R. § 36.4340(k).

212. Pursuant to VA regulations, each loan approved for the VA guarantee or refinancing incorporates the following certification:

> The undersigned lender certifies that the (loan) (assumption) application, all
> verifications of employment, deposit, and other income and credit verification

documents have been processed in compliance with 38 CFR part 36; that all credit reports obtained or generated in connection with the processing of this borrower's (loan) (assumption) application have been provided to VA; that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

*Id.* at § 36.4340(k)(2)(i).

213.   Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must execute VA Form 26-1820, pursuant to which it further certifies, among other things, that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code, and the Regulations concerning guaranty or insurance of loans to veterans."

### The USDA's Rural Development Home Loan Guaranty Program

214.   Pursuant to Section 502(h) of the Housing Act of 1949, as amended, the United States Department of Agriculture Rural Development ("USDA") offers mortgage assistance through the Single Family Housing Guaranteed Loan Program ("SFHGLP").

215.   Through this program, the USDA facilitates government insured mortgage loans for "low or moderate income families or persons, whose incomes do not exceed 115 percent of the median income of the area, as determined by the Secretary." See 42 U.S.C. § 1472(h)(3).

216.   Like FHA and VA loans, USDA-guaranteed loans are made by private lenders, such as banks and mortgage companies, who are approved by the government after meeting the requisite qualifications. *See* 42 U.S.C. § 1472(6).

217.   To obtain a USDA loan, a borrower must apply to an approved USDA lender. Then, if the loan is approved, the USDA will guarantee "an amount equal to 90 percent of the loan." *See* 42 U.S.C. 1472(h)(2).

218.   By guaranteeing 90 percent of the loan value, the USDA loan guarantee

encourages eligible lenders to make loans to low to moderate income borrowers in rural areas who might otherwise not qualify for a conventional loan.

219.    Lenders, like Embrace, approved by the USDA for the SFHGLP program are authorized to underwrite mortgage loans, determine whether a borrower qualifies for a USDA sponsored loan, and endorse loans for the USDA loan guarantee.

220.    Like with HUD and the VA, the USDA considers private lenders "key to the success of the SFHGLP" as they are "ultimately responsible for ensuring that all program requirements are met, and that the underwriting procedures for the loans are followed." *See* SFH Guaranteed Loan Program Technical Handbook, HB-1-3555, 1.5.

**USDA's Due Diligence Requirements**

221.    In underwriting loans and evaluating whether to endorse loans for the USDA guarantee, USDA approved lenders are required to follow the applicable USDA underwriting guidelines.

222.    These guidelines are set forth in the SFH Guaranteed Loan Program Technical Handbook, HB-1-3555 ("HB-1-3555") and incorporated into federal regulations at 7 C.F.R. § 3555.

223.    The USDA's underwriting guidelines contain rules that must be followed in order to, among other things, "[e]nsure that applicant income limits are not exceeded" and "[e]nsure that borrowers have adequate loan repayment ability and acceptable credit histories[.]" *See* 7 C.F.R. § 3555.51(b)(5), (6).

224.    The USDA relies on the lenders to conduct due diligence on prospective loans prior to endorsing them for the USDA guarantee and conditions a lender's approval status on compliance with the due diligence requirements. *See* 7 C.F.R. § 3555.51.

225.    USDA approved lenders must, among other things, verify income, develop an applicant's credit history, obtain required credit verifications from a credit report, calculate debt obligations, ensure the overall accuracy of documentation on which a decision is based, and comply with all of the USDA promulgated loan guidelines. *See, e.g.*, HB-1-3555, chs. 9–11; 7 C.F.R. § 3555.51(b)(1), (3) (compliance with all Agency regulations), 3555.151(h) (repayment ability, debt, and credit verification), 3555.152 (calculation of income and assets).

### *USDA Loan Certifications*

226.    In order to be an approved lender by the USDA Rural Development, a lender must provide documentation listed in the Lender Approval Checklist in an application to submit to the USDA. *See* HB-1-3555, ch. 3, Attachment 3-A (Lender Approval Checklist).

227.    As indicated on the Lender Approval Checklist, a lender must first execute a lender agreement with USDA (Form RD 3555-16). This form, among other things, requires the lender to agree to underwrite USDA loans "in accordance with Agency's regulations and guidelines[.]" *See* Form RD 3555-16, subsection C(2). The Lender Approval Checklist also requires the lender to certify that the information provided in accompanied documents are truthful.

228.    After the government approves the lender based on the initial criteria, the USDA will issue an approval notice to the lender conditioned upon "the lender and all origination and underwriting staff involved with the SFHGLP completing mandatory training." *See* 7 C.F.R. § 3555.52(b); HB-1-3555, 3.4(A).

229.    Once the lender is finally approved, it may begin participating in the USDA SFHGLP program but, importantly, it "must adhere to SFHGLP guidelines as outlined in Paragraph 4.8 of Chapter 4 of [HB-1-3555]." HB-1-3555, 3.6. Paragraph 4.8 of the Handbook

requires that a lender "follow all SFHGLP guidelines" including eligibility, underwriting, servicing, and monitoring requirements. HB-1-3555, 4.8.

230.   Certification of compliance with USDA regulatory and statutory requirements are also made at the individual loan level.

231.   When an approved lender closes a borrower's loan for approval, the lender submits a loan for government insurance using the Request for Single Family Housing Loan Guarantee (Form RD 3555-21).

232.   "Form RD 3555-21 summarizes the details of the loan to be guaranteed and requires the lender to certify that all eligibility requirements have been met." *See* HB-1-3555, 15.3.

233.   Specifically, a lender must certify that:

In order to induce the Agency to issue the requested guarantee, we certify that we have originated the loan in compliance with all Agency loan requirements. This form contains or is supplemented with all information required by 7 CFR § 3555.107(e) and further clarified in Chapter 15 of HB-1-3555 of 7 CFR 3555.

234.   As such, USDA insurance on a property is predicated on an approved lender's certification that each individual endorsed loan is in compliance with the appropriate loan guidelines in 7 C.F.R. § 3555 and HB-1-3555.

**Embrace's certifications to the Government Programs on individual loans**

235.   Absent a truthful loan application certification, Embrace is not entitled to endorse a particular loan for government insurance.

236.   Absent the applicable certifications for an individual loan as described above, Embrace cannot endorse that loan for government insurance.

237.   Unless Embrace had submitted a truthful loan-level certification, Embrace is not entitled to receive the government's financial backing of that mortgage, including the pledge

of the government's full faith and credit for backing such mortgages.

238.    Each of the foregoing certifications is material to the government's payment of any claim submitted under the Government Lender Programs.

239.    The government does not review government loans for approval prior to the loan being endorsed for insurance; instead, it relies on lenders such as Embrace to comply with the government's requirements and to ensure that every loan is in fact eligible for government insurance.

240.    The certifications are required for Embrace to enter and remain in the Government Programs.

241.    Embrace's certifications are critical to the government's ability to ensure that only qualified and eligible loans are endorsed for government insurance.

242.    Embrace's certifications are essential for a claim on a loan to be submitted for government insurance.

243.    And Embrace's certifications are needed to protect the government insurance fund from undue risk and loss.

*Defaulted loans result in losses to the government*

244.    Once a loan is endorsed by Embrace, it is insured by the government on the basis that that the Government Lender has followed the government requirements and has submitted accurate certifications and that the loan is eligible for government insurance.

245.    Additionally, Embrace's annual certifications ensure that Embrace has met all of the government's requirements on both a programmatic and individual loan basis.

246.    Without those requirements being met, any loan submitted by Embrace is not eligible for government insurance.

247.    It is only because a Government Lender endorses a loan for government insurance that the holder of the mortgage is able to submit a claim to the government for any losses.

248.    If the borrower defaults, the holder of the mortgage can submit a claim to the government for any loss from the default.

249.    The holder of an FHA loan submits a claim for insurance by using HUD's electronic claim system.

250.    The claim must include certain information.

251.    Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number.

252.    If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

253.    The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

254.    FHA pays these insurance claims in two parts.

255.    First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.

256.    Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

257.    These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically.

258.    The system ensures that the FHA insurance is active with respect to the FHA

case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.

259.    After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

260.    The holder of a VA loan submits a claim for insurance electronically to the VA through the Servicer Web Portal of the VA Loan Electronic Reporting Interface (VALERI). *See* VA Manual 26-3, ch. 14.

261.    Once the claim through VALERI is reviewed and calculated, the loan servicer receives the insurance claim payment form the government. *See id.*

262.    The holder of a USDA loan submits a claim for insurance request through the USDA Customer Service Center in St. Louis, Missouri or made electronically through USDA's Guaranteed Loan System (GLS). *See* HB-1-3555, 20.3.

263.    Within 60 days of approval of the USDA loss claim, payments are issued to the loan holder by the USDA's finance office. *See id.* at 20.5.

264.    The damages sustained by the United States as a result claims on the government resulting from Embrace's conduct takes several forms.

265.    First, the United States sustains losses in the form of "net losses" whereby the amount of proceeds received by the government from reselling the foreclosed properties, or from bundling the loans for sale to an investor, is deducted from the loan or claim amount.

266.    Additionally, any costs associated with foreclosure, resale, or sale of the note, such as marketing expenses, real estate taxes, and maintenance costs, are added to the claim amount.

267.    In other words, the loss to the government on the loans is adjusted for any proceeds received by the government from the sale of the foreclosed property, and for any costs associated with the disposition of the property.

268.    Thus, for each loan underwritten, the government extended its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

269.    In addition, the taxpayer has been required to fund the insurance premiums for the FHA program.

270.    Further, the government incurs significant administrative costs in running the FHA, VA, and USDA loan programs and accepting endorsed loans by Embrace.

271.    In addition, the government paid claims on any loan that defaulted.

## EMBRACE'S NATIONAL SCHEME TO DEFRAUD THE GOVERNMENT PROGRAMS THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE LOANS FOR GOVERNMENT INSURANCE

272.    As described below, Embrace knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with the government's underwriting requirements, and thus were not eligible for government mortgage insurance.

273.    From at least 2013 to the present, Embrace engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to the government that these loans were eligible for government insurance.

274.    Embrace focused on maximizing these profit-making schemes across all locations in the company.

275.    In addition, Embrace established national underwriting policies and practices.

276.    The policies described in this complaint reflect Embrace's nationwide loan and

underwriting polices which are used interchangeably at all its locations.

277.    For example, Relator is aware that Embrace's national underwriting policies and interpretations were established by individuals such as Bob Lamy, Director of Risk Management at Embrace and Sara Davis, Vice President of Underwriting.

278.    Additionally, Relator is aware that emails discussing Embrace's underwriting policies and practices were communicated to its underwriting staff throughout the United States.

279.    From at least 2013 to the present, Embrace has engaged in a regular policy and practice of reckless origination and underwriting of its government loans and falsely certifying to the government that those loans were eligible for government insurance.

280.    Furthermore, Embrace was aware of certain underwriting processes that deliberately ignored and recklessly disregarded government requirements that would result in Embrace endorsing materially deficient loans for government mortgage insurance.

281.    For example, within the first six months of Relator being employed at Embrace she remembers conditionally approving an FHA loan and asked her manager, Milena MacColl, to review it. Ms. MacColl relayed back to Relator that Mr. Lamy said the file should be approved even though it did not meet the FHA requirements.

282.    As such, Embrace pushed for increased loan volume that came at the expense of loan quality.

283.    But Embrace's management failed to take effective action to address the seriously deficient loan originations and underwriting that it knew was occurring.

284.    The underlying causes of Embrace's very serious loan quality problems and reckless underwriting are multifold, several of which are detailed in this Complaint.

285.    In this case, Embrace instituted a series of policies that replaced its fiduciary obligation with one that maximized its profits and sales.

286.    Embrace's interest was underwriting as many government loans as possible, secure in the knowledge that if it was not caught, the government would pay for any defaulted loans.

287.    The proximate and natural result of Embrace's process was to endorse loans that defaulted at a significantly higher rate than comparable mortgagees, which was borne out by its statistics.

288.    Embrace's policies caused it to endorse loans that defaulted at a higher rate than comparable mortgagees.

289.    Embrace's government insured loans were so problematic that over the past two years, FHA loans from Embrace have resulted in claims, or have seriously delinquent payments (payments over 90 days due which often signal a likely complete default on the loan) that have exceeded the national average for other government loan lenders at a significantly higher rate.

290.    HUD's Neighborhood Watch database provides data information for tracking the performance of loans originated, underwritten, and serviced by FHA-approved lending institutions.

291.    The system is designed to provide information about the performance of loans that are originated, underwritten and serviced by FHA-approved lending institutions by highlighting instances of high defaults and claims among lending institutions by geographic area, loan characteristic, and other factors.

292.    Embrace was one of the worst performing lenders according to Neighborhood Watch during the time that Relator worked there.

293. Embrace was in the top 25th percentile of worst performing FHA lenders in terms of percentage of seriously delinquent loans and claims over the past two-year history according to Neighborhood Watch data.

294. For example, according to HUD Neighborhood Watch data for the two-year time period between January 1, 2017 to December 31, 2018, Embrace's compare ratio was 127%, which is "the value that reveals the largest discrepancies between the [Embrace's] seriously delinquent and claim percentage and the serious delinquent and claim percentage to which it is being compared."

295. Therefore, Embrace's reckless and fraudulent underwriting practices is illustrated by its ranking among the top quarter of worst performing lenders in the entire DE program.

***Embrace knowingly violated specific HUD requirements governing the origination and underwriting of FHA insured mortgage loans***

296. Embrace's knowingly improper FHA mortgage origination and underwriting violated numerous specific rules and requirements published by HUD.

297. Specifically, Embrace violated requirements contained or referenced in one or more of the following documents, which set forth the minimum standards for originating and underwriting FHA insured mortgages and with which HUD regulations required Embrace to comply, *see* 24 C.F.R. §§ 203.5(c), (d), (e); 203.255(b)(5):

a. HUD Handbook 4155.1 Revision 5 ("REV-5"), Mortgage Credit Analysis for Mortgage Insurance, dated October 2003 and Mortgagee Letters amending and clarifying the same;

b. HUD Handbook 4155.1, Mortgage Credit Analysis for Mortgage Insurance, issued May 2009 and Mortgagee Letters amending and clarifying the same; and

c. FHA Total Mortgage Scorecard User Guide dated December 2004;

d. HUD Handbook 4000.1-FHA Single Family Housing Policy

e. HUD Handbook 4000.4 REV-1, Change 2, Single Family Direct Endorsement Program, issued July 1994 and Mortgagee Letters amending and clarifying the same;

f. HUD Handbook 4060.1 REV-2, FHA Title II Mortgage Approval Handbook, issued August 2006 and Mortgagee Letters amending and clarifying the same;

g. HUD Handbook 4000.2 REV-3, FHA Mortgagees' Handbook Application Through Insurance, issued May 2004 and Mortgagee Letters amending and clarifying the same;

h. HUD Handbook 4155.2, Lender's Guide to Single Family Mortgage Insurance Processing, issued May 2009 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letter 2009-28);

i. HUD Handbook 4165.1 REV-2, Endorsement for Insurance for Home Mortgage Programs (Single Family), issued April 2005 and Mortgagee Letters amending and clarifying the same;

j. HUD Handbook 4150.1 REV-1, Valuation Analysis for Home Mortgage Insurance, issued February 1990 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letters 1994-54 and 1996-26); and

k. HUD Handbook 4150.2 Change 1, Valuation Analysis for Single Family One- to Four-Unit Dwellings, issued July 1999 and Mortgagee Letters amending and clarifying the same.

298.    Compliance with these Handbooks, Mortgage Letters, and other documents (such as the TOTAL User Guides), is expressly incorporated into the Code of Federal Regulations and these documents have the force of law. *See* 24 C.F.R. § 203.5(c).

299.    Embrace's violations of these authorities as to specific loans rendered Embrace's certifications on the loans' HUD Forms 92900-A false. HUD Form 92900-A, HUD/VA Addendum to uniform Residential Loan Applications, dated 2005 and revisions of the same. *See, e.g.*, 24 C.F.R. § 203.255(b)(5).

300.    These falsities knowingly made by Embrace were material to and rendered false the ultimate submission of mortgage insurance claims on the loans, including because the claims were made on mortgage insurance that was fraudulently induced because such claims

contained misleading half-truths. Specifically:

    a.  By certifying a loan's compliance with the above authorities at the time of endorsement (when the loan did not so comply), Embrace falsely and fraudulently induced HUD to insure the loan (rendering any insurance claim for payment on that loan false).

    b.  Likewise, by falsely certifying Embrace's compliance with the above authorities to underwrite FHA loans in accordance with these regulations, when Embrace knew it had no intention of complying with these regulations, Embrace fraudulently induced the Government into insuring every FHA loan underwritten by Embrace.

    c.  Further, a claim presented by Embrace on HUD Form 27011 or its electronic counterpart, for a loan that Embrace falsely endorsed for FHA mortgage insurance gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Embrace's fraud or misrepresentation in originating the loan. As such, the failure to disclose such non-compliance renders the claim for insurance payment a misleading half-truth.

    d.  Lastly, a claim presented by a subsequent holder of a loan on HUD Form 27011 or its electronic counterpart that Embrace falsely endorsed for FHA mortgage insurance gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities because Embrace failed to disclose that the loan did not qualify for FHA insurance.

*Embrace knowingly violated specific VA requirements governing the origination and underwriting of VA insured mortgage loans*

301.    Embrace's knowingly improper origination and underwriting of VA mortgage loans violated specific rules and requirements published by VA.

302.    Specifically, as one example, Embrace violated requirements contained or referenced in one or more of the following documents, which set forth the standards for originating and underwriting VA insured mortgages and with which Embrace certified that each loan met all statutory and regulatory requirements. *See, e.g.* 38 U.S.C. § 36.4340(j), (k); VA

Form 26-1820.

      a.  Applicable provisions of 38 U.S.C. § 36

      b.  VA Manual 26-1

      c.  VA Manual 26-2

      d.  VA Manual 26-3

      e.  VA Manual 26-4

      f.  VA Manual 26-9

      g.  VA Pamphlet 26-7

303.    Mandatory compliance with all VA statutory and regulatory requirements in the origination and underwriting of VA loans is expressly codified at 38 U.S.C. § 36.4340(k).

304.    Embrace's violations of the above authority rendered each of Embrace's loan-level certifications on VA Form 26-1820 false.

305.    These falsities were material to and rendered false the ultimate submission of mortgage insurance claims on the VA loans, including because the claims were made on mortgage insurance that was fraudulently induced because such claims contained misleading half-truths.

306.    Additionally, by falsely certifying a loan's compliance with the above authorities at the time of endorsement, *see* 38 U.S.C. § 36.4340(k)(2)(i), (when the loan did not so comply), Embrace falsely and fraudulently induced the VA to insure the loan (rendering any subsequent insurance claim for payment on that loan false).

307.    Likewise, by falsely certifying Embrace's compliance with all VA regulations and applicable provisions of title 38 of the U.S. Code, when Embrace knew it had no intention of complying with these regulations, Embrace fraudulently induced the Government into insuring

every VA loan underwritten by Embrace.

*Embrace knowingly violated specific USDA requirements governing the origination and underwriting of USDA Rural Development insured mortgage loans*

308.    Embrace's knowingly improper origination and underwriting of USDA Rural Development mortgage loans violated specific rules and requirements published by USDA made applicable to the Single Family Housing Guaranteed Loan Program (SFHGLP).

309.    Specifically, Embrace violated requirements contained or referenced in the SFH Guaranteed Loan Program Technical Handbook (HB-1-3555) codified with the full force of law at 7 C.F.R. § 3555, which sets forth the standards for originating and underwriting USDA SFHGLP mortgages.

310.    Mandatory compliance with USDA agency regulations in the origination and underwriting of USDA SFHGLP loans is expressly codified at 7 C.F.R. § 3555.51(b)(1), (3).

311.    Embrace's violations of the above USDA authority rendered each of Embrace's specific loan-level certification on Form RD 3555-21 false.

312.    These falsities were material to and rendered false the ultimate submission of mortgage insurance claims on the SFHGLP loans, including because the claims were made on mortgage insurance that was fraudulently induced because such claims contained misleading half-truths.

313.    Additionally, by falsely certifying a loan's compliance with the above authorities at the time of endorsement (when the loan did not so comply), Embrace falsely and fraudulently induced USDA to insure the loan (rendering any subsequent insurance claim for payment on that loan false).

314.    Likewise, by falsely certifying Embrace's compliance with "all Agency regulations and handbooks" and to underwrite the loans in accordance with these regulations, when

Embrace had no intention of complying with these regulations, Embrace fraudulently induced the Government into insuring every USDA loan underwritten by Embrace.

***Embrace falsely represented to the government that it was not pressuring employees to endorse bad loans***

315.    Proper due diligence is a critical component of the Direct Endorsement Program. *See* 4000.1.II.A.5.d.i; HUD Handbook 4155.2 2.A.4.b.

316.    This due diligence is required by both the federal regulations and the government handbooks.

317.    Embrace, however, as part of its scheme to profit off the government insured mortgage programs, knowingly pressured employees to endorse loans that were not underwritten with the required due diligence, but then repeatedly certified to the government that it was conducting due diligence.

318.    Put simply, Embrace is required to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c).

319.    Contrary to these requirements, Embrace improperly pressured employees through a series of policies and practices.

320.    Embrace's policies and practices included:

    a.    Constant escalation of loan files to management where underwriters would not sign off on conditions that violated the government requirements;

    b.    Pressure to approve loan files with conditions in order to meet guaranteed closings where Embrace would have to pay the borrower if the loan did not close;

    c.    Subsequent pressure to remove the conditions after a file had been conditionally approved;

    d.    Never allowing underwriters to decline files, even when the loan files violated government requirements;

    e.  Monthly rankings of underwriters based on volume of purchase loans, refinance loans, special products loans, clear to close files, and customer service scores as judged by the loan officers;

    f.  Instructing underwriters to "move forward" and "run with it" when they obtained an approve/eligible rating on an AUS run;

    g.  Instructing underwriters to "don't ask questions" and turn a blind eye to red flags in loan files or letters of explanations that violate government loan requirements; and

    h.  Management granting improper exceptions to push files forward.

321.    Embrace knew that these policies and practices did not allow for the proper underwriting of all governmental loan applications, but instead pressured for the approval of unqualified files to meet those requirements.

322.    Embrace knew that these pressure tactics would, and did in fact, encourage employees performing underwriting functions to approve government loan applications in which the borrower's qualifications did not conform to the governmental requirements, but would still receive government insurance.

323.    Relator witnessed, usually first-hand, Embrace improperly pressure employees to approve loans starting at the beginning of her employment with Embrace and continuing throughout the duration of her employment on a frequent basis.

324.    Embrace knew, or should have known, that its pressure tactics were improper for a Direct Endorsement lender and directly conflicted with the duty of care and due diligence Embrace certified it would comply with in its annual and loan level certifications to the government.

325.    Embrace's representations to the government that it was not engaging in such conduct are false.

326.    Additionally, Embrace fraudulently induced HUD, the VA, and the USDA to insure mortgage loans by falsely certifying it would exercise due diligence in the underwriting process, even though it no intention of doing so given Embrace's improper pressure tactics.

327.    As such, Embrace submitted materially false claims to the government.

**Embrace's "do not decline" directive resulted in Embrace falsely representing to the government that its loans were in conformance with HUD, FHA, VA, and USDA requirements**

328.    Embrace management instituted a directive that underwriters were not to decline a government loan, even when the loan did not meet the government's underwriting requirements.

329.    This is in blatant conflict with the CFR and the Government Programs' directives to underwrite loans in full compliance with the regulatory and statutory guidelines "deemed to be the minimum standard of due diligence in underwriting mortgages." 24 C.F.R. § 203.5(c). *See also* 38 C.F.R. § 36.4340(k) (VA directive); 7 C.F.R. § 3555.51(b)(1), (3) (USDA directive).

330.    In fact, the 4000.1 guidelines even list numerous scenarios where an underwriter must affirmatively deny a loan to an ineligible FHA borrower. *See, e.g.* 4000.1.II.A.1.ii(12) ("Borrowers with delinquent Federal Tax Debt are ineligible."); 4000.1.II.A.1.b.ii(3)(b) (credit scores below 500 ineligible); 4000.1.II.A.1.b.ii(10) ("Mortgagees are prohibited from processing an application for an FHA-insured Mortgage for Borrowers with delinquent federal non-tax debt[.]"); 4000.1.II.A.1.b.ii(11) (previous delinquency on an FHA-insured mortgage ineligible).

331.    Shortly upon starting at Embrace, Relator was told by Embrace that underwriters were not allowed to decline a loan file.

332.    Even if a government loan did not meet the applicable government requirements,

Embrace instructed underwriters to "find a way" to approve the file rather than flat out deny the file.

333.    Thus, through Embrace's no decline directive, Embrace encouraged underwriters and mortgage origination staff to "make it work" and "be creative" in order to obtain an approval so the government loan could be submitted for insurance.

334.    When underwriters would not find a creative way to get a government file approved, Embrace's sales force would "escalate" the government loan application above the assigned underwriter, which would often result in management overriding the governmental requirements in order to push a government loan file through for insurance.

335.    As a result of Embrace's "do not decline" policy, numerous government loans were submitted for insurance when they otherwise were ineligible for government insurance as a result of material violations of government regulations.

***Embrace's policy of requiring approved or conditionally approved files to always be approved, even when it became clear that a file did not meet government requirements, resulted in Embrace falsely representing to the government that its loans were in conformance with HUD, FHA, VA, and USDA requirements***

336.    Embrace had another directive that even if an underwriter approved or conditionally approved a government loan file later found to have material violations of government requirements, Embrace forbade underwriters from reversing the decision to approve the loan.

337.    This policy was universally implemented by Embrace.

338.    To make matters worse, Embrace's "guaranteed on-time close" policy requires Embrace to pay the borrower an amount of money if the closing deadline is not met. Per Embrace's website, "[i]f for any reason your Conventional, VA, or FHA loan doesn't close on time and it's our fault, we'll pay you $2,500."

339.    Embrace's policy allowed loan officers to choose a closing deadline for a file.

340.    With a guaranteed closing deadline set, this placed pressure on the underwriters to do whatever was necessary to approve the loan file before the guaranteed close deadline to prevent Embrace from paying cash to a customer.

341.    As a result, underwriters were pressured to "approve" a government loan file so that the file could meet the arbitrary loan closing deadline set by the loan officer. Moreover, Embrace's policy resulted in underwriters "approving" a government loan file with numerous conditions in order to meet the deadline. Since the "guaranteed close" policy worked in tandem with Embrace's policy not to overturn an approval, Embrace knowingly submitted loans for government insurance with material violations of government requirements.

342.    In addition to Embrace's policies to approve loans and refuse declines, Embrace management had another policy referred to as "owning" the file. Through this, Embrace management would push conditionally approved loans out the door for government insurance even when the loan files had material violations and were in the originally assigned underwriter's CHUMS number.

343.    With this practice, Embrace management would frequently sign off on conditions an underwriter would not remove and the file would be submitted for government insurance with the assigned underwriter's CHUMS number on it despite Embrace knowingly the file contained material deficiencies.

344.    As a result, files with material violations were nonetheless submitted for government insurance by Embrace bearing Relator's CHUMS number even though she was not the one to approve the file.

***Embrace falsely represented to the government that it properly documented loan files in conformance with government requirements***

345. The HUD guidelines are clear that a lender must properly and accurately document everything in the loan file required by government regulations.

346. In fact, the very first page of HUD requirements for originating and processing FHA loans states that "[t]he Mortgagee must maintain all information and documentation that is relevant to its approval decision in the mortgage file. All information and documentation that is required in this *SF Handbook*, and any incidental information or documentation related to those requirements, is relevant to the Mortgagee's approval decision." 4000.1.II.A.1.a.i.

347. Additionally, "after obtaining all documentation required . . . [if] the Mortgagee has reason to believe it needs additional support of the approval decision, the Mortgagee must obtain additional explanation and documentation, consistent with information in the mortgage file to clarify or supplement the information and documentation submitted by the Borrower." *Id.*

348. Embrace knowingly removed documentation that would disqualify a loan for government insurance and also knowingly placed improper documentation in files in order to approve a loan for government insurance when the file would otherwise be ineligible for government insurance.

349. Embrace utilized a "Miscellaneous" file that would house documents that, for all practical purposes, had disappeared from the loan file. This practice effectively hid problematic documentation from the loan file so that it could be approved.

350. Embrace would instruct underwriters, or underwriters' management, to move documents received that would otherwise make a government loan ineligible for insurance into the miscellaneous folder so that the loan file could be approved.

351. On other occasions, Embrace would completely delete problematic documents

from the loan file without even moving them to the miscellaneous file.

352.    Similarly, there was another practice at Embrace where loan officers would change documents, obtain fraudulent letters of explanations, or coach borrowers in what to say in a letter of explanation to get the file approved or clear a condition.

353.    This policy is problematic since the loan officer has a direct role in the creation of a letter of explanation even though they have an interest in the transaction closing. *See* 4000.1.II.A.1.a.i(A)(2) (lenders "must not accept or use documents relating to employment, income, assets, or credit of Borrowers that have been handled by, or transmitted from [parties with an interest in the transaction].").

354.    Embrace had a broad policy where it would use letters of explanation to cure any defect in the loan file, which also directly conflicts with its obligations of due diligence under the government requirements.

355.    This policy essentially told underwriters to ignore their due diligence requirements when given a letter of explanation was given for a particular issue in a loan file and to move forward to closing.

356.    As a result, Embrace excepted numerous letters of explanations in lieu of appropriate documentation.

357.    In addition to this practice, Embrace had a "don't ask questions" policy it directed to underwriters when given loan documentation that posed red flags.

358.    Thus, instead of exercising the required due diligence and documenting all information relevant to make an underwriting determination, Embrace pushed the boundaries by removing, adding, and supplementing loan files with letters of explanations in order to get around documenting information required to approve government loan files.

359.   As a result of these practices, Embrace approved numerous government loan files with material violations of government underwriting requirements.

***Embrace falsely represented to the government that it was not manipulating variables in the AUS/TOTAL system in order to endorse FHA loans for unqualified borrowers***

360.   As described in ¶¶ 182–89 *supra*, the government has a credit-rating algorithm maintained by the FHA known as TOTAL Mortgage Scorecard—that works in conjunction with Embrace's automated underwriting system ("AUS")—to obtain "accept/approve" ratings for its FHA loans.

361.   The "TOTAL Mortgage Scorecard evaluates the overall credit risk posed by the Borrower, based on a number of credit variables, when combined with the functionalities of an AUS." 4000.1.II.A.4.a.iii.

362.   TOTAL rates loans as either "accept/approve" or "refer" based on data points that Embrace enters into the AUS including, for example, the dollar value of the borrowers' income and assets.

363.   Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating.

364.   If an underwriter obtains a "refer," then "[t]he underwriter must manually underwrite [the] mortgage application[.]" 4000.1.II.A.4.a.iv(C).

365.   Additionally, because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for AUS approval and must be manually underwritten.

366.   "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve." FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.

367.    While a lender is not required to have a DE underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval.

368.    Importantly, "[t]he Mortgagee must verify the integrity of all data elements entered into the AUS to ensure the outcome of the Mortgage credit risk evaluation is valid including: Borrower's Credit Report, Borrower's Liabilities/Debt, Borrower's Effective Income, Borrower's Assets/Reserves, Adjusted Value, Borrower's total Mortgage Payment including Principal, Interest, Taxes, and Insurance (PITI)." 4000.1.II.A.4.a.iii(A)(1).

369.    Also, to ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "manipulating . . . application variables in[ ] the TOTAL mortgage scorecard to obtain an accept/approve risk classification." *See* Mortgagee Letter 2005-15; HUD Handbook 4000.1.II.A.4.a.iii(A)(1), II.A.4.a.iv; HUD Handbook 4155.1, 6.A.c.

370.    If TOTAL does not approve a loan with an "accept/approve" decision, it returns a "refer" decision, meaning the loan is referred back to the lender for manual underwriting.

371.    Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under the FHA's manual underwriting requirements. *See* 24 C.F.R. § 203.255(b)(5)(i)(B).

372.    For example, if a Direct Endorsement Lender receives a "refer" rating after entering all relevant data points into an AUS/TOTAL, the lender may not then enter hypothetical income or asset amounts (i.e., income or asset amounts that lack a factual basis) in an effort to determine what level of income or assets would generate an "accept/approve" rating.

373.    Rather, as made clear by the 4000.1 Handbook, "[i]f a determination is made that the Mortgage must be downgraded to manual underwriting, the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage." *See* HUD Handbook 4000.1.II.A.4.a.vi.

374.    The prohibition on entering unsubstantiated data points into the AUS/TOTAL exists, among other reasons, to protect against fraud.

375.    TOTAL is not to be used by sales people to manipulate fake variables in attempt to figure out how to get an "approve" score form the system.

376.    Embrace knowingly ran the AUS reports on government loan files excessively in order to strike a financial balance in information that would result in an approve/eligible.

377.    For instance, if a Direct Endorsement Lender entered factually unsupported income or asset amounts into an AUS—and thereby determined the precise amount of income or assets necessary to obtain an "accept/approve" rating from TOTAL—the lender could falsify loan documentation to state that the borrower possesses the required amount of income or assets.

378.    For this reason, among other things, is why the regulations require that a Mortgagee's employees cease using the system as soon as the result is a "refer." *See* HUD Handbook 4000.1.II.A.4.a.vi.

379.    Importantly, the AUS and TOTAL are merely tools to be utilized by underwriters in making a determination on a loan and "[t]he Mortgagee may not accept or deny an FHA-insured Mortgage based solely on a risk assessment generated by TOTAL Mortgage Scorecard." 4000.1.II.A.4.a.iii.

380.    As part of its scheme to approve all government loans it was presented, Embrace

systematically manipulated the data that was entered into Embrace's AUS/TOTAL system to determine which financial balances would lead to an "accept/approve" rating from TOTAL.

381.    Obtaining an "accept/approve" rating is in Embrace's best interest as a file that obtains a "refer" must be manually underwritten and the use of the AUS must cease. *See* 4000.1.II.A.4.a.vi ("the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage."). Even if Embrace did obtain a refer, which again must cease use of AUS, Embrace would continue to run the file through the AUS in disregard of HUD's manual underwriting directive.

382.    Since the manual underwriting guidelines were stricter, Embrace instructed underwriters to "don't ask questions" and "run with it" even when Embrace knew the file otherwise had red flags with violations of government regulations.

383.    There is no legitimate, fiduciary basis to re-run AUS multiple times on the same loan file unless the lender is attempting to manipulate the system even though the financial situation of the borrower had not changed between these runs.

384.    Embrace's manipulative and excessive AUS directive can be illustrated by the following government loan files:

        a.  Embrace internal loan number 2017-2997189 with the borrower's last name Daudelin was run through the AUS approximately 38 times before Embrace was able to obtain an accept/approve.

        b.  Embrace internal loan number 2018-3140006 with the borrower's last name Leonard was run through the AUS approximately 21 times.

        c.  Embrace internal loan number 2016-2861760 with the borrower's last name Watts was run through the AUS approximately 11 times before Embrace started over with a brand new FHA case number.

***Embrace falsely represented to the government that employees performing underwriting functions were not being managed by mortgage origination employees***

385.    FHA guidelines are clear that "[t]he Mortgagee must ensure that its underwriters are not managed by and do not report to any individual who performs mortgage origination activities." See 4000.1.I.A.4.c.iv(B)(3)(b)(vi).

386.    This prohibition, in part, is to insulate the underwriting team from influence or obstruction that may result from a lenders' origination goals.

387.    Underwriting independence is essential due to the inherent difference in roles between a lender's underwriting team and origination team.

388.    Contrary to government requirements, Embrace allowed its sales employees to override and obstruct the underwriting team from properly underwriting government loan files.

389.    Embrace's policy towards underwriting is best summarized by Embrace's insistence that the underwriters were to treat loan officers as the underwriters' "customers."

390.    Not only does this encapsulate Embrace's approach to risk management of government files, the scheme is in blatant violation of government requirements requiring a "Mortgagee [to] ensure that its underwriters are not managed by and do not report to any individual who performs mortgage origination activities." *See id.*

391.    Despite these governmental requirements, Embrace made clear that underwriting was subservient to the company's sales function. As such, underwriters were easily influenced and obstructed by the sales team at Embrace in violation of the government requirements.

392.    Shortly after beginning at Embrace, Relator was told that she needed to understand and act as though the loan officers were her "customers" and her job was to ensure they were satisfied.

393.    The loan officers at Embrace would directly go above an underwriter's head and

escalate a file when the underwriter would not "make it work."

394.    By sales employees being able to escalate an underwriters' loan file to their management, Embrace allowed the sales employees to directly influence and obstruct the underwriters' workflow.

395.    Embrace's policy of underwriters existing only to serve the sales team was perhaps best illustrated by *monthly* rankings sent out to the entire underwriting force that displayed individual underwriter "scores" as judged by the loan officers.

396.    These "customer service scores" were based on how satisfied the loan officers were with the underwriters' job performance.

397.    These scores were not only used to evaluate underwriters, but they also reflected individual underwriters who were singled out based on their customer service score as judged by Embrace's loan officers.

398.    This practice is completely improper as it disintegrates the government required "wall" between the due diligence imposed on underwriters and the profit goals of Embrace as contemplated by the government requirements.

399.    As such, Embrace promulgated an inappropriate policy that resulted in underwriters being subservient to the sales force with the sales force having the ability to exert management authority over the underwriters' day-to-day operations in material violation of government requirements.

400.    Consistent with Embrace's goals, Embrace's subordination of underwriters to the sales employees was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements, but still received government insurance.

401.   Given that Embrace knew, or should have known, that having sales employees engage in underwriting employees would result in the endorsement of non-qualified applicants, regardless of the government requirements, Embrace's conduct was improper for a Direct Endorsement lender.

*Embrace's false certifications regarding individual loans*

402.   Embrace falsely certified that statements made in the application for government insurance were true and accurate and that all conditions had been satisfied.

403.   Despite these certifications, Embrace submitted mortgages that did not qualify for government insurance because they were not underwritten in accordance with HUD, FHA, VA, or USDA requirements, Embrace had not used due diligence in underwriting them, Embrace entered data into its AUS that lacked integrity, and Embrace failed to satisfy AUS conditions before closing and endorsing the mortgages for government insurance.

404.   As a result of the foregoing conduct, Embrace submitted numerous false claims to HUD, the VA, and the USDA for insurance on defaulted loans that were ineligible for such insurance.

405.   The following examples are a non-exhaustive and only small set of examples of the loans which Embrace improperly approved and submitted for government insurance.

406.   First, Embrace internal loan number 2018-3134829 with the borrower last name Hammond was submitted for government on approximately October 11, 2018.

407.   Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

408.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

409.    Specifically, Embrace approved this loan for FHA insurance by using the borrower's overtime income in income calculations that was neither consistently earned nor reasonably likely to continue in material violation of HUD requirements.

410.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

411.    Second, Embrace internal loan number 2018-3138302 with the borrower last name Miller was submitted for government in approximately October 2018.

412.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

413.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

414.    Specifically, Embrace approved this loan for FHA insurance by fraudulently calculating the income for a borrower by using a year to date calculation of the borrower's first five months on a new job instead of averaging over two years as required by HUD requirements.

415.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

416.    Third, Embrace internal loan number 2018-3149963 with the borrower last

name Wilson was submitted for government in approximately February 2019.

417.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

418.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

419.    Specifically, Embrace approved this loan for FHA insurance as instructed by Mr. Lamy even though Embrace excluded business expense deductions from the borrower's income by removing IRS forms from the loan file in violation of HUD requirements.

420.    Additionally, Embrace used one year of tip income in calculations despite the HUD requirements of a two-year work history.

421.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

422.    Fourth, Embrace internal loan number 2018-3107995 with the borrower last name Cora was submitted for government in approximately August 2018.

423.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

424.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and

approving the mortgage for FHA insurance.

425.    Specifically, Embrace approved this loan for FHA insurance despite the fact that the borrower owed $24,000 in federal tax debt and was delinquent on his tax obligations without having made three timely months of scheduled payments.

426.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

427.    Fifth, Embrace internal loan number 2017-3051620 with the borrower last name Diederich was submitted for government in approximately December 2017.

428.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

429.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

430.    Specifically, Embrace approved this loan for FHA insurance despite knowingly failing to obtain a bank statement form a donor to properly source gift funds used as an earnest money deposit.

431.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

432.    Sixth, Embrace internal loan number 2018-3083797 with the borrower last name Gomez was submitted for government insurance.

433.    Embrace underwrote the mortgage for this property, approved and endorsed it

for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

434.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

435.    Specifically, Embrace approved this loan for FHA insurance despite the fact that the borrower had a large deposit of $4,900, which was in excess of one percent of the sales price, and Embrace failed to document and source the deposit in violation of HUD requirements.

436.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

437.    Seventh, Embrace internal loan number 2016-2861760 with the borrower last name Watts was submitted for government insurance.

438.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

439.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

440.    Specifically, Embrace approved this loan for FHA insurance by excluding cosigned liabilities from income calculations without verifying and documenting that the

primary borrower was current on payments in violation of HUD requirements.

441.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

442.    Eighth, Embrace internal loan number 2016-2950330 with the borrower last name Melvins was submitted for government in approximately April 2017.

443.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

444.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

445.    Specifically, Embrace approved this loan for FHA insurance even though Embrace did not have adequate documentation to evidence the borrower's garnishments on paystubs were resolved in violation of HUD requirements.

446.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

447.    Ninth, Embrace internal loan number 2017-2997189 with the borrower last name Daudelin was submitted for government in approximately June 2017.

448.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

449.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

450.    Specifically, Embrace approved this loan for FHA insurance by raising the original sales price to the higher appraisal value in order to qualify the borrower in violation of HUD requirements.

451.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

452.    Tenth, Embrace internal loan number 2017-3008536 with the borrower last name Bentley was submitted for government in approximately June 2017.

453.    Embrace underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with all HUD requirements, and was eligible for FHA insurance.

454.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

455.    Specifically, Embrace approved this loan for FHA insurance based solely on the AUS/TOTAL decision in violation of HUD requirements.

456.    Despite the fact that this loan did not meet all applicable HUD requirements, Embrace nonetheless approved the mortgage for FHA insurance.

457.    Eleventh, Embrace internal loan number 2018-3120114 with the borrower last name Alicea was submitted for government insurance.

458.    Embrace underwrote the mortgage for this property, approved and endorsed it for USDA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, that the loan complied with USDA requirements, and was eligible for USDA insurance.

459.    Contrary to Embrace's certifications, Embrace did not use due diligence to underwrite the mortgage and did not comply with USDA requirements in underwriting and approving the mortgage for USDA insurance.

460.    Specifically, Embrace approved this loan for USDA insurance even though Embrace accepted a letter of explanation directly from the loan officer instead of the borrower. This is inappropriate since the loan officer has an interest in the transaction and violated USDA requirements.

461.    Despite the fact that this loan did not meet all applicable USDA requirements, Embrace nonetheless approved the loan for USDA insurance.

*Embrace failed to maintain an adequate quality control program*

462.    A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its government-insured mortgages. HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions." HUD Handbook 4060.1, REV-2, ch. 7-3.B; see also HUD Handbook 4700.2, REV-1, ch. 6-1.A; 4000.1.V.A.2.a.i.

463.    The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action. HUD Handbook 4060.1, REV-2, ch. 7-2. The quality control program also must review a sample of

all closed loan files to ensure they were underwritten in accordance with HUD guidelines. HUD Handbook 4060.1, REV-2, ch. 7-6.C; see also HUD Handbook 4700.2, REV-1, ch. 6-1.D; 4000.1.V.A.1.a.

464.    When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information.

465.    For instance,"[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; see also HUD Handbook 4700.2 REV-1, ch. 6-3.A.2; 4000.1.V.A.3.c.ii(B)(1)(a).

466.    If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.  "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2; 4000.1.V.A.3.c.ii(B)(2)(a).

467.    At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.  The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month[']s sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4; 4000.1.V.A.3.b.i, ii.

468.    HUD recommends three types of ratings. The ratings provided for this purpose

Quality Control plan to report any findings internally.

474. "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." Id.; see also HUD Handbook 4700.2, REV-1, ch. 6-1.F; 4000.1.V.A.2.d.iii(B).

475. FHA regulations require that a lender train its employees to ensure that its staff knows all the current underwriting requirements for FHA loans and provides all staff with access to HUD regulations. HUD Handbook 4000.1, V.A.2.b.i(A)(1)(a), (2)(a); see also HUD Handbook 4155.2, 2.A.4.b.

476. Despite these programmatic requirements, Embrace failed to provide FHA loan administration and Quality Control staff with adequate training and feedback pertaining to violations of government requirements.

477. Although Relator identifies specific Embrace loan files submitted for government insurance with material violations of government requirements, Embrace failed to take any substantive steps to provide training or corrective measures to address these issues.

478. Instead, Embrace's lack of a thorough quality control plan was designed to, and did result in, the endorsement of government loan files in which the borrower's income, asset, and debt obligations, among other things, did not conform to government requirements, yet was still submitted for government insurance.

479. Relator raised numerous instances of fraud and material representation in loan files that, to her knowledge, was never "immediately," or ever for that matter, reported to HUD.

480. Given that Embrace knew, or should have known, that its quality control process and training was materially defective in that it continued to submit loans with material

violations for government insurance, Embrace failed to abide by government quality control and compliance regulations and thus failed to live up to its certifications required to become a Direct Endorsement lender.

***Embrace retaliated against Relator by terminating her in violation of the False Claims Act***

481.   During Relator's employment with Embrace, she discovered that Embrace was engaged in a variety of problematic policies and practices with respect to the underwriting and origination of FHA, VA, and USDA loans that led Relator to suspect that Embrace was engaged in violations of the False Claims Act.

482.   The False Claims Act contains an anti-retaliation provision that prevents employers from retaliating or otherwise discriminating against employees who engage in protected activity under the statute. 31 U.S.C. § 3730(h).

483.   This protected activity not only includes "lawful acts done by the employee" such as filing a False Claims Act case, but also includes "other efforts to stop 1 or more violations of" the False Claims Act. *Id.* at (h)(1).

484.   As such, employers may not retaliate against employees who have engaged in investigatory or oppositional activity related to an employer's fraud against the government.

485.   Relator was terminated on February 5, 2019.

486.   Throughout her employment, Relator repeatedly alerted Embrace as to specific instances of fraud and misrepresentation.

487.   Due to these material deficiencies, Relator alerted Embrace's management that Embrace was approving government loan files that Embrace knew did not meet the appropriate government regulatory and statutory requirements and thus Embrace was knowingly engaging in fraud against the government.

488. Relator made complaints of fraud and improper conduct frequently both in writing and verbally to Embrace's management including Milena MacColl, Claudia Mobilia, Sara Davis, and Robert Lamy.

489. Specifically, on An October 25, 2019, Relator was called in for a meeting with Sara Davis, Vice President of Underwriting, and Claudia Mobilia, Senior Vice President of Operatations, due to Relator's underwriting manager, Milena MacColl, relaying to management that Relator was experiencing some "frustration." It was soon apparent that this meeting was not actually due to Relator's "frustration," but instead her unwillingness to get on "the same page" with Embrace's policies and practices. During this meeting, Relator made clear that Embrace was committing material violations of government loan requirements and that Relator felt Embrace's practices were putting pressure on her to fraudulently submit files for government insurance that she was not comfortable with. It was at this meeting that Ms. Mobilia commented that "maybe it was not the right marriage for [Relator]."

490. Embrace had knowledge that Relator was raising specific instances in which Embrace was engaging in fraudulent practices against the government.

491. Embrace's reason for terminating Relator was pretextual and masked the retaliatory reason for Relator's discharge.

492. Embrace's termination of Relator was in retaliation for Relator engaging in protected activity under the False Claims Act.

***Embrace knowingly made false statements to the government pertaining to the quality of its underwriting process and endorsed loans***

493. Embrace did not want the government to know that it was underwriting files illegally, or that Embrace was breaking contractual agreements.

494. As such, Embrace made false statements to the government to induce the

government to extend insurance coverage on FHA, VA, and USDA home loans, as well as pay for losses on loans ensured by the government programs.

495.    Embrace made such false certifications repeatedly in regard to its underwriting process.

496.    Each false certification independently triggers Embrace's liability.

497.    In addition, the purpose, as well as the actual outcome, of Embrace's improper policies and practices of improperly pressuring employees to approve ineligible loans, instructing underwriters to not decline loan files, requiring an approved file to always be approved even when Embrace knew there were material violations of government guidelines, improperly documenting loan files in conformance with government guidelines by hiding documentation, deleting documentation, and accepting inadequate documentation, excessively running the AUS in order to strike a financial balance to obtain an approval, allowing the sales employees to have control over underwriters, and failing to maintain an adequate quality control program, was to push Embrace employees to endorse loans in which the applicant fell below government's requirements for insuring the loans as described in ¶¶ 315–401, 462–80, *supra*.

498.    Embrace's illegal policies and practices thus induced these knowing, false statements set forth in ¶¶ 499–524, *infra* and Embrace is independently liable for such false statements.

### *Annual certifications*

499.    As set forth above, Embrace submitted annual certifications to HUD in every year that it was a member of the Direct Endorsement Lender program.

500.    For fiscal years 2013 to 2016, Embrace annually certified to the federal

government that its operations had been, and was, in conformance with all applicable HUD and FHA regulations and handbooks.

501.    From 2016 to present, Embrace annually certified to the federal government that its operations had been, and were, in conformance with HUD Handbook 4000.1, Sections I and V, and any agreements between HUD and Embrace.

502.    Despite these annual certifications, Embrace was not in compliance with these HUD and FHA requirements.

503.    For example, Embrace made false, specific representations about the quality of the services it was providing.

504.    Embrace annually certified that it was providing HUD and FHA complaint underwriting services when it knew it did not, and no intention of providing such services, due to its implemented schemes to defraud the Untied States as described above.

505.    Among other things, Embrace knew these statements on its annual certifications were false because Embrace was improperly pressuring employees to approve ineligible loans, instructing underwriters to not decline loan files, requiring an approved file to always be approved even when Embrace knew there were material violations of government guidelines, improperly documenting loan files in conformance with government guidelines by hiding documentation, deleting documentation, and accepting inadequate documentation, excessively running the AUS in order to strike a financial balance to obtain an approval, allowing the sales employees to have control over underwriters, and failing to maintain an adequate quality control program, even though Embrace contracted with the government not to engage in such conduct and the government regulations forbade Embrace from engaging in such practices.

506.    Additionally, Embrace knew this statement was false when Embrace made its

annual certifications because Embrace had been, and intended to continue, its improper practices and policies including improperly pressuring employees to approve ineligible loans, instructing underwriters to not decline loan files, requiring an approved file to always be approved even when Embrace knew there were material violations of government guidelines, improperly documenting loan files in conformance with government guidelines by hiding documentation, deleting documentation, and accepting inadequate documentation, excessively running the AUS in order to strike a financial balance to obtain an approval, allowing the sales employees to have control over underwriters, and failing to maintain an adequate quality control program.

507.    Embrace was also not in compliance with all HUD and FHA requirements because it knowingly endorsed loans that fell below the enumerated government requirements.

508.    For example, Embrace knowingly submitted loan files for government insurance with improper overtime income, no two-year histories of employment for income calculations, required documents that were removed from the file, improper documents placed in the file, delinquent tax debt, unsourced and undocumented gift funds, unsourced and undocumented large deposits in excess of one percent of the sale price, no required documentation to exclude cosigned liabilities, no documentation to verify garnishments were paid, use of the higher of the sale and appraisal price to calculate loan value, and underwriting decisions based solely on an AUS approval.

509.    Thus, when Embrace stated in its annual certification that its operations conformed to HUD and FHA requirements, Embrace knew that this statement was false because Embrace had (and intended to continue) to endorse deficient loan files with material violations of such requirements.

510.    Embrace's representations on the annual certifications were designed to, and did in fact, cause the government to extend governmental insurance coverage and pay insurance claims on home loans that are ineligible for government insurance.

511.    In the submission of these annual certifications, Embrace did not disclose its non-compliance with these important regulatory and contractual requirements thereby making Embrace's annual certifications false statements.

*Loan-level certifications*

512.    As set forth above, for each FHA loan Embrace endorsed, Embrace also certified that, as to the loan, there was "no defect in connection with my approval of this mortgage[,]" and also certified that, as to that loan, it was not the case that "the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900-A.

513.    For each VA loan that Embrace endorsed, Embrace certified that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36[.]" *See* 38 C.F.R. § 36.4340(k)(2)(i).

514.    For each USDA loan that Embrace endorsed, Embrace certified that "we have originated the loan in compliance with All Agency loan requirements" which are codified at 7 C.F.R. § 3555.

515.    Although Embrace, through its employees and agents, certified that the loan approval process was free from defects and in accordance with all of the applicable FHA, VA, and USDA requirements, Embrace knew that such certification on those loans was not accurate.

516.    Embrace submitted these false loan-level certifications on virtually every business day from at least 2013 to the present.

517.    In combination with the schemes set forth above, Embrace knew that its loan level certifications were false because Embrace had a defective underwriting process in place for the approval of the mortgage and that the loan itself did not meet the governmental requirements.

518.    Specifically, Embrace knew that, among other things, it was improperly pressuring employees to approve ineligible loans, instructing underwriters to not decline loan files, requiring an approved file to always be approved even when Embrace knew there were material violations of government guidelines, improperly documenting loan files in conformance with government guidelines by hiding documentation, deleting documentation, and accepting inadequate documentation, excessively running the AUS in order to strike a financial balance to obtain an approval, allowing the sales employees to have control over underwriters, and failing to maintain an adequate quality control program.

519.    In addition, as a result of Embrace's fraudulent scheme to maximize loan submissions by submitting ineligible loans, Embrace endorsed loan files that did not qualify under the applicable government regulations.

520.    This included submitting loan files for government insurance with improper overtime income, no two-year histories of employment for income calculations, required documents that were removed from the file, improper documents placed in the file, delinquent tax debt, unsourced and undocumented gift funds, unsourced and undocumented large deposits in excess of one percent of the sale price, no documentation required to exclude cosigned liabilities, no documentation to verify garnishments were paid, use of the higher of

the sale and appraisal price to calculate loan value, and basing an underwriting decision solely on an AUS approval.

521.    Therefore, Embrace's statement on the loan-level certifications for FHA, VA, and USDA loans that the loan met all government requirements was false.

522.    Embrace knew this statement was false, among other reasons, because Embrace knowingly used improper overtime income, failed to obtain two-year histories of employment for income calculations, removed required documents form files, placed improper documents in files, disregarded delinquent tax debt, failed to source and document gift funds, failed to source and document large deposits in excess of one percent of the sale price, failed to obtain documentation to exclude cosigned liabilities, failed to obtain documentation to verify garnishments were paid, used the higher of the sale and appraisal price to calculate loan value, and based an underwriting decision solely on an AUS approval.

523.    Despite Embrace's representations on each loan that they were endorsing compliant FHA, VA, and USDA loans, Embrace knew that it was in fact delivering non-conforming loans to the government.

524.    In the submission of these loan certifications, Embrace did not disclose this non-compliance with the above regulatory and contractual requirements thereby making Embrace's loan-level certifications false statements.

*Materiality*

525.    Embrace's false statements were material in inducing the government to extend insurance coverage to loans endorsed by Embrace, and to pay claims on such loans that had been endorsed by Embrace.

*Annual certifications*

526.    As set forth above, the purpose of the regulations, and the purpose of Embrace's annual certification that they were following the government regulations, was to ensure that Embrace's underwriting operations met acceptable underwriting standards for FHA-insured loans.

527.    A reasonable person would not have extended loan insurance on a loan file, and certainly not provided it at the lower rates offered in the governmental program, if she knew that Embrace was not following the required underwriting process, including improperly pressuring employees to approve ineligible loans, instructing underwriters to not decline loan files, requiring an approved file to always be approved even when Embrace knew there were material violations of government guidelines, improperly documenting loan files in conformance with government guidelines by hiding documentation, deleting documentation, and accepting inadequate documentation, excessively running the AUS in order to strike a financial balance to obtain an approval, allowing the sales employees to have control over underwriters, and failing to maintain an adequate quality control program when Embrace was falsely certifying that it was in compliance with the regulations banning such practices.

528.    Additionally, a reasonable person would not have allowed Embrace to participate in the Direct Endorsement Program if she knew that Embrace was disregarding the required underwriting process to participate in the Direct Endorsement Program, including important contractual and regulatory requirements such as not pressuring employees, not instructing underwriters to not decline files, not allowing files to be approved despite violations of government requirements, not approving a file based on inadequate or fraudulent documentation, not deleting documents from files, not running the AUS excessively to strike a financial balance, not allowing the sales employees to have authority over underwriting

employees, and maintaining an adequate quality control program, particularly when Embrace was falsely certifying that it was in compliance with the DE Program requirements.

529.    Embrace knew that the government attached importance to these annual certifications to ensure Embrace was in compliance with the regulations.

530.    Among other things, the government required the annual certifications before extending insurance coverage to Embrace's endorsed loans, and before allowing Embrace to participate in the Direct Endorsement Program.

531.    Further, the regulations define such violations as "material."

532.    The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and Embrace as Embrace would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to Embrace loans based on Embrace's accurate representation that it had followed the regulatory and contractual requirements on the loans, including not pressuring employees, not instructing underwriters to not decline files, not allowing files to be approved despite violations of government requirements, not approving a file based on inadequate or fraudulent documentation, not deleting documents from files, not running the AUS excessively to strike a financial balance, not allowing the sales employees to have authority over underwriting employees, and maintaining an adequate quality control program.

533.    As such, the government was expressly clear that a condition of extending insurance coverage to Embrace's endorsed loans, and the government's ultimate payment of any losses was that Embrace annually certify its compliance with the regulations, including not pressuring employees, not instructing underwriters to not decline files, not allowing files to be

approved despite violations of government requirements, not approving a file based on inadequate or fraudulent documentation, not deleting documents from files, not running the AUS excessively to strike a financial balance, not allowing the sales employees to have authority over underwriting employees, and maintaining an adequate quality control program

534.    The government, in reliance on Embrace's false statements in its annual certifications to the government, extended FHA insurance coverage to all FHA home loans endorsed by Embrace.

535.    The government extended that insurance based on Embrace's certification that it is in compliance with all government regulations, including not pressuring employees, not instructing underwriters to not decline files, not allowing files to be approved despite violations of government requirements, not approving a file based on inadequate or fraudulent documentation, not deleting documents from files, not running the AUS excessively to strike a financial balance, not allowing the sales employees to have authority over underwriting employees, and maintaining an adequate quality control program.

536.    Without Embrace's certification, the government would not have allowed Embrace to participate in the Direct Endorsement Program, as Embrace knew.

537.    As Embrace also knew, the government has on numerous occasions commenced enforcement proceedings against mortgagees who fail to comply with HUD and FHA regulations.

538.    Without Embrace's certification, the government would not have extended insurance coverage to files endorsed by Embrace, and certainly not at the rates guaranteed by the government.

539.    Without Embrace's certification, the government would not have been liable for

the insured losses on loans endorsed by Embrace and covered by the government.

540.    Had Embrace truthfully told the government that it was not in compliance with government regulations, and specifically the requirements of not pressuring employees, not instructing underwriters to not decline files, not allowing files to be approved despite violations of government requirements, not approving a file based on inadequate or fraudulent documentation, not deleting documents from files, not running the AUS excessively to strike a financial balance, not allowing the sales employees to have authority over underwriting employees, and maintaining an adequate quality control program, Embrace would not have been allowed to endorse any loans for the FHA.

*Loan-level certifications*

541.    As set forth above, the purpose of the FHA, VA, and USDA loan level certifications is to ensure that there are no defects in the loan file and that the loan had been approved in accordance with the applicable statutory and regulatory requirements so that the government could ensure that Embrace was providing compliant underwriting services to the government.

542.    A reasonable person would not have extended loan insurance, and certainly not at lower rates offered in the government program, if she knew that there were defects in regards to the underwriting process as it relates to the approval of the mortgage, and that the approval had not been in accordance with government requirements, including defects such as improperly using overtime income, failing to use two-year histories of employment for income calculations, removing documents from a file, disregarding delinquent tax debt, failing to source and document gift funds, failing to source and document large deposits in excess of one percent of the sale price, failing to obtain documentation to exclude cosigned liabilities, failing to obtain

documentation to verify garnishments were paid, using the higher of the sale and appraisal price to calculate loan value, and basing an underwriting decision solely on an AUS approval, particularly when Embrace was falsely certifying that these defects were not occurring.

543.    Embrace knew that the government attached importance to these loan-level certifications that there were no defects regarding the approval of the mortgage and that the loan had been approved in conformance with government requirements.

544.    Among other things, the government required these certifications before extending insurance coverage to Embrace's endorsed loans.

545.    The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and Embrace: Embrace would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to Embrace's loans based on Embrace's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including properly calculating overtime income, properly using two-year histories of employment for income calculations, properly documenting required materials in the loan file, properly analyzing delinquent tax debt, properly sourcing and documenting gift funds and large deposits in excess of one percent of the sales price, properly obtaining documentation required to exclude cosigned liabilities, properly verifying garnishments were paid, properly calculating the loan value, and properly using the AUS/TOTAL.

546.    Therefore the government was expressly clear that a condition of extending insurance coverage to Embrace's endorsed loans and ultimate payment on any losses was that Embrace's loan certifications that there were no defects in regards to the approval of the

mortgage and it had been approved in accordance with government requirements, including properly calculating overtime income, properly using two-year histories of employment for income calculations, properly documenting required materials in the loan file, properly analyzing delinquent tax debt, properly sourcing and documenting gift funds and large deposits in excess of one percent of the sales price, properly obtaining documentation required to exclude cosigned liabilities, properly verifying garnishments were paid, properly calculating the loan value, and properly using the AUS/TOTAL.

547.   The government, in reliance on these false statements by Embrace in its certifications to the government, extended FHA, VA, and USDA insurance coverage to the government home loans endorsed by Embrace.

548.   The government extended that insurance based on Embrace's loan-level certification that were no defects in the underwriting process and that the loans had been approved in accordance with government requirements, including properly calculating overtime income, properly using two-year histories of employment for income calculations, properly documenting required materials in the loan file, properly analyzing delinquent tax debt, properly sourcing and documenting gift funds and large deposits in excess of one percent of the sales price, properly obtaining documentation required to exclude cosigned liabilities, properly verifying garnishments were paid, properly calculating the loan value, and properly using the AUS/TOTAL.

549.   Without Embrace's loan-level certification, the government would not have extended insurance coverage to files endorsed by Embrace, as Embrace knew, and certainly not at the rates guaranteed by the government.

550.   Without Embrace's loan-level certification, as Embrace knew, the government

would not have been liable for the insured losses on loans endorsed by Embrace and covered by the government.

551.    Had Embrace truthfully told the government that there were defects regarding the approval of the mortgage and it had not been approved in accordance with government requirements, and specifically including improperly using overtime income, not using two-year histories of employment for income calculations, removing required documents from the file, disregarding delinquent tax debt, failing to source and document gift funds, failing to source and document large deposits in excess of one percent of the sale price, failing to obtain documentation to exclude cosigned liabilities, failing to obtain documentation to verify garnishments were paid, using the higher of the sale and appraisal price to calculate loan value, and basing an underwriting decision solely on an AUS approval, the files would not have been eligible for government insurance.

552.    In addition, the purpose, as well as the actual outcome, of Embrace's underwriting operations was to have Embrace's employees endorse loans in which Embrace knew the applicant fell below government's requirements for insuring the loans as described in ¶¶ 402–61.

553.    Embrace's illegal policies and practices therefore induced materially false representations to the government as set forth in ¶¶ 499–524 and Embrace is independently liable for such materially false statements knowingly induced by these practices.

554.    Additionally, the endorsement of unqualified borrowers also constituted a material false statement on the loan-level certifications.

555.    A reasonable person would not have extended loan insurance on and endorsed loan, and certainly not provided it at lower rates offered in the governmental program, if she

knew that the borrower was not qualified for the loan as wrongly certified by Embrace.

556.    Embrace knew that the government attached importance to these loan-level certifications that the loan files accurately reflected that the borrower was qualified for the mortgage.

557.    Without Embrace's certification, the government would not have allowed Embrace to participate in the Direct Endorsement Program, as Embrace knew.

558.    Among other things, the government required these certifications before extending insurance coverage to Embrace endorsed loans.

559.    The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and Embrace, as Embrace would only endorse loans that met the regulations' requirements, and the government would only extend insurance to Embrace's loans based on Embrace's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not pressuring employees, not instructing underwriters to not decline files, not allowing files to be approved despite violations of government requirements, not approving a file based on inadequate or fraudulent documentation, not deleting documents from files, not running the AUS excessively to strike a financial balance, not allowing the sales employees to have authority over underwriting employees, and maintaining an adequate quality control program, particularly when Embrace was falsely certifying that it was in compliance with the regulations.

560.    Therefore, the government was expressly clear that a condition of extending insurance coverage to Embrace's endorsed loans, and ultimate payment on any claims, was that Embrace's loan-level certifications were accurate, and specifically that the applicant was qualified for the loan.

561.    The government, in reliance on these false statements by the Embrace in its loan-level certifications to the government, extended government insurance coverage to the government home loans endorsed by Embrace.

562.    The government extended that insurance based on Embrace's certification that the information provided about the applicant was accurate, and that the applicant met the government's criteria.

563.    Without Embrace's loan-level certification, the government would not have extended insurance coverage to files endorsed by Embrace, as Embrace knew, and certainly not at the rates charged by the government.

564.    Without Embrace's loan-level certification, the government would not have been liable for the insured losses on loans endorsed by Embrace and covered by the government.

565.    Had Embrace truthfully told the government that the information in the file was not accurate, and that the applicant was not qualified, the government would not have insured Embrace's endorsed loan files.

*Claims on the government*

566.    The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property

which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

567.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. See United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

568.    As set forth above, loans endorsed by Embrace caused the government to sustain claims against it.

569.    Had Embrace truthfully certified to the government that it was not in conformance with governmental underwriting requirements, the government would not have insured these loans and would not have been liable for claims arising from these improperly approved loans.

570.    Similarly, had Embrace not knowingly and falsely certified to the government that there was no defect in connection with the improperly approved mortgage, the government would not have insured any of it loans and would not have been liable for claims arising from these improperly approved loans.

571.    Another independent way in which Embrace triggered claims against the government was through the government payments of losses on any of Embrace's loans.

572.    Had Embrace not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured any of Embrace's loans and thus would not have been liable for claims arising from any of Embrace's loans.

573.    Another independent way in which Embrace triggered claims against the

government was through the government subsidized insurance that the government provided to all of the loans endorsed by Embrace, subsidized insurance which constitutes a "claim" under the FCA.

574.    Had Embrace not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured Embrace's loans and thus would have provided the government subsidized insurance to Embrace's governmental loans.

575.    Similarly, had Embrace not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured those loans and would not have been liable for claims arising from these improperly approved loans.

576.    Another independent way in which Embrace triggered claims against the government was through the lower premium rates charged on Embrace's loans.

577.    The premium rates charged by the government are premised on mortgagees only endorsing loans that meet governmental requirements.

578.    Had Embrace not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured Embrace's loans at the rates it did.

579.    Similarly, had Embrace not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured Embrace's loans at the rates it did.

580.    Thus, Embrace triggered a claim against the government by having its loans insured at lower premium rates than was justified.

581.    Another independent way in which Embrace triggered claims against the government was through the additional administrative costs to the government on loans that had been endorsed by Embrace.

582.    Had Embrace not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have borne the additional administrative costs from servicing and supporting Embrace's loans.

### FIRST CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(A)
### Causing False Claims

583.    The United States repeats and realleges the allegations above as if fully set forth herein.

584.    The Government seeks relief against Embrace under 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

585.    As set forth above, Embrace knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its endorsement of government-insured mortgages.

586.    The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by Embrace because of Embrace's wrongful conduct.

587.    By endorsing ineligible mortgages for Embrace insurance Emrbace fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

588.    By reason of the false claims of Embrace, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

### SECOND CAUSE OF ACTION
**31 U.S.C. § 3729(a)(1)(B)**
**Use of False Statements**

589.    The United States repeats and realleges the allegations above as if fully set forth herein.

590.    The Government seeks relief against Embrace under 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act.

591.    As set forth above, Embrace knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with Embrace's endorsement of government-insured mortgages.

592.    The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by Embrace because of Embrace's wrongful conduct.

593.    By making false statements, Embrace fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

594.    By reason of the false claims of Embrace, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

### THIRD CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(G)
### Reverse False Claims

595.    United States repeats and realleges the allegations above as if fully set forth herein.

596.    The Government seeks relief against Embrace under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

597.    As set forth above, Embrace knowingly made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

598.    The Government paid insurance claims, and incurred losses, relating to government-insured mortgages wrongfully endorsed by Embrace because of Embrace wrongful conduct.

599.    By virtue of the false records or statements made by Embrace, the Government suffered damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by each false statement.

### FOURTH CAUSE OF ACTION
### 31 U.S.C. § 3730(h)
### Unlawful Retaliation Under the False Claims Act

600.    Relator repeats and realleges the allegations above as if fully set forth herein.

601.    This is a claim for back pay, interest on the back pay, front pay, compensation for special damages, and such other and further relief as the Court may deem proper for injuries Relator sustained as a result of retaliatory actions taken against Relator by Embrace, including litigation costs and reasonable attorneys' fees.

602.    31 U.S.C. § 3730(h) provides, in relevant part:

(h) Relief From Retaliatory Action.

(1)     Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2)     Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

603.     Through the acts described above, Relator repeatedly attempted to stop Embrace from committing countless violations of 31 U.S.C. § 3729(a).

604.     Relator's acts described above, undertaken to stop Embrace from committing countless violations of 31 U.S.C. § 3729(a), consisted of protected conduct under 31 U.S.C. § 3729 *et seq*. Relator repeatedly raised concerns with Embrace and management that Embrace was engaging in fraud and submitting false claims to the Government. Embrace was aware of Relator's protected conduct and acted in retaliation as a result of Relator's protected conduct under the False Claims Act.

605.     Through the acts described above, Embrace repeatedly ignored and/or refused to provide any meaningful response or corrective measures to Relator's lawful inquiries and efforts to redress Embrace's ongoing, intentional, and knowing violations of HUD, FHA, VA, and USDA statutes and regulations, and 31 U.S.C. § 3729(a).

606.     As a direct result of Relator's lawful inquiries and efforts to redress Embrace's ongoing, intentional, and knowing violations of the requirements of the Government Programs and 31 U.S.C. § 3729(a), Embrace unlawfully terminated Relator because of lawful acts done

by Relator in furtherance of her engagement in protected conduct by her efforts to stop Embrace from submitting false claims.

607.     Embrace is liable under 31 U.S.C. § 3730(h) for (i) an award of double back pay; (ii) interest on back pay; (iii) an award of front pay; (iv) special damages; (v) litigation costs; (vi) attorneys' fees; and (vii) such other and further relief as the Court may deem proper.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.    A judgment against Embrace in an amount equal to three times the amount of damages the United States has sustained as a result of Embrace's violations of the False Claims Act;

b.    A judgment against Embrace for civil penalties as described (and adjusted for inflation) under 31 U.S.C. § 3729(a) (1)(G) for each of Embrace's violations of the False Claims Act;

c.    That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.    That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.    That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f.    That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g.    An award to Relator on her retaliation claims including double back pay; interest on back pay; an award of front pay; litigation costs; attorneys' fees; special damages; an injunction restraining further retaliation; restatement of Relator's position; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, benefits, and seniority rights; and other renumeration.

h.    That a trial by jury be held on all issues so triable;

i.    An award of pre-judgment interest; and

j.    Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: February 13, 2019

THOMAS & SOLOMON LLP

By: _____

J. Nelson Thomas, Esq.
Michael J. Lingle, Esq.
Jonathan W. Ferris, Esq.
*Attorneys for Relator*
693 East Ave
Rochester, New York 14607
Telephone: (585) 272-0540