# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* DEBORAH SOUZA, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:22-cv-453-JJM-PAS |
| EMBRACE HOME LOANS, INC.; DENNIS HARDIMAN; KURT NOYCE; and ROBERT LAMY, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Plaintiff-Relator Deborah Souza brings this *qui tam* action against Embrace Home Loans, Inc. ("Embrace"), as well as Dennis Hardiman, Kurt Noyce, and Robert Lamy (the "Individual Defendants"), on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* ECF No. 97. Ms. Souza, a former employee of Embrace, alleges that the Defendants made false representations to the U.S. Department of Housing and Urban Development ("HUD") while certifying residential mortgage loans for insurance coverage from the Federal Housing Administration ("FHA"). *Id.* She also alleges that Embrace unlawfully retaliated against her by terminating her employment when she raised concerns regarding the alleged fraud. *Id.*

In response, the Defendants have collectively filed three motions: (1) a Motion for Judgment on the Pleadings (ECF No. 169);[1] (2) a Motion to Exclude Ms. Souza's experts (ECF No. 177); and (3) a Motion to Strike Ms. Souza's "Statements of Facts" (ECF No. 196).[2]  Embrace and the Individual Defendants have also filed separate

---

[1] In their Motion for Judgment on the Pleadings, the Defendants assert that this action must be dismissed, claiming that the *qui tam* provisions of the FCA are unconstitutional because they violate Article II's Appointments Clause, Take Care Clause, and Vesting Clause.  ECF No. 169 at 1-2.  The Defendants primarily rely on a pair of rulings made by a judge in the U.S. District Court for the Middle District of Florida, which struck down the *qui tam* provisions of the FCA as violative of the Appointments Clause.  *Id.* at 2 (citing *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024)); ECF No. 202 at 2 (citing *United States ex rel. Gose v. Native Am. Servs. Corp.*, No. 8:16-cv-03411-KKM-AEP, 2025 WL 1531137 (M.D. Fla. May 29, 2025)).

As Ms. Souza correctly points out, the Middle District of Florida court has been the only one to rule in this way.  ECF No. 182 at 3.  Thus far, every circuit court to consider the Appointments Clause issue has ruled precisely the opposite.  *See, e.g.*, *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-05 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Corp.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993).  As another court succinctly put it, the Middle District of Florida cases are "outlier[s] … that whistle[ ] past precedent…."  *United States v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 1:21-cv-84, 2024 WL 4784372, at *3 (E.D. Tenn. Nov. 7, 2024).

Courts have also routinely rejected the Defendants' Take Care and Vesting Clause argument.  *Stone*, 282 F.3d at 807; *Riley*, 252 F.3d at 753; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 754.  The Middle District of Florida court does not even address this particular argument.  *See Zafirov*, 751 F. Supp. 3d at 1304 ("I do not address the defendants' other Article II argument."); *Gose*, 2025 WL 1531137, at *2 ("I do not reach the defendants' arguments under the Vesting and Take Care Clauses.").

The Court sees no reason to go against the clear weight of authority by ruling that the FCA's *qui tam* provisions are unconstitutional.  As such, the Court DENIES the Motion for Judgment on the Pleadings.  ECF No. 169.

[2] In their Motion to Strike, the Defendants argue that Ms. Souza's "Statement of Facts" must be stricken because it fails to comply with Local Rule 56.  ECF No. 196 at 1.  This rule governs how the parties' statements of undisputed facts must be paginated and structured.  District courts generally have discretion over how they

Motions for Summary Judgment (ECF No. 165 and ECF No. 167, respectively), arguing that Ms. Souza's suit should be dismissed because she does not raise a genuine dispute of material fact as to the alleged false certification or retaliation claims.

For the reasons below, the Court DENIES the Defendants' Motion for Judgment on the Pleadings, ECF No. 169, and DENIES the Defendants' Motion to Strike, ECF No. 196. The Court GRANTS IN PART and DENIES IN PART the Defendants' Motion to Exclude the testimony of Ms. Souza's experts. ECF No. 177. The Court also GRANTS IN PART and DENIES IN PART Embrace's Motion for Summary Judgment. ECF No. 165. Finally, the Court GRANTS IN PART and DENIES IN PART the Individual Defendants' Motion for Summary Judgment. ECF No. 167.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    The Direct Endorsement Lender Program

The FHA, an agency within HUD, is one of the largest mortgage insurers in the world. ECF No. 97 at 11. It serves to expand homeownership opportunities for low- and moderate-income families, first-time homebuyers, and individuals with

---

handle technical violations of the rule provided that they still "parse the record" where factual analysis is required. *See Swallow v. Fetzer Vineyards*, 46 F. App'x 636, 638-39 (1st Cir. 2002); *see also United States v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 128 (D. Mass. 2016). Here, the Court does not find that striking Ms. Souza's "Statement of Facts" is necessary. Rather, her briefing provides adequate references to the evidentiary record, and the Court will treat that briefing as meeting the requirements of Local Rule 56. As such, the Court DENIES the Motion to Strike. ECF No. 196.

lower credit who may not otherwise qualify for conventional mortgages because lenders deem them to be at a higher risk of default. *Id.* The FHA helps to mitigate that risk by insuring mortgages for these individuals (i.e., "FHA insurance") and guaranteeing that lenders will suffer no loss if a particular borrower cannot repay their loan. *Id.* In the event of default, a lender may submit a claim to HUD, and HUD in turn pays the lender the outstanding balance on the loan and any other associated costs. *Id.*

One way in which the FHA insures home mortgages is through its Direct Endorsement Program ("DE program"). *Id.* at 12. Lenders apply to the FHA to become Direct Endorsement lenders ("DE lenders"). *Id.* Once they are approved, DE lenders are authorized to underwrite mortgages and assess whether loan applications qualify for FHA insurance. *Id.* If they do, then the DE lenders submit their claims to HUD for endorsement. *Id.* As part of the submission process, DE lenders must certify that the loan fully complies with all governmental requirements. *Id.* This is an important responsibility as the FHA "does not review applications for mortgage insurance before the mortgage is executed." *Id.* (quoting 24 C.F.R. § 203.5(a)). Thus, in deciding whether to approve a loan for FHA insurance, DE lenders are expected to exercise due diligence and act with the utmost good faith, honesty, and fairness. *Id.* at 13, 15.

To demonstrate compliance with the applicable regulations, HUD requires DE lenders to make two types of certifications: individual loan-level certifications and annual certifications.

### a.    Loan-Level Certifications

With each loan for which they seek FHA insurance coverage, DE lenders are required to certify that the loan complies with HUD rules and is eligible for FHA insurance.  *Id.* at 23.  This certification can be done in one of two ways: through manual certification or through the automated underwriting system ("AUS").  *Id.* at 23-24.

If manual certification is used, the DE lender, through one of its underwriters, must complete a HUD-92900-A form,[3] certifying that they have "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting [the] mortgage."  *Id.* at 23.

By contrast, if the DE lender chooses to certify through the AUS, then one of its underwriters inputs loan information into a proprietary HUD algorithm called Technology Open to Approved Lenders ("TOTAL").  *Id.* at 24; *see also United States*

---

[3] The HUD-92900-A form also requires the underwriter to affirm that they have made "all certifications required for this mortgage as set forth in HUD Handbook 4000.4."  ECF No. 165-1 at 31-32 (quoting Form HUD-92900-A) (May 2008)).
      HUD Handbook 4000.4, Appendix 3 reads in pertinent part:

The underwriter executing form [HUD-92900-A] has personally reviewed the appraisal report (if applicable) and credit application, including the analysis performed on the mortgage credit analysis worksheet, and certifies, for and on behalf of the mortgagee, that the mortgage complies with HUD underwriting requirements as contained in all outstanding HUD handbooks and Mortgagee Letters, and is in compliance with the applicable regulations … The mortgage loan is eligible for mortgage insurance under the Direct Endorsement program.

*Id.* at 32 (quoting HUD Handbook 4000.4, App. 3).

*ex rel. Tutanes-Luster v. Broker Sols., Inc.*, No. CV 19-1630 PSG (JPRx), 2019 WL 6972689, at *4 (C.D. Cal. July 8, 2019). Based on the information entered, TOTAL provides one of several possible ratings: (1) "accept" or "approve"; or (2) "refer" or "caution." ECF No. 97 at 24. If the AUS produces an "accept" or "approve" rating, then the underwriter must certify, among other things, the "integrity of the data supplied by the lender used to determine the quality of the loan." *Id.* However, if the AUS produces a "refer" or "caution" rating, then the underwriter may still certify the loan's eligibility for FHA insurance but only by conducting a manual certification. *Id.* at 24-25.

### b.    Annual Certifications

In addition to these individual loan-level certifications, DE lenders must submit annual certifications to HUD to continue participating in the DE program. *Id.* at 20. Through one of its corporate officers, the DE lender must certify that it is complying with the program's requirements, including adherence to underwriting standards, exercise of due diligence, and the implementation of a compliant quality control program. *Id.* (citing HUD Handbook 4000.1).

### 2.    Ms. Souza's Allegations Against Embrace

Embrace is a mortgage lender with its headquarters in Rhode Island and branches across the United States. *Id.* at 7-8. In 2008, Embrace received approval from HUD to serve as a DE lender. ECF No. 165-1 at 16.

Dennis Hardiman is the current CEO and President of Embrace. ECF No. 167-1 at 9. Kurt Noyce formerly served as President of Embrace from February 2000 to

6

the end of 2017. *Id.* at 11. Robert Lamy served as Director of Risk Management until his retirement from Embrace at the end of 2020. *Id.* at 14.

Ms. Souza worked as an underwriter at Embrace from September 2016 until February 2019, when the company terminated her. ECF No. 97 at 8. Her role primarily involved underwriting governmental loans, including those issued under the DE program. *Id.* at 9. Ms. Souza alleges that, from at least February 2009 to July 29, 2022 (the "claims period"), Embrace "knowingly approved mortgages that violated FHA rules and requirements while falsely certifying compliance with those rules." *Id.* at 2. She further asserts that members of Embrace's senior leadership—Messrs. Noyce, Hardiman, and Lamy—were "responsible for Embrace's failure to self-report materially deficient loans to HUD." *Id.* at 99-100.

Specifically, Ms. Souza contends that FCA liability was triggered when Embrace fraudulently induced HUD to insure mortgage loans by falsely certifying compliance with the agency's guidelines through its individual loan-level and annual certifications. *Id.* at 32-33. With respect to the loan-level certifications, she identifies 210 loans that Embrace allegedly certified as being eligible for FHA insurance, even though she claims they were not. ECF No. 191 at 33. Regarding the annual certifications, she alleges that each annual submission made by Embrace between 2009 and 2021 falsely attested to the company's compliance with HUD and FHA requirements. *Id.* at 10; ECF No. 97 at 48.

According to Ms. Souza, Embrace adopted various policies and practices that were noncompliant with HUD and FHA guidelines. These policies and practices include:

1. "Do Not Decline" Policy

   a. Ms. Souza claims that Embrace management directed underwriters not to decline FHA loan applications, even when they failed to meet HUD's underwriting requirements. ECF No. 191 at 20. Instead, underwriters were instructed to "find a way" to approve the loans by getting "creative." *Id.* at 20-21.

2. "Guaranteed On Time Close" Policy

   a. Ms. Souza claims that Embrace had a policy where it promised to pay borrowers $2,500 if their FHA loan did not close on time, potentially creating pressure to approve loans prematurely or without proper documentation. *Id.* at 38; ECF No. 191 at 22.

3. Loan Officers Managing and Pressuring Underwriters

   a. Ms. Souza claims that Embrace allowed its sales employees to exert control over underwriters, which undermined the independence required in the underwriting process. ECF No. 97 at 33. She claims the company did this in part by insisting that underwriters treat loan officers as their "customers" and by having loan officers issue "customer service scores" to underwriters based on how satisfied they were with the underwriters' job performance. *Id.* at 34. Underwriters were evaluated, in part, on how many loans they approved. ECF No. 191 at 17-18. Ms. Souza also claims that loan officers improperly pressured underwriters to approve ineligible loans. *Id.* at 18-19.

4. Improper Documentation Practices

   a. Ms. Souza claims that Embrace improperly documented loan files to make them appear compliant with governmental regulations. ECF No. 97 at 56-57. This included hiding and deleting required documentation to push loans through the approval process. *Id.*

8

5. Manipulation of the AUS/TOTAL System

    a. Ms. Souza claims that Embrace manipulated data entered into the AUS system to endorse ineligible loans for FHA insurance. ECF No. 97 at 60. This included allegedly testing different financial data to achieve an "Accept/Approve" rating rather than a "Refer" rating from TOTAL. *Id.* at 60-61. However, even when the system produced a "Refer" result, Embrace allegedly continued to resubmit the file in disregard of HUD requirements. *Id.* at 60-61.

6. Management Overrides of Underwriting Decisions

    a. Ms. Souza claims that Embrace purposefully escalated loan applications that were not approved by underwriters to management so that they could override governmental regulations and ensure the loan's approval. ECF No. 97 at 37. In one instance, she claims that her manager took over a loan application that was initially ineligible for FHA insurance due to the applicant having insufficient funds, added $10 to the account to make the loan eligible, re-ran the loan, and endorsed the loan for FHA insurance. ECF No. 191 at 37.

7. Inadequate Quality Control ("QC") Program

    a. Ms. Souza claims that Embrace failed to maintain an adequate QC program. ECF No. 97 at 40-45. Specific concerns include: (1) temporarily bringing quality control in-house but only for a few months; and (2) reducing its in-house QC staff from four employees to two. *Id.* She also contends that Embrace submitted several late monthly QC reports and that third-party conducted audits consistently found Embrace's QC process to be unacceptable. ECF No. 191 at 27-28.

8. "Don't Ask Questions" and Letters of Explanation Policy

    a. Ms. Souza claims that Embrace maintained a "Don't Ask Questions" policy in which it directed underwriters to ignore red flags or potential violations of loan requirements. ECF No. 97 at 57-58. She claims that Embrace instructed its employees to obtain fraudulent letters of explanation and coach prospective borrowers on what to say in these letters so their loans would get approved. *Id.*

In all, Ms. Souza claims that Embrace defrauded the government by causing

HUD to insure ineligible loans and then pay for the resulting losses when those loans

defaulted. *Id.* at 3, 97. She estimates that this resulted in damages to the United States ranging from tens of millions to hundreds of millions of dollars. *Id.* at 99; ECF No. 191 at 34.

Ms. Souza also alleges that Embrace retaliated against her in violation of the FCA by terminating her employment after she complained to Embrace management about the company's purportedly fraudulent conduct. ECF No. 97 at 101. Specifically, she claims that, after sharing her complaints with an Embrace supervisor and executive at a meeting, the company fired her a little over three months later. *Id.* at 101-02.

### B. Procedural Background

On February 14, 2019, Ms. Souza filed her original complaint in the U.S. District Court for the Northern District of New York, where Ms. Souza claimed a significant portion of the events giving rise to this action occurred. ECF No. 1; ECF No. 44. The federal government investigated Ms. Souza's claims for over three years but declined to intervene. *See* ECF No. 16. Even so, the FCA permits relators to pursue such actions where the government declines to intervene in the name of the United States. 31 U.S.C. § 3730(b)(1). The Defendants later moved to transfer venue, arguing that the U.S. District Court for the District of Rhode Island was the proper venue for this suit given that Embrace is headquartered in Rhode Island. *See* ECF No. 40. Although she initially opposed such a transfer, *see* ECF No. 44, Ms. Souza later withdrew her opposition. *See* ECF No. 70. As such, Ms. Souza's case was transferred to this Court. *See* ECF No. 71.

The Defendants subsequently moved to dismiss Ms. Souza's complaint.  *See* ECF No. 86.  The Court denied their motion, concluding that the allegations, if taken as true, were sufficient to state a claim for violations of the FCA.  *See* ECF No. 96. Ms. Souza then filed her Second Amended Complaint.[4]  *See* ECF No. 97.  In it, she alleges that the Defendants submitted or caused to be submitted false claims for payment to HUD in violation of the FCA, 31 U.S.C. §§ 3729(a)(1)(A)-(B) (Counts I and II).  *Id.* at 102-04.  She also alleges that Embrace retaliated against her in violation of the FCA, 31 U.S.C. § 3730(h) (Count III).[5]  *Id.* at 104-05.  The Defendants have now each moved for summary judgment (ECF No. 165 and ECF No. 167, respectively) and to exclude the testimony of all three of Ms. Souza's experts (ECF No. 177).

## II.    STANDARDS OF REVIEW

### A.    Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment is appropriate when the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party

---

[4] Ms. Souza filed her Second Amended Complaint on July 3, 2023.  ECF No. 97. She filed her First Amended Complaint on February 10, 2023.  ECF No. 84.

[5] Initially, Ms. Souza alleged that the Individual Defendants also engaged in unlawful retaliation under the FCA.  ECF No. 97 at 104-05.  However, she has voluntarily dismissed this claim as it relates to the Individual Defendants.  ECF No. 187 at 64 n.5.

bears the burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "An issue is 'genuine' if it can be 'resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).

Once the moving party has met its burden, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." *Pleasantdale Condos., LLC v. Wakefield*, 37 F.4th 728, 733 (1st Cir. 2022). To satisfy this burden, the nonmovant "must present definite, competent evidence" demonstrating that a trial-worthy issue exists. *Id.* (quoting *Mesnick*, 950 F.2d at 822). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are not enough. *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 108 (1st Cir. 2024) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). Ultimately, the Court must "view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor, without weighing the evidence or evaluating the credibility of the witnesses." *Sheehan v. N. Am. Mktg. Corp.*, 610 F.3d 144, 149 (1st Cir. 2010) (citing *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006)).

### B. *Daubert* In the Context of Summary Judgment

Under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, trial judges are charged with evaluating the admissibility of expert testimony. *Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77, 80-81 (1st Cir. 1998) (citing Fed. R. Evid. 702; 509 U.S. 579 (1993)). In essence, the court plays a "gatekeeping role" in which it determines the expert testimony that will come in or be kept out of trial. *Id.* at 80. This inquiry is "is a flexible one, and there is no particular procedure that the trial court is required to follow in executing its gatekeeping function." *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002) (citation and internal quotation marks omitted).

This by no means gives experts "carte blanche" to express any opinion they so choose. *Ruiz-Troche*, 161 F.3d at 80. Rather, the trial court must first ensure that "the witness is sufficiently qualified by 'knowledge, skill, experience, training, or education' to give his proffered opinion." *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 152 (D. Mass. 2023) (quoting Fed. R. Evid. 702). If the witness is deemed qualified as an expert on the topic at issue, the court must then decide whether the specific testimony "both rests on a reliable foundation and is relevant to the task at hand." *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 52 (1st Cir. 2016) (quoting *Daubert*, 509 U.S. at 597). If the expert's testimony "rests upon 'good grounds, based on what is known,' it should be tested by the adversary process— competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily

13

weigh its inadequacies." *Ruiz-Troche*, 161 F.3d at 85 (quoting *Daubert*, 509 U.S. at 590).

However, "[t]he *Daubert* analysis contains an extra wrinkle when confronted at the summary judgment stage." *Liberty Mut. Ins. Co. v. Broan-NuTone LLC*, 731 F. Supp. 3d 205, 212 (D. Mass. 2024). Often, a motion for summary judgment is so closely intertwined with a motion to exclude expert testimony such that "the court cannot rule on the former without essentially ruling on the latter." *Id.* For instance, "[i]f proffered expert testimony fails to cross *Daubert*'s threshold for admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment." *Cortés-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).

Here, the Court finds that the Defendants' summary judgment motions are "so closely intertwined" with their motion to exclude Ms. Souza's experts that a joint resolution of both motions is required. First, the Court will rule on the *Daubert* motion, and then it will turn its attention to considering the summary judgment motions. In so doing, the Court is mindful of the First Circuit's caution to employ "great care and circumspection at [this] stage" and to avoid excluding evidence without affording Ms. Souza an adequate opportunity to defend its admissibility. *Cortés-Irizarry*, 111 F.3d at 188.

## III.  *DAUBERT* ANALYSIS

In their motion to exclude, the Defendants seek to strike the testimony of all three of Ms. Souza's experts: (1) Dr. Christopher Bennett; (2) Ms. Pamela Hamrick;

and (3) Mr. Victor Baev. ECF No. 177. The admissibility of each expert's testimony is addressed in turn.

### A.    The Admissibility of Dr. Bennett's Testimony

#### 1.    Background

Ms. Souza retained Dr. Bennett as an expert to evaluate each of the defective loans she identified and assess whether the problems in Embrace's underwriting process increased each loan's risk of default. ECF No. 195 at 3. In their motion, the Defendants assert that Dr. Bennett's testimony should be excluded for two main reasons. First, they contend that his opinions regarding causation and "increased risk" are outside his realm of expertise, and he has not performed a causation analysis. ECF No. 177 at 9. Second, they argue that Dr. Bennett's opinions are ultimately unhelpful to the factfinder. *Id.*

#### 2.    "Causation" Allegation

The Defendants' first argument is that Dr. Bennett's testimony should be excluded because he stated at his deposition that he was "not offering an opinion on causation explicitly in this matter and [had] not done that analysis." *Id.* at 9 (citing Bennett Dep. Tr. at 115:11-15). The Defendants claim that, contrary to this statement, Dr. Bennett does in fact seek to testify about causation—specifically, they believe he opines on what caused, or likely caused, Embrace's at-issue loans to default. *Id.* In the Defendants' view, Dr. Bennett's acknowledgment to the contrary and the fact that he has not conducted a causation analysis preclude him from providing expert testimony. *Id.* at 9-10. Ms. Souza counters, arguing that Dr.

Bennett offers an opinion on a factual issue (i.e., the increased risk of default from Embrace's underwriting deficiencies), not a legal issue.  ECF No. 195 at 3.

In general, experts may not proffer testimony about legal issues in the case because that is "exclusively the domain of the judge."  *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997).  Experts are permitted, however, to offer "opinions as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied…."  *United States ex rel. LaCorte v. Wyeth Pharms., Inc.*, 706 F. Supp. 3d 206, 239 (D. Mass. 2023) (quoting *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.D.C. 1997)).

Here, Dr. Bennett was asked to opine on whether Embrace's underwriting defects created an elevated risk of default for its borrowers.  ECF No. 195 at 3.  He concluded that they did—an opinion of fact.  *Id.*  That he claimed to be offering no opinion as to causation does not disqualify him as an expert.  In fact, that is not his job at all.  Instead, it is Ms. Souza's job to make the causation argument and the job of this Court to ultimately determine whether that argument is persuasive.  As such, this challenge to Dr. Bennett's testimony fails.

### 3.    Helpfulness to the Jury

The Defendants' second argument—that Dr. Bennett's expert opinion is unhelpful to the trier of fact—is also unconvincing.  As Ms. Souza notes, Dr. Bennett's opinion regarding the elevated risk of default created by Embrace's underwriting defects is a fact that she will use to make her proximate cause argument.  ECF No. 195 at 4.  Indeed, other courts that have evaluated FCA claims in the context of

16

FHA loans have found that a higher risk of default is evidence upon which jurors can rely to conclude that the proximate causation element has been met. *See, e.g.*, *United States v. Hodge*, 933 F.3d 468, 475 (5th Cir. 2019) (finding that expert testimony about loans "defaulting at higher rates" was "more than enough evidence for a jury to find that the false statements were a proximate cause"); *United States v. Spicer*, 57 F.3d 1152, 1160 (D.C. Cir. 1995) (finding that high risk of default was a fact that rational factfinders could use to conclude that proximate causation element was met). Thus, Dr. Bennett's opinion will undoubtedly be helpful to a jury.

Accordingly, the Court DENIES the Defendants' Motion to Dismiss Dr. Bennett's expert testimony.

### B.    The Admissibility of Ms. Hamrick's Testimony

#### 1.    Background

Ms. Souza retained Ms. Hamrick to review certain Embrace-endorsed FHA loans and determine whether they complied with HUD guidelines. ECF No. 177 at 3-4 (citing Hamrick Expert Report at 10). Ms. Hamrick claims that at least 210 of the loans she reviewed did not comply with these rules. *Id.* at 4 (citing Hamrick Expert Report at 18). She also identified specific Embrace practices that she asserts demonstrate a disregard for governmental regulations. *Id.* at 4 (citing Hamrick Expert Report at 16-17).

The Defendants argue that all of Ms. Hamrick's expert opinions ought to be excluded for three reasons. First, they argue that she lacks the qualifications to serve as an expert in this case. *Id.* at 17. Second, they assert that she used an unreliable

methodology in making her findings. *Id.* at 13. Third, they claim that Ms. Hamrick's opinions regarding Embrace's policies and practices are "speculative, unhelpful to the trier of fact, and beyond the scope of permissible expert testimony." *Id.*

### 2. Qualifications

The Defendants first challenge Ms. Hamrick's qualifications as an expert and her lack of direct experience with FHA lending and HUD guidelines. ECF No. 165 at 17; ECF No. 208 at 8. They claim that her "experience with mortgage lending operations generally" is insufficient to qualify her as an expert in this case. ECF No. 208 at 9.

The Court finds this argument to be unavailing. Ms. Hamrick is clearly well-qualified to serve as an expert in this case. A review of her report shows not only that she has extensive experience in the mortgage industry writ large, but that—contrary to the Defendants' claim—she has *direct* experience working with FHA and HUD guidelines. *See* Hamrick Expert Report at 3-5. Ms. Hamrick received her CHUMS number in 2001, which means she has been certified as a Direct Endorsement underwriter and is capable of endorsing FHA loans.[6]  *Id.* at 3. In addition, a significant portion of her 37-year career has involved hiring, training, and managing loan underwriters who have received their Direct Endorsement certifications under her supervision. *Id.* This has necessarily involved keeping up-to-date and ensuring

---

[6] Before 1996, HUD and FHA had the responsibility for certifying individuals as DE underwriters. *See, e.g.,* Gerry Glavey, *What You Need to Know to Become a "DE Underwriter,"* LoanLogics (July 20, 2015), https://www.loanlogics.com/what-you-need-to-know-to-become-a-de-underwriter. However, after that, the government delegated the responsibility of registering underwriters to approved DE lenders. *Id.*

compliance with HUD and FHA guidelines. *Id.* As the President of Incenter Diligence Solutions, Ms. Hamrick has conducted several reviews of loans to ensure accuracy, quality control, and due diligence. *Id.*

Furthermore, while the Defendants claim that Ms. Hamrick had trouble testifying at her deposition without referencing her expert report, these are hardly grounds to exclude her testimony. *See, e.g.*, *Massachusetts Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 2130060, at *9 (D. Mass. May 7, 2015) (finding that expert's purported difficulty testifying at his deposition without referring to his materials was issue of credibility for jury to weigh and did not warrant excluding his opinion). Rather, this is squarely an issue for a jury to assess. *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 81 (1st Cir. 2002) ("The ultimately credibility determination and the testimony's accorded weight are in the jury's province."). This challenge to Ms. Hamrick's qualifications thus fails.

### 3. Reliability

The Defendants next argue that Ms. Hamrick's opinions are unreliable and should therefore be excluded because she applied the wrong guidelines at times. *Id.* at 13-14. In her initial report, Ms. Hamrick and her team reunderwrote several Embrace-endorsed loans and identified 265 that potentially violated HUD guidelines. *Id.* at 3-4. After she issued this report, the Defendants' expert, Rosemary Mysliwiec, issued her own report in which she argued that Ms. Hamrick's findings were "unsupported and unreliable." *Id.* at 5. Specifically, Ms. Mysliwiec claimed that Ms.

Hamrick used the wrong HUD guidelines when evaluating whether a particular loan violated HUD requirements.  ECF No. 195 at 9.

Ms. Mysliwiec's claim requires a brief explanation.  Prior to May 2017, HUD evaluated loans according to a "Basis of Ratings" framework.  ECF No. 165-1 at 20.  After May 2017, HUD moved to a "defect taxonomy" system in which the loan practices of DE lenders were measured on a four-tiered severity basis.[7]  *Id.*  As a result, the HUD guidelines used to evaluate a loan, for example, in 2011 were different from those in effect in 2017.  Because the claims period in this case stems from 2009 to 2022, when they were reunderwriting the at-issue loans, Ms. Hamrick and her team "had to match the date of the loan with the guidelines in effect on that date."  ECF No. 195 at 9.  Ms. Hamrick instructed her team to be vigilant in ensuring that each loan be matched with the correct guidelines, but she acknowledges that, in some instances, some loans were matched with the wrong year.  *Id.*

In her report, Ms. Mysliwiec identified at least 55 loans with this issue.  ECF No. 177 at 15.  After receiving Ms. Mysliwiec's report, Ms. Hamrick went back and reevaluated these 55 loans with the correct guideline.  ECF No. 195 at 9.  She concluded that those loans did not materially violate HUD's guidelines after all and,

---

[7] Under the four-tiered "defect taxonomy" system, the severity of a defect (i.e., a deviation from HUD policy requirements) is assigned a Tier 1, 2, 3, or 4 rating.  *See* HUD Handbook 4000.1, App. 8.0.  Tier 1 and Tier 2 defect findings are considered "unacceptable" and may constitute evidence of a "Material Finding" of noncompliance.  *Id.*  In addition, Tier 1 and Tier 2 defects potentially impact a loan's eligibility for FHA insurance, whereas Tier 3 and Tier 4 defects do not.  *Id.*

as such, she downgraded her findings from 265 at-issue loans to 210 at-issue loans. ECF No. 177 at 15. She then issued her corrected findings in her rebuttal report. *Id.*

Ultimately, these are not grounds for excluding Ms. Hamrick's opinions. In factually similar cases involving experts who have at times applied the wrong guidelines to a small subset of loans they reunderwrote, courts have been forgiving of this error. *See, e.g.*, *DB Structured Prods.*, 2015 WL 2130060, at *14 ("In any event, only a small portion of the loans were reunderwritten using the purported wrong guidelines, and [the expert] has since explained that his analysis does not materially change even when using the guidelines to which Defendants point. Any error on [the expert's] part does not render his analysis inadmissible."); *In re Washington Mut. Mortg. Backed Sec. Litig.*, No. C09–37 MJP, 2012 WL 2995046, at *6 (W.D. Wash. July 23, 2012) ("Defendants have raised some question as to whether [the plaintiff's expert] properly applied each of the guidelines. But this hardly requires exclusion of his report, particularly where both sides seem to agree that application of the underwriting guidelines requires some discretionary decision-making. It is up to a jury to determine whether the purported flaws in [the expert's] analysis renders his opinion unworthy of merit.").

Thus, that Ms. Hamrick made corrections to her initial report in her rebuttal report is not per se disqualifying. *See, e.g.*, *Equal Emp. Opportunity Comm'n v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 169 n.7 (D. Mass. 2016) (permitting expert who made miscalculations in his initial report to make corrections in his rebuttal report). Ultimately, "[t]he determination of what constitutes proper rebuttal evidence [lies]

within the sound discretion of the [district court]." *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 47 (1st Cir. 1991) (quoting *Hickok v. G.D. Searle & Co.*, 496 F.2d 444, 447 (10th Cir. 1974)).

Additionally, as the First Circuit has noted, "*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche*, 161 F.3d at 85. If it rests on "good grounds," expert testimony should be tested by the adversary process—competing expert testimony and active cross-examination—"rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Id.* (citing *Daubert*, 509 U.S. at 590). Undoubtedly, that Ms. Hamrick changed her findings is an issue for the jury to weigh, but it does not merit exclusion on the grounds of unreliability.

### 4.    Helpfulness to the Jury

The Defendants next make several arguments as to why Ms. Hamrick's opinions are unhelpful to the jury and should therefore be excluded. ECF No. 177 at 19. These arguments are addressed in turn.

### a.    "Cherry-Picked Emails" Allegation

First, the Defendants take issue with Ms. Hamrick's purported "cherry-picking of a handful of emails and documents to support her broad conclusions about Embrace's practices over a nearly 12-year period." *Id.* 42 of the 50 emails and documents referenced by Ms. Hamrick in her report are from 2010 to 2012, and they claim that this timeframe inadequately represents the decade-long claims period. *Id.*

at 20. "To be sure, [i]f an expert 'cherry picks' favorable data ... ignore[ing] a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data." *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 1:12-cv-10601-IT, 2022 WL 2662678, at *8 (D. Mass. July 8, 2022) (internal quotation marks omitted).

However, no evidence demonstrates that—in producing her opinions—Ms. Hamrick has ignored unfavorable evidence such that exclusion would be necessary. Rather, based on her management experience in the mortgage industry, she offers a theory about how those emails could reflect a culture of Embrace's disregard for HUD guidelines. *See generally* Hamrick Expert Report at 58-77. As such, this opinion is indeed helpful to the trier of fact, who is tasked with determining whether Embrace violated such guidelines.

### b.    "Narrative Summary" Allegation

Next, the Defendants claim that Ms. Hamrick's testimony should be excluded because it "provide[s] nothing more than a narrative summary of company documents and does not rely on any specialized expert knowledge...." ECF No. 177 at 22. Narrative summaries of internal company documents with little reliance on expertise may not be admissible—or a Court could find that such summary helps a jury. *See, e.g., Singular Computing LLC v. Google LLC*, No. 19-12551-FDS, 2023 WL 8810187, at *5 (D. Mass. Dec. 20, 2023); *In re Zofran Prods. Liab. Litig.*, No. 1:15-md-2657-FDS, 2019 WL 5685269, at *9 (D. Mass. Nov. 1, 2019). But, as Ms. Souza points out, Ms. Hamrick does more than provide a summary of documents. Where she cites

Embrace emails in her report, Ms. Hamrick is careful to articulate how those emails might deviate from HUD standards—something that she was specifically retained to identify. *See, e.g.*, Hamrick Expert Report at 67, 70 (identifying Embrace email discussing loan officers calling, emailing, and disrupting underwriters and linking that to HUD policy proscribing loan originators from exerting pressure over underwriters); *id.* at 87 (identifying Embrace email related to employee's failure to visit and audit branches and linking that to a potential violation of a HUD rule concerning "inadequate branch oversight"). In making these findings, Ms. Hamrick draws on her experience working in management at lender companies—an experience that a lay person lacks. ECF No. 195 at 13 (citing Hamrick Expert Report at 70-85).

### c.  "Layperson" Allegation

The Defendants also argue that Ms. Hamrick's opinions should be excluded because a jury is fully capable of understanding mortgage lending practices on its own. ECF No. 177 at 24. As the First Circuit has recognized, "[i]f a layperson is capable of understanding an issue without the aid of an expert, a district court may properly decline to admit expert testimony on that issue on the ground that it would not be helpful to the jury." *United States v. Navedo-Ramirez*, 781 F.3d 563, 568 (1st Cir. 2015) (citing *United States v. Salimonu*, 182 F.3d 63, 74 (1st Cir. 1999)).

The Court does not agree that mortgage lending is a subject that falls within the common understanding of an untrained layperson. As one court has observed:

> Mortgage servicing is highly technical because services must navigate through a thicket of complex federal regulations on government insured

> home loans, various investor rules and guidelines (like those set by Fannie Mae and Ginnie Mae), and federal, state, and local law on foreclosures…. [M]ortgage servicing requires 'specialized knowledge' because mortgage servicers must know about 'complex rules and regulations, the intricate compliance issues[,] the complex analysis regarding various issues relating to defaults, foreclosures, attorney performances, discovery[,]' as well as '[c]ourt delays, borrower's actions, cloud on title actions and things all beyond the borrower's control.' This is all highly technical and touches on many subjects well beyond 'the realm of common knowledge and experience of a lay jury.'

*Freedom Mortg. Corp. v. Loancare, LLC*, No. 16-02569 (RMB/AMD), 2023 WL 4759162, at *14 (D.N.J. July 23, 2023) (quoting *Benedict v. Hankook Tire Co. Ltd.*, 286 F. Supp. 3d 785, 791 (E.D. Va. 2018)); *see also In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 931 (D. Minn. 2020) (noting that "the complex residential mortgage-backed securities industry [is] a subject *not* within the knowledge or experience of lay people"); *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 5:05-cv-260-Oc-GRJ, 2008 WL 11336701, at *2 (M.D. Fla. Aug. 6, 2008) ("The complexity in this case … is evident in the volume of evidence and the specialized knowledge involved in the mortgage servicing industry, which would not be familiar to the average lay person."). Suffice it to say, an expert like Ms. Hamrick is clearly in the best position to help jurors understand issues relating to mortgage lending.

### d.    Ms. Hamrick's Testimony Regarding Intent

Lastly, the Defendants assert that Ms. Hamrick's opinions about the Defendants "knowingly or recklessly present[ing] false claims for payment to HUD" must be precluded. ECF No. 177 at 27. Specifically, they take issue with Ms. Hamrick opining on Embrace management "Inten[ding] to Deceive," "[knowing]

internally of material deficiencies affecting loans the company produced," and "knowingly closing loans containing material violations of FHA's guidelines for insurance." *Id.* (citing Hamrick Expert Report at 73, 103). Of course, "[a] party's intent or state of mind is not the proper subject of expert testimony." *OneBeacon Am. Ins. Co. v. Com. Union Assurance Co. of Can.*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011), *aff'd*, 684 F.3d 237 (1st Cir. 2012). The jury must be able to draw its own conclusions regarding intent, and experts are not permitted to offer their opinions as to what inferences can be drawn. *Bawduniak*, 2022 WL 2662678, at *3 (citing *In re Zofran*, 2019 WL 5685269, at *9).

Here, the Court agrees with the Defendants. The examples they point to go a step too far and leave no room for the jury to draw its own inferences as to Embrace's scienter—a key element of the FCA analysis. Such portions must therefore be excluded.

Accordingly, the Defendants' *Daubert* motion is GRANTED to the extent that they seek to exclude portions of Ms. Hamrick's testimony opining on Embrace's intent. However, the Defendants' motion to exclude the other portions of Ms. Hamrick's expert testimony is DENIED.

### C.    The Admissibility of Mr. Baev's Testimony

#### 1.    Background

Ms. Souza retained Mr. Baev to offer insights into the inherent pressures on lenders, lender QC processes, the motivations behind certain Embrace shareholder distributions, and the use of the FCA vis-à-vis FHA loans. ECF No. 177 at 6-7 (citing

Baev Expert Report).  Mr. Baev also proffered testimony regarding Embrace's "FHA
Compare Ratio," which measures "a lender's default and claim rate on FHA-insured
mortgage loans and compares it to other lenders."  *Id.* at 37-38 (quoting Baev Expert
Report at 17).

The Defendants challenge Mr. Baev's expert opinion on four grounds.  First,
they challenge his qualifications to offer testimony in this case.  *Id.* at 27-28.  Second,
they contend that Mr. Baev's opinions lack a reliable foundation.  *Id.* at 30.  Third,
they argue that his opinions regarding Embrace's QC process "are based on limited
and irrelevant data, speculative, and unaccompanied by any substantive analysis."
*Id.* at 36, 41.  Fourth and finally, they claim that his opinion regarding Embrace's
shareholder distributions is unreliable.  *Id.* at 46.

### 2.    Qualifications

The Defendants contend that Mr. Baev lacks experience working directly for
HUD, FHA, or a mortgage lending company and is therefore unqualified to testify
about matters concerning the HUD Handbook, quality control guidelines, and the
interplay between the FCA and FHA loans.  *Id.* at 28-29.  Ms. Souza, by contrast,
argues that Mr. Baev is qualified to testify because he has been involved in various
mortgage finance roles—as a residential mortgage trader, an investor, and a portfolio
manager—for the last 20 years.  ECF No. 195 at 15.  In these positions, she contends
that Mr. Baev has worked with mortgage originators, analyzed mortgage risks, and
reviewed mortgage guidelines and quality control practices that closely mirror FHA's
own policies.  *Id.* at 15-16.  Even though she concedes that Mr. Baev is not an expert

on FHA requirements, she claims that his having worked in the same field—but not in the exact same specialty—is sufficient for his testimony to be admissible. *Id.* at 17.

The Court agrees with Ms. Souza. The Defendants take too narrow a scope of the rules governing the admissibility of evidence. As an initial matter, Rule 702 provides that an expert be qualified by "knowledge, skill, experience, training, or education" to render an opinion. Fed. R. Evid. 702. This rule "has been interpreted liberally in favor of the admission of expert testimony." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (citing *Daubert*, 509 U.S. at 588). "As such, experts need not have overly specialized knowledge to offer opinions." *Id.* at 78 (citing *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24-25 (1st Cir. 2003)). In fact, they may testify in an area outside of their specialty but within their area of expertise. *See, e.g.*, *Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) (finding expert physician with background in hematology and oncology was qualified to testify about physicians' treatment of colonoscopy patient, even though he did not directly specialize in gastroenterology); *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 31 (1st Cir. 2000) (finding expert qualified to testify about docking procedures—despite having never crewed the specific type of vessel at issue—because he was qualified as a docking master and had rode in hundreds of other vessels).

Here, there is no question that Mr. Baez possesses substantial expertise in the mortgage lending industry. As a residential mortgage investor of two decades, his running of a multi-billion-dollar loan and mortgage-backed securities portfolio required him to analyze risk, just as FHA insurers must do. ECF No. 195 at 15 (citing

Baev Expert Report at 3-4). He became intimately familiar with the loan origination, underwriting, quality control, and warehouse financing practices of lenders like Embrace and possesses ample knowledge of standards pertaining to lender operations, underwriter pressures, and due diligence. *Id.* at 16-17 (citing Baev Expert Report at 3-4). None of these things are unique to DE lenders—they apply broadly throughout the mortgage industry.

Thus, Mr. Baez's lack of familiarity with HUD-specific requirements does not render his expert testimony inadmissible given that he has other relevant experience in the residential mortgage industry. *See, e.g., United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*, 70 F.4th 968, 975 (7th Cir. 2023) ("[W]orking for HUD is not the sole path for a proffered expert to become sufficiently knowledgeable about HUD's decision-making processes or the causes of its payments on federal insurance claims. Many people with long careers in the residential mortgage industry can and do develop this expertise."). In addition, as the First Circuit has emphasized, "[t]he fact that [an expert] is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985). Mr. Baez is therefore qualified to testify as an expert on this subject.

### 3.    Reliability

The Defendants next challenge as unreliable Mr. Baev's opinion about the pressures underwriters at Embrace may have felt, calling it nothing more than guess work and speculation. ECF No. 177 at 31. They first take issue with the data points

he chose to make his opinion, criticizing his use of Embrace emails, underwriter customer service surveys, a high utilization rate of a warehouse line of credit, and an alleged breach of a minimum positive income to conclude that certain pressures existed at Embrace during the claims period. *Id.* They also criticize as speculative his opining on the combinations of layoffs at Embrace and the customer service scores generating pressure on underwriters. ECF No. 177 at 32-33.

Again, these critiques go to the weight of Mr. Baev's opinion, not its admissibility. As the First Circuit has noted, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). "When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *Id.* (quoting *United States v. Vargas*, 471 F.3d 255, 264 (1st Cir. 2006)). Ms. Souza is correct in pointing out that the Defendants cannot dictate exactly which facts Mr. Baev focuses on when offering his opinion. ECF No. 195 at 20. If his methodology is sound, this too is not a proper ground for exclusion.

### 4.    Helpfulness to the Jury

The Defendants next make several arguments as to why Mr. Baev's opinions are not helpful to the jury and should therefore be excluded. ECF No. 177 at 19. These arguments are addressed in turn.

### a.    "Layperson" Allegation

First, the Defendants argue that any layperson is capable of reviewing the evidence that Mr. Baev relied upon and reaching their own independent conclusion. ECF No. 177 at 34.  For example, they contend that "[a]ny layperson, including a member of the jury, is capable of arriving at the conclusion that layoffs … could create feelings of pressure in the workplace." *Id.*

This argument is overly reductive.  The Defendants overlook the fact that Mr. Baev cites layoffs as just one of several contributing factors to underwriter pressure. *See* Baev Expert Report at 6-12 (explaining that layoffs, *along with* customer service surveys, undue influence from loan officers, shifting interest rates, and the overall volatility of the mortgage industry, contribute to "structural pressures" in mortgage lending).  Once again, this Court remains unpersuaded that laypersons possess the same level of understanding of the mortgage industry's complexities as qualified experts. *See, e.g.*, *Freedom Mortg. Corp.*, 2023 WL 4759162, at *14.

### b.    "Cherry-Picked Data Points" Allegation

The Defendants also take issue with Mr. Baez's opinion regarding Embrace's warehouse line of credit and its implications for the health of the company.  ECF No. 177 at 34-35.  In particular, Mr. Baez concludes that lenders like Embrace that default on their warehouse lines of credit are more at risk of putting pressure on their employees to turn a profit, and the Defendants argue that this opinion is unreliable because it fails to consider whether Embrace had access to other sources of capital during the claims period. *Id.* at 34.

The Court is unconvinced.  That Mr. Baez did not account for other data points that the Defendants would have liked him to consider "is not an appropriate basis for exclusion...." *Watts v. Liberty Mut. Pers. Ins. Co.*, No. 23-12845-BEM, 2025 WL 2163913, at *4 (D. Mass. July 30, 2025); *see also Waters v. Town of Ayer*, No. 04-10521-GAO, 2009 WL 10728967, at *6 (D. Mass. Apr. 6, 2009) ("Any failure by [the expert] to consider facts that the defendants deem to be important may impact the weight of his testimony, but does not warrant a conclusion that the testimony lacks a reliable foundation and is inadmissible.").  This argument thus fails.

### c.    "Narrative Summary" Allegation

The Defendants also claim that Mr. Baev's opinion as to Embrace's warehouse line of credit was generated only by summarizing the content of various Embrace emails.  ECF No. 177 at 35-36.  To be sure, experts are expected to do more than simply summarize documents given to them by those who retain them.  *See, e.g.*, *Polidore v. McBride*, Nos. 07-433ML, 09-81ML, 2010 WL 3666971, at *7 (D.R.I. Sept. 13, 2010) (excluding testimony of expert who did nothing more than review police report and other materials and "basically [come] up with [his] findings").

However, a review of Mr. Baev's report shows that he did more than just that: after a careful examination of Embrace's audited financial statements, he drew a conclusion based on his prior experience analyzing mortgage risk and the warehouse lines of credit that are precisely at issue here.  *See* Baez Expert Report at 12-16.  Therefore, this argument also fails.

### d.    The Quality Control Arguments

Next, the Defendants rehash some of the same arguments already addressed (i.e., "layperson," "cherry-picked data points," and "narrative summary" allegations), but they raise them again in the context of challenging Mr. Baev's opinions on quality control audits and late quality control reviews.    ECF No. 177 at 39-45.    These arguments are now addressed in turn.

### i.    "Narrative Summary" and "Layperson" Allegations

The Defendants claim that Mr. Baev's quality control opinions are nothing more than "narrative summaries" and that "[a] layperson is fully capable of replicating [his] document review and arriving at her or his own conclusion." *Id.* at 39-40, 42-45.

The Court again rejects these arguments.  In preparing his report, Mr. Baev reviewed numerous Embrace financial reports, as well as audits conducted by Freddie Mac and GMAC Mortgage, and ultimately concluded that those findings raised concerns about problems with Embrace's quality control processes. *See* Baev Expert Report at 16-17.  To argue that a layperson could have reviewed these documents and arrived at their own conclusion is unconvincing given that "[t]he average layperson is not an expert in reading and analyzing financial statements." *McPhee v. Symphony New Hampshire*, No. 18-cv-322-LM, 2020 WL 3950786, at *4 (D.N.H. Apr. 16, 2020) (declining to exclude expert testimony on grounds that expert "reviewed" but did not himself audit company's financial statements).  As such, Mr. Baev's testimony would help to the extent that it would assist the "untrained layman" in

understanding some of the complexities in this case. *Goldenson v. Steffens*, No. 2:10-cv-00440-JAW, 2013 WL 682844, at *7-8 (D. Me. Feb. 25, 2013). This argument fails.

### ii.    "Cherry-Picked Data Points" Allegation

The Defendants also assert that Mr. Baev failed to conduct any specialized analysis in coming up with his quality control opinions. ECF No. 177 at 39-40. They specifically fault him for having limited his analysis to only to certain quality control audits and late quality control reviews. *Id.* at 39.

However, as this Court has noted, any purported limitations in the data points Mr. Baev considered is an issue for the jury to ultimately weigh; it is not a basis for exclusion. *See Milward*, 639 F.3d at 22; *see also Crowe v. Machand*, 506 F.3d 13, 18 (1st Cir. 2007) ("Objections … which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility."). As such, this argument also fails.

### e.    Mr. Baev's Testimony Regarding Intent

The last challenge the Defendants mount is with respect to Mr. Baev's opinion about Mr. Hardiman's potential motivation for making shareholder distributions. ECF No. 177 at 46. They take specific issue with Mr. Baev opining that an "increased risk of claims against [Embrace's] assets stemming from the [DOJ] investigation played a role in Mr. Hardiman's decision to take a shareholder distribution" and that "a possible motivation [for Mr. Hardiman's distribution] was to prevent cash assets from being seized as a result of the ongoing investigation." *Id.* (citing Baev Expert

Report at 20-21). They contend that experts may not opine on parties' intentions or motives and that Mr. Baev's opinions in this regard must be excluded. *Id.*

Here, the Court agrees with the Defendants. As with Ms. Hamrick's opinion regarding Embrace management's intent, Mr. Baev's opinion as to Mr. Hardiman's intentions and motivations must be excluded. "A party's intent or state of mind is not the proper subject of expert testimony." *OneBeacon Am. Ins. Co.*, 804 F. Supp. 2d at 85; *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 734655, at *2 (D. Mass. Feb. 6, 2018) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). Again, the jury is charged with drawing its own conclusions about intent, and this is not an area for experts to offer their opinions as to what inferences can be drawn. *Bawduniak*, 2022 WL 2662678, at *3.

Accordingly, the Defendants' *Daubert* motion is GRANTED to the extent that they seek to exclude portions of Mr. Baev's testimony opining on Mr. Hardiman's intentions and motivations. However, the Defendants' motion to exclude other portions of Mr. Baev's expert testimony is DENIED.

### D. Summary of *Daubert* Analysis

In sum, the Court GRANTS the Defendants' motion to exclude the expert testimony of Ms. Hamrick and Mr. Baev only insofar as it relates to impermissible opinions regarding the intentions and motivations of Embrace and the Individual Defendants. However, the Defendants' motion to exclude other portions of the experts' testimony is DENIED, and that testimony may be considered in the

Defendants' summary judgment motions and at trial. The Court now turns to analyzing those motions.

## IV. EMBRACE'S MOTION FOR SUMMARY JUDGMENT

### A. False Claims Under the FCA

There are two types of false claims at issue here. Ms. Souza first alleges that Embrace violated the FCA's presentment clause (Count I) by "knowingly present[ing], or caus[ing] to be presented, a false fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A). ECF No. 97 at 102-03. She also claims that Embrace violated the FCA's false record clause (Count II) by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B). *Id.* at 103-04.

Under either theory of liability, a violation of the FCA turns on four elements: (1) whether a false claim has been made; (2) whether the claim was made with scienter; (3) whether the claim was material to HUD's payment decision; and (4) whether the claim caused the government to pay out a sum of money. *See, e.g.*, *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 387-88 (1st Cir. 2011); *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307, 312 (1st Cir. 2010). In the FHA insurance context, the alleged false claim occurs if the mortgage lender knowingly certified that a loan met HUD underwriting requirements—even when it failed to comply with some of those requirements. *See Calderon*, 70 F.4th at 973. If HUD would have withheld FHA insurance, had it known of the noncompliance, then the false certification is material to HUD's

payment decision. *Id.* Finally, if the loan defaulted and HUD covered the costs associated with the default, then the false certification of compliance causes the government's loss. *Id.*

### 1. Existence of a False Claim

"The 'sine qua non' of a False Claims Act violation is, as the name of the statute would suggest, an 'actual false claim.'" *United States v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 129 (D. Mass. 2016) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004), *abrogated on other grounds by*, *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)). "Without proof of a false claim, there is no liability under the False Claims Act." *Id.*

"To avoid 'foreclos[ing] FCA liability in situations that Congress intended to fall within the Act's scope," the First Circuit takes "a broad view" of what may constitute a false claim. *United States ex rel. Jones v. Brigham and Women's Hosp.*, 678 F.3d 72, 85 (1st Cir. 2012) (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1268 (D.C. Cir. 2010)). Though it has generally declined to rely on categorical labels such as "false certification," the First Circuit has noted that FCA liability may arise where a defendant falsely certifies compliance with a material requirement of a federal statute or regulation. *See United States v. Regeneron Pharms., Inc.*, 128 F.4th 324, 332-33 (1st Cir. 2025) ("[W]e [have] eschewed reliance on terms like "false certification" that are not mentioned in the [FCA] … but we [have] reached a result identical to what a false certification theory would have produced.") (citing *Hutcheson*, 647 F.3d at 387-88)).

In the context of FHA insurance, a false claim exists where a DE lender wrongly certifies that a loan complies with HUD underwriting requirements and, if the loan defaults, HUD pays the lender the costs associated with the default. *See, e.g.*, *Calderon*, 70 F.4th at 973. The false claims at issue here stem from Embrace's loan-level and annual certifications in which it asserted compliance with FHA and HUD guidelines. Ms. Souza contends that Embrace employed various policies and practices that violated those guidelines, thereby rendering its certifications false.

Here, the Court's task is relatively straightforward. If Embrace can demonstrate that it complied with HUD guidelines, then there is no genuine dispute of material fact regarding the existence of a false claim, and summary judgment for Embrace is appropriate. If, on the other hand, Ms. Souza has identified specific instances in which Embrace violated those guidelines—despite certifying otherwise— then falsity is established, and the Court will proceed to evaluate the next element.

As a preliminary matter, Ms. Souza asserts that her false claims "are now substantiated in the evidence" because this Court previously ruled in her favor by denying Embrace's earlier motion to dismiss this case. ECF No. 191 at 36 (citing ECF No. 96 at 7-8). But Ms. Souza's assertion is wrong. The standards for a motion to dismiss and a motion for summary judgment are inherently different.

As stated in its earlier order, at the motion to dismiss stage, the Court's job is to determine whether, under Federal Rule of Civil Procedure 12(b)(6), the plaintiff has presented facts that make her claim plausible on its face. ECF No. 96 at 3 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because this is an FCA claim,

the Court also looked to the requirements of Federal Rule of Civil Procedure 9(b) to decide whether the plaintiff "pleaded sufficient facts to provide fair notice to the defendant[ ] and state a facially plausible legal claim." *Id.* at 4 (quoting *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013)). Having met these preliminary requirements, this Court concluded that Ms. Souza's complaint *plausibly alleged* a false claim. *Id.* at 5, 8.

However, on a motion for summary judgment, the evidentiary standard is higher. As the First Circuit has noted, "at the summary judgment stage, relators must produce competent evidence of an actual false claim made to the government." *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 58 (1st Cir. 2017). Ultimately, "summary judgment … is 'the put up or shut up moment in litigation,'" and a relator certainly must make a greater showing than is required in a pleading in order "to get in front of a jury." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013) (quoting *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010)); *see also United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004) ("Without proof of an actual claim, there is no issue of material fact to be decided by a jury. [Relator's] theory that the claims 'must have been' submitted cannot survive a motion for summary judgment.").

One would expect that, after the extensive discovery that has occurred since the Court denied Embrace's motion to dismiss, Ms. Souza should be able to produce sufficient evidence of an "actual false claim." *Pfizer*, 188 F. Supp. 3d at 129. As such,

the Court analyzes the eight different Embrace policies or practices that she identifies as bases for false claims.

### a.    "Do Not Decline" Policy

Ms. Souza contends that Embrace pressured its employees to endorse loans that failed to meet FHA guidelines by instituting a "Do Not Decline" policy.  ECF No. 191 at 20.  Under this policy, she alleges that Embrace instructed underwriters not to decline FHA loan applications, even if they did not meet HUD's underwriting requirements.  *Id.*  Instead, underwriters were told to find a "creative way" to approve the loans.  *Id.*  Of course, approving an ineligible loan would be a clear violation of HUD guidelines.  *See* HUD Handbook 4000.4, App. 3 ("The underwriter … certifies … [t]he mortgage loan is eligible for mortgage insurance under the Direct Endorsement program.").

Embrace, however, contends that no such policy ever existed.  ECF No. 165-1 at 43.  The company argues, among other things, that it regularly declined loans that did not meet FHA guidelines, noting that it received more than 750,000 FHA loan applications during the claims period but approved and funded only about 80,000— an acceptance rate of 10.6%.  *Id.* at 42-43.

Ms. Souza in turn cites various emails from Embrace management that she claims support her allegation.  *See* ECF No. 191 at 37-38 (citing Ex. BJ ("[L]et's be a deal maker, not a deal breaker."); Ex. DR (referring to "[t]he get it done attitude"); Ex. BR ("PLEASE Revisit this with your [underwriting] manager again."); Ex. BZ ("If you have an underwriter who can not get to [clear the conditions] the loans – Beth

[an underwriting team leader] has offered to clear the files so please utilize her."); Ex. BK ("We need sets and we need them desperately, there are no excuses if you need a condition to get a loan cleared to close make it happen.")). Embrace, in response, claims that these emails are innocuous. *See* ECF No. 200 at 23 (citing Ex. BR ("[I]n Exhibit BR, a loan officer ... asks if the underwriting manager can take another look 'to see if what [she is] trying to outline makes sense.' There is nothing improper about this ... [it] is commonplace in virtually every industry."); Ex. BZ ("There is nothing wrong with having an underwriter with available bandwidth work on a loan file because other underwriters are busy[.]"); Ex. DR ("[T]here is nothing wrong about ... Embrace ... encourage[ing] underwriters to find loan products for borrowers that they are properly qualified for[.]")). Whether the cited communications—particularly when viewed in the context of Ms. Souza's other allegations—suggest an attempt to avoid declining ineligible loans raises a genuine dispute of material fact.

Ms. Souza has therefore provided enough evidence to demonstrate that the "Do Not Decline" policy is a basis for a false claim. Accordingly, it can proceed, and the Court DENIES summary judgment as to this issue.

### b.    "Guaranteed On Time Close" ("GOTC") Policy

Ms. Souza alleges that, under its GOTC policy, Embrace would offer prospective borrowers $2,500 if their FHA loan failed to close on time. ECF No. 97 at 38. She asserts that this policy pressured underwriters to approve loans so that their employer would not lose money, which ultimately led them to approve loans that did not meet FHA guidelines. ECF No. 191 at 22.

Embrace counters that the GOTC policy "was simply a guarantee that the applicable loan would close on time *if* it was approved, and not a guarantee that the loan *would* be approved."  ECF No. 165-1 at 44.  Under the policy, Embrace states that "Embrace would not be obligated to pay any penalty if a loan was not approved (as there would naturally not be a closing)."  *Id.* at 45.  Since no penalty was triggered for loans that were not approved, they argue that underwriters could not have been pressured by this policy.  *Id.*

The Court agrees with Embrace.  Even when viewed in the light most favorable to Ms. Souza, there is no evidence linking the GOTC policy to underwriters' decisions to approve noncompliant loans.  Nor does she cite any specific instances where underwriters felt pressured by this policy to approve ineligible loans.

Because the GOTC policy, on its face, does not violate HUD guidelines, it cannot support a false claim under the FCA.  Accordingly, the Court GRANTS summary judgment on this issue.

### c.    Loan Officers Managing and Pressuring Underwriters

Ms. Souza alleges that Embrace violated FHA guidelines prohibiting underwriters from being managed by individuals engaged in loan origination (i.e., loan officers).  ECF No. 97 at 33 (citing HUD Handbook 4000.1.I.A.4.c.iv(B)(3)(b)(vi)).  She claims the company did this in part by insisting that underwriters treat loan officers as their "customers."  *Id.* at 34.  She also states that Embrace violated this rule by having loan officers issue underwriters "customer service scores" based on their satisfaction with the underwriters' job performance.  *Id.*  She claims these scores

were then used by underwriting managers as a way of evaluating the underwriters and even played a role in influencing employment decisions. ECF No. 191 at 17-18. She also asserts that the loan officers improperly pressured the underwriters to approve ineligible loan applications. *Id.* at 18-19.

Ms. Souza further claims that Embrace management distributed "monthly stats" to the entire underwriting team, ranking individual underwriters on four metrics—one of which was the "customer service score" assigned by loan officers. ECF No. 97 at 35. These stats were then used to reward top performers with cash prizes, company clothing, or tickets to sporting events. ECF No. 200 at 32. Taken together, Ms. Souza contends that these policies made it so that the loan officers exerted management authority over the underwriters. *Id.* at 35. She also specifically points to 21 ineligible loans that she claims Embrace endorsed because of this conduct. *Id.* at 36 (citing *id.* at 64-87).

Embrace denies any violation. As for the "customer" policy, the company argues that Ms. Souza took Embrace's policy out of context: Embrace encouraged *all* its employees to "treat [their] colleagues like customers," not just underwriters to treat loan officers as such. ECF No. 165-1 at 46. As to the customer service scores, Embrace argues that Ms. Souza "does not identify any FHA requirement that is violated by such surveys." ECF No. 200 at 31. Specifically, the company asserts that the "factual record demonstrates that Embrace's underwriters were wholly independent of the loan origination team" and that "Embrace went to great lengths and took proactive steps to avoid potential pressure on underwriters." ECF No. 165-

1 at 45. As for the monthly stats, Embrace contends they were used to "monitor consistency among [their] staff and in order to award top performers." ECF No. 200 at 32.

Here, the Court agrees with Ms. Souza that these practices appear problematic. Per HUD guidelines, underwriters may not be managed by loan officers. ECF No. 97 at 33 (citing HUD Handbook 4000.1.I.A.4.c.iv(B)(3)(b)(vi)). It is important to note that, though they may work for the same company, the roles of underwriters and loan officers are fundamentally different. Loan officers are part of the mortgage origination sales team; their job is to bring in business in the form of borrowers, which generates revenue for the mortgage lender. ECF No. 191 at 16. These officers are paid on a commission basis, meaning if a loan they originated is approved, they receive compensation. *Id.* Underwriters, by contrast, are expected to "exercise integrity, prudence, candor, and due diligence on behalf of the government when underwriting loans." ECF No. 97 at 15 (citing HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 1.B.8.a; 1.B.8.b; 1.B.8.c.). To prevent financial bias, HUD explicitly prohibits DE lenders from paying its underwriters on a commission basis. ECF No. 97 at 19 (citing HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii); HUD Handbook 4060.1 REV-2,1I2-9(A)).

Thus, it is not difficult to see how a conflict of interest could arise if a loan officer had influence over an underwriter. In this case, having loan officers assign underwriters "customer service scores" that were included in "monthly stats" used by management to rank underwriters and determine rewards for top performers does

not support the claim that underwriters were "wholly independent" from loan officers, as Embrace suggests.  ECF No. 165-1 at 45.  On the contrary, these practices raise serious concerns, particularly if the scores and stats played a role in measuring the underwriters' overall job performance or led to adverse employment actions.  A reasonable juror could therefore conclude that the scoring system and monthly stats made it seem as though loan officers were managing underwriters, thereby violating HUD guidelines.

There is enough evidence for this violation to rise to the level of a false claim.  Accordingly, it can proceed, and the Court DENIES summary judgment as to this issue.

### d.    Improper Documentation Practices

Ms. Souza alleges that Embrace used improper documentation practices concerning applicants' loan files, such as removing documentation that would disqualify a loan for FHA insurance and placing improper documentation in files to make them appear compliant with governmental regulations.  ECF No. 97 at 56-57.  For instance, she claims that Embrace used a "Miscellaneous" file where underwriters would hide documents from borrowers that would make their loans ineligible for FHA insurance, and this disappearance made it so the loan file could be approved.  *Id.* at 57.  Another example she points to was Mr. Lamy instructing an underwriting team lead to remove 1040 tax return forms from a particular loan file because the forms would reduce the borrower's income and make the loan ineligible for FHA insurance.  *Id.* at 57.  She contends that, by adopting these practices,

Embrace violated HUD guidelines, specifically the requirement that the lender properly and accurately document everything in the loan file. *Id.* at 56 (citing HUD Handbook 4000.1.II.A.1.a.i.).

Embrace argues that Ms. Souza mischaracterizes the evidence. ECF No. 200 at 25. The company explains, for example, that Mr. Lamy could not have acted deceptively because he reached out to the FHA personally to ask whether it was appropriate to remove the 1040 forms. ECF No. 165-1 at 49. *Id.* However, Embrace fails to address the allegations regarding the "Miscellaneous" folder. When viewed in the light most favorable to Ms. Souza, there is a genuine dispute of material fact as to whether Embrace's documentation practices violated HUD rules.

As such, this claim should also proceed. The Court DENIES summary judgment on the improper documentation issue.

### e.    Manipulation of the AUS/TOTAL System

Ms. Souza also claims that Embrace manipulated the AUS system to endorse ineligible loans for FHA insurance. ECF No. 97 at 60. This included allegedly running the system excessively and testing different financial data in TOTAL to achieve an "Accept/Approve" rating rather than a "Refer" rating. *Id.* at 60-61. However, even when TOTAL produced a "Refer" result (meaning that Embrace was required to manually underwrite the file), Embrace continued to resubmit the file through the system, purportedly in violation of HUD requirements. *Id.* at 60.

Embrace argues that running the AUS system multiple times does not violate HUD guidelines. ECF No. 165-1 at 41. Embrace points out that, because borrowers'

data and information naturally fluctuate during the FHA loan underwriting process, HUD permits DE lenders to conduct multiple AUS runs. *Id.* at 41-42. As long as the lender includes the final AUS report relied upon for the credit decision, underwriters comply with HUD guidelines. *Id.* at 42.

The Court agrees with Embrace. Here, the commentary to Regulation C of the Home Mortgage Disclosure Act (the regulation governing use of the AUS) is instructive:

> [I]f a financial institution obtains a result from an AUS that requires the financial institution to underwrite the loan manually, but the financial institution subsequently processes the application through a different AUS that also generates a result, the financial institution complies with [Regulation C] by reporting the name of the second AUS that it used to evaluate the application and the AUS result generated by that system.

Home Mortgage Disclosure (Regulation C), 80 FR 66128-01 (citing 12 C.F.R. § 1003.4(a)(35)). Clearly, running the AUS multiple times is not inherently a violation of HUD guidelines.

Running the AUS multiple times therefore does not rise to the level of a false claim under the FCA. Accordingly, the Court GRANTS summary judgment on this issue.

### f.    Management Overrides of Underwriting Decisions

Ms. Souza next alleges that, if a loan failed to be approved by an underwriter, the loan application would be escalated to an underwriting manager, who would override governmental requirements to ensure the loan's approval. ECF No. 97 at 37; ECF No. 191 at 37. Specifically, Ms. Souza cites an example where she herself denied a loan because the borrower had insufficient funds in their bank account to proceed

with their application,[8] and her manager took over, added $10 to the account to make the loan eligible for FHA insurance, re-ran the loan, and approved the loan application.  ECF No. 191 at 37.

Embrace first asserts that there is nothing inherently problematic about escalating loans to management.  ECF No. 200 at 20.  The company next claims that Embrace management never overrode FHA requirements.  *Id.*  Rather, it maintained "Embrace-imposed overlays," which are internal underwriting policies in addition to, and exceeding, FHA baseline requirements.  *Id.* at 15.  Embrace explains that management reviews were often used to determine whether exceptions should be granted to these Embrace-imposed overlays, and that such exceptions in no way suggest a violation of FHA policy.  *Id.*  As for the allegation regarding the ten-dollar discrepancy, Embrace explains that lenders often provide borrowers with small credits to reduce upfront closing expenses, and that there is also nothing wrong with this practice.  *Id.* at 15-16 n.9 (citing LaToya Irby, *What Are Lender Credits?*, Experian (Apr. 19, 2025), https://www.experian.com/blogs/ask-experian/what-are-lender-credits).

The Court agrees with Embrace that this allegation does not suggest an inherently problematic practice.  Management reviews of underwriting decisions— particularly when used to determine whether to grant exceptions to lender-imposed

---

[8] To qualify for FHA insurance, a borrower must have, among other things, sufficient funds to close on the transaction.  *See, e.g.*, Andrew Wan, *FHA Loan Requirements in 2025*, The Close (July 1, 2025), https://theclose.com/fha-loan-requirements.  These funds can include a down payment amount, closing expenses, and other associated costs.  *Id.*

(and not FHA-imposed) policies—do not violate HUD guidelines. Additionally, the ten-dollar discrepancy that Ms. Souza highlights is nominal and, as explained by Embrace, represents a practice commonly used by lenders.

The management escalation allegation therefore does not amount to a false claim under the FCA. Accordingly, the Court GRANTS summary judgment on this issue.

### g.    Inadequate Quality Control ("QC") Program

Ms. Souza next claims that Embrace failed to maintain an adequate QC program in violation of HUD guidelines. ECF No. 97 at 40-42 (citing HUD Handbook 4060.1 REV-2, ch. 7-2). *Id.* Specifically, she contends that Embrace's decisions to temporarily bring its QC program in-house, to reduce its in-house QC staff from four employees to two, and then to suddenly change course and hire a new outside auditor, suggests impropriety. *Id.* at 44-45. She also claims that Embrace's completion of QC reports was "perpetually behind," despite FHA rules requiring reviews to be conducted within 90 days of loan closings. ECF No. 191 at 39. Finally, she contends that Fannie Mae and Freddie Mac conducted audits that consistently found Embrace's QC process to be unacceptable. *Id.* at 27-28; ECF No. 97 at 45-46. For instance, the audits noted that Embrace failed to: (1) timely provide QC reports to management; (2) implement methods for tracking QC reports; and (3) take corrective action when QC reports demonstrated deficiencies. ECF No. 191 at 28.

Embrace argues that it did not violate any FHA requirement by choosing to bring QC in-house or by attempting to reduce business expenses. ECF No. 200 at 23.

The company states that the move was done to improve efficiency and productivity, and when it failed to do so, Embrace enlisted the help of external auditors to meet its goals. *Id.* at 23-24. Additionally, while Embrace does admit to being late in producing monthly QC reports, it notes that this occurred only eight times over thirteen years, and therefore does not demonstrate the level of impropriety Ms. Souza alleges. *Id.* at 22-23.

While the Court agrees that there is nothing inherently improper about staff reductions or moving QC functions in-house (and later outsourcing them again), the Fannie Mae and Freddie Mac audits do suggest deficiencies in Embrace's QC process. Embrace also failed to address these audits in its briefings. Ms. Souza is correct in noting that monthly QC reports must be conducted in a timely manner under FHA guidelines. *See* HUD 4060.1, REV-2, ch. 7-6 ("In order for a Quality Control Program to be useful and acceptable to FHA …. [l]oans must be reviewed within 90 days from the end of the month in which the loan closed.").

A jury is likely in the best position to decide whether the problems with Embrace's QC operation rise to the level of an FCA violation. Accordingly, the Court DENIES summary judgment as to this issue.

**h.    "Don't Ask Questions" and Letters of Explanation Policy**

Ms. Souza also claims that Embrace had a "Don't Ask Questions" policy wherein it directed underwriters to ignore red flags or potential violations of loan requirements. ECF No. 97 at 58. She asserts that, rather than exercising the due diligence required of underwriters, Embrace personnel were instructed to obtain

fraudulent letters of explanation and coach prospective borrowers on what to say in such letters to ensure loan approval.  *Id.* at 57.

Embrace contends that no "Don't Ask Questions" policy ever existed and that underwriters were never instructed to misuse letters of explanation.  ECF No. 200 at 25.  The company points out that the only evidence Ms. Souza offers in support of her claim is the deposition testimony of Embrace's Senior VP of Operations in which she merely explains what a letter of explanation is, along with an exhibit providing a sample letter.  *Id.*  Embrace argues that this does not prove any violation of HUD guidelines.  *Id.*

The Court agrees with Embrace.  Ms. Souza does not explain in her briefing how the sample letter of explanation demonstrates the existence of a "Don't Ask Questions" policy, nor does she show how this letter (or others like it) was used to fraudulently circumvent HUD guidelines.

As such, the "Don't Ask Questions" and letters of explanation policy does not rise to the level of an FCA violation.  The Court GRANTS summary judgment on this issue.

To summarize, four of the policies or practices that Ms. Souza identified must be dismissed because they do not rise to the level of HUD violations: (1) Embrace's GOTC Policy; (2) Embrace's manipulation of the AUS/TOTAL system; (3) Embrace management's overrides of underwriting decisions; and (4) Embrace's "Don't Ask Questions" and letters of explanation policy.  Meanwhile, the other four Embrace policies or practices are not dismissed because Ms. Souza has provided sufficient

evidence that they violate HUD guidelines. They include: (1) Embrace's "Do Not Decline" policy; (2) Embrace loan officers "managing" and "pressuring" underwriters; (3) Embrace's improper documentation policies; and (4) Embrace's inadequate quality control program. These policies and practices form the basis of Embrace's purported submission of false claims under the FCA. The next step will be to analyze whether Embrace acted with scienter in its submission of these false claims.

### 2. Scienter

The scienter requirement asks whether a defendant knowingly submitted a false claim. *See Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019) (citing 31 U.S.C. §§ 3729(a)(1), (b)(1)). A person acts "knowingly" if they: "(1) had actual knowledge of the information"; "(2) acts in deliberate ignorance of the truth or falsity of the information"; or "(3) acts in reckless disregard of the truth or falsity of the information." *Hutcheson*, 647 F.3d at 380 (citing 31. U.S.C. § 3729(b)). Under the FCA, the term "knowingly" requires "no proof of specific intent to defraud." *Id.*

More specifically, the Supreme Court has defined "actual knowledge" as referring to a person who is "aware of" information, such as "knowledge obtained from investigation, study, or instruction." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 n.4 (2023). The term "deliberate ignorance" refers to those "who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* at 751. Finally, the term "reckless disregard" refers to those "who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.*

Ms. Souza argues that Embrace either "knew that they were falsely endorsing loans that failed to comply with FHA guidelines, or at a minimum [acted with] deliberate ignorance and 'shut [its] eyes' to the facts...." ECF No. 191 at 52. She asserts that Embrace acted knowingly because the company certified compliance with HUD guidelines, despite being aware that its loan approval and QC processes violated those same guidelines. ECF No. 191 at 44, 48. She states Embrace was aware of these problems because: (1) she and other employees told Embrace management about them; and (2) third-party auditors, like Fannie Mae and Freddie Mac informed the company as much. *Id.* at 46, 49.

### a.    Non-Submitting Entity Argument

Embrace first claims that Ms. Souza cannot survive summary judgment because she cannot "show specific proof that each individual underwriter who certified each loan (and the individuals submitting the annual certifications) believed each certification was false when made." ECF No. 165-1 at 51. However, this position is wrong. FCA liability is not conditioned on whether the individual who directly submitted the certification (i.e., the "submitting entity") "knew or should have known" that it was a false claim. *Hutcheson*, 647 F.3d at 390. Indeed, a "false claim may be presented through an innocent third party." *United States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995) (citing *United States v. Bornstein*, 423 U.S. 303, 309 (1976)). The FCA in fact reaches those who do *not* submit the false certification personally (i.e., the "non-submitting entities") if they "knowingly caused the submission of either a false or fraudulent claim." *Hutcheson*, 647 F.3d at 390.

Thus, Ms. Souza need not demonstrate that the individual Embrace underwriters who made loan-level certifications or the Embrace employee who submitted each annual certification did so knowing that the certifications were false, as Embrace suggests.[9]  *See* ECF No. 165-1 at 51, 54.  It suffices if she can show that Embrace had such knowledge.

### b.    "Robust" Compliance Argument

Next, Embrace argues that its "robust" compliance and QC practices across the claims period demonstrate that it could not have knowingly certified false compliance with HUD and FHA guidelines.  ECF No. 165-1 at 56.  This point is undermined by the issues with Embrace's QC operation identified above.  For instance, the Fannie Mae and Freddie Mac audits that Ms. Souza points to show problems with Embrace's QC process, such as failing to timely provide QC reports to management, failing to implement methods to track QC reports, and failing to take corrective actions.  ECF No. 191 at 27-28.  These audits were conducted throughout the claims period in 2009, 2010, 2011, and 2016, and they continually show the inadequacies in Embrace's QC's practice.  *Id.* at 28.  Ms. Souza also points to eight instances between 2009 and 2012 in which Embrace did not conduct its monthly QC reports in a timely manner in violation of FHA rules.  *Id.* at 39.  As such, this argument is unpersuasive.

---

[9] Embrace cites two decisions from outside of this circuit to support its argument.  *See* ECF No. 165-1 at 50-55 (citing *United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973 (N.D. Ill. 2015); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039 (11th Cir. 2015)).  These cases do not hold precedential value over this Court and are not persuasive.

c.    "Government Knowledge" Argument

Embrace also claims that, under the so-called "government knowledge" defense, HUD's prior knowledge of Embrace's performance throughout the claims period negates any potential finding of scienter.  ECF No. 165-1 at 59; ECF No. 200 at 39.  The company asserts that "Embrace rebutted or otherwise mitigated issues that HUD identified, 'consistently sought clarification' from HUD on ambiguous FHA requirements, self-reported issues to HUD, and was forthright with HUD."  ECF No. 165-1 at 59.  However, Embrace's reliance on this defense is misplaced.

The First Circuit has held that Congress, through its amendment of the FCA in 1986, replaced the "government knowledge" defense with the "public disclosure" defense.  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 26 (1st Cir. 2009).  Previously, the FCA barred relator suits that relied on evidence or information in the possession of the U.S. government at the time the suit was brought.  *Id.* at 25-26.  This defense "proved too restrictive of qui tam actions, resulting in the under-enforcement of the FCA."  *Id.* (quoting *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 729 (1st Cir. 2007)).  With the "public disclosure" defense, the FCA now only bars relator suits where there has been "public disclosure of information given to the government."  *Rost*, 507 F.3d at 729-30 (citing *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 684 (D.C. Cir. 1997)).

Here, Embrace does not raise a "public disclosure" defense.  The company instead relies on the "government knowledge" defense, which the First Circuit no longer recognizes.  *See, e.g.*, *Duxbury*, 579 F.3d at 26 (noting that Congress

"abolish[ed] the 'governmental knowledge' regime" with its 1986 amendment to FCA). Embrace cites the law of other circuits in support of its argument. ECF No. 165-1 at 59 (citing *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999); *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014); *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 531 (6th Cir. 2012)). However, even these circuits have said that the "government knowledge" defense only applies where the government has full knowledge and all pertinent information regarding the defendant's false claims. *See, e.g.*, *Durcholz*, 189 F.3d at 544-45; *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991); *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 454 n.21 (6th Cir. 2005)). Here, as Ms. Souza points out, HUD did not have "full knowledge" of all the claims against Embrace giving rise to this action. ECF No. 191 at 53-54. As such, Embrace's use of this defense fails.

### d.   Evidence Supporting Scienter Requirement

In all, Ms. Souza has raised a genuine dispute of material fact regarding Embrace's knowledge of noncompliance. First, she points to sufficient evidence by which a reasonable juror could find that Embrace intentionally developed and implemented the policies and practices that this Court has found to be at issue: (1) the cited email communications from Embrace management that suggest a "Do Not Decline" policy; (2) the customer service scores and monthly stats that led loan officers to exert managerial influence over the underwriters; and (3) the use of a "Miscellaneous" file to improperly hide documentation. During the claims period, at

least two underwriters (Ms. Souza included) reported to management their complaints regarding Embrace's policies and practices, describing "undue pressure to approve loans" and what they viewed as the "textbook definition of a False Claims Act" violation.  ECF No. 191 at 45.

Second, Ms. Souza points to significant defects in Embrace's QC process that third-party auditors had identified throughout the claims period.  Embrace cannot on the one hand tout its "robust compliance and quality control program," *see* ECF No. 165-1 at 56, while on the other hand failing to comply with HUD's rules regarding QC practices, *see* ECF No. 191 at 27-28, 29 (describing such violations).  Taken together, this would suggest that Embrace acted with at least "reckless disregard" because—based on the complaints from underwriters and the findings of third-party auditors—the company was aware of a "substantial and unjustifiable risk" that it was failing to comply with HUD guidelines, but it certified compliance otherwise through the submission of its loan-level and annual certifications.

The scienter element has thus been satisfied at this stage of the litigation, and the Court will next proceed to the materiality element.

### 3.    Materiality

Materiality is the third step in the FCA analysis, and it is "a fact-intensive and context-specific inquiry."  *New York v. Amgen Inc.*, 652 F.3d 103, 111 (1st Cir. 2011).  "The falsity of a claim is 'material' if it has 'a natural tendency to influence, or [was] capable of influencing, the [government's decision]' whether to pay or reimburse the

claim." *Guilfoile*, 913 F.3d at 187 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016) (*Escobar II*)).

In analyzing materiality, the First Circuit considers three factors: (1) "whether the government expressly identified compliance with a particular provision as a condition of payment"; (2) whether the government paid "a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position"; and (3) "whether the noncompliance in question goes to 'the very essence of the bargain,' or is merely 'minor or insubstantial.'" *United States ex rel. Zotos v. Town of Hingham*, 98 F.4th 339, 344 (1st Cir. 2024) (citing *Escobar II*, 579 U.S. at 193-95)). While no single factor is dispositive, compliance (or lack thereof) with regulations that are repeatedly referenced in absolute language is "the textbook example" of the type of representation that would be material to the government's decision to pay claims. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016) (*Escobar III*) (citing *Escobar II*, 579 U.S. at 193).

### a.    The MOU and the DOJ's Decision Not to Intervene

Embrace first argues that materiality is lacking because HUD and the Department of Justice ("DOJ") entered a Memorandum of Understanding ("MOU") in 2019 in which the parties agreed that FHA violations would "be enforced primarily through HUD's administrative proceedings." ECF No. 165-1 at 61-62 (citing Press Release, U.S. Dep't of Justice, Departments of Justice and Housing and Urban Development Sign Interagency Memorandum on the Application of the False Claims

Act (Oct. 28, 2019), https://www.justice.gov/archives/opa/pr/departments-justice-and-housing-and-urban-development-sign-interagency-memorandum-application).

Under the MOU, in the event of a *qui tam* action, HUD has committed to "make known to DOJ whether and to what extent any alleged defects or violations regarding the relevant FHA requirements are material or not material to the agency so that DOJ can determine whether the elements of the FCA can be established." *Id.* at 63 (citing Memorandum of Understanding Between the Department of Housing and Urban Development and the Department of Justice 3 (Oct. 21, 2019)). In essence, Embrace claims that the DOJ's decision not to intervene in the present case indicates that HUD views Ms. Souza's allegations as immaterial. *Id.*

Embrace, however, omits a key portion of the MOU, which states in relevant part:

> [I]n connection with any case filed by a *qui tam* relator, HUD may recommend that DOJ seek *dismissal* of the case if HUD does not support the FCA litigation. Among other reasons, HUD may recommend dismissal because the alleged conduct fails to meet the HUD FCA Evaluation Standards, the alleged conduct does not represent a material violation of FHA requirements, or the litigation threatens to interfere with HUD's policies or the administration of its FHA lending program and dismissal would avoid these effects. While the decision of whether to seek *dismissal* remains the exclusive authority of DOJ, DOJ will consult with HUD in making such a decision.

MOU at 3-4 (emphasis added). The DOJ's decision whether to intervene is related to its decision to seek dismissal of an FCA action—but not in the way Embrace makes it out to be.

As the Supreme Court recently made clear, the DOJ "may seek dismissal of an FCA action … so long as it intervened sometime in the litigation, whether at the

outset or afterward." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023). The DOJ, after having properly intervened, may even seek dismissal of the suit over a relator's objection. *Id.* at 424, 438-39. "Only if the [DOJ] passes on intervention does the relator 'have the right to conduct the action.'" *Id.* at 425 (quoting 31 U.S.C. § 3730(b)(4)(B)).

Here, if the DOJ viewed Ms. Souza's claims as immaterial, as Embrace suggests, then it would have sought dismissal of her action—something that can only occur through the Government's intervention in the litigation. *Id.* at 424. However, the DOJ declined to intervene. *See* ECF No. 16. In fact, the Government's position in this case is as follows:

> Although the United States declines to intervene, we respectfully refer the Court to 31 U.S.C. § 3730(b)(1), which allows the relator to maintain the action in the name of the United States…. The United States reserves its right … to intervene in this action for good cause at a later date, and to seek the dismissal of the relator's action or claim.

*Id.* at 1. That the DOJ has not yet intervened to dismiss this case, which it would have had to do in consultation with HUD under the MOU, contradicts the very point Embrace attempts to make. As such, this argument is unpersuasive.

### b.    The Materiality Factors

Embrace next claims that Ms. Souza cannot demonstrate materiality because none of the materiality factors support such a finding. ECF No. 200 at 48. The Court analyzes these factors in turn.

### i.    Compliance as a Condition of Payment

The first factor—whether the government expressly identified compliance with a particular provision as a condition of payment—weighs in Ms. Souza's favor. As

other federal courts that have analyzed FCA claims in the FHA insurance context have observed, a mortgage lender's participation in the DE program is "conditioned" on its loan-level and annual certifications of compliance with HUD requirements.[10] *See, e.g.*, *Tutanes-Luster*, 2019 WL 6972689, at *8-9; *United States v. Acad. Mortg. Corp.*, No. 16-cv-02120-EMC, 2018 WL 4053484, at *11 (N.D. Cal. Aug. 24, 2018); *United States v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1040 (E.D. Mich. 2017). "Absent the certification, the mortgage loan would be ineligible for FHA insurance in the first place." *Quicken Loans*, 239 F. Supp. 3d at 1040 (citing *United States v. Americus Mortg. Corp.*, No. 4:12-cv-02676, 2014 WL 4274279, at *11 (S.D. Tex. Aug. 29, 2014)). Here, it is clear that Embrace's status as a DE lender is conditioned on its loan-level and annual certifications to FHA.

### ii.    Payment of Claim Despite Knowledge of Violation

The second factor—whether the government paid a claim despite knowing that certain requirements were violated—cuts in favor of Ms. Souza as well because there is a genuine dispute over whether the Government had actual knowledge of

---

[10] Embrace relies on other federal court decisions to argue that FHA insurance is *not* conditioned on its annual certifications of compliance with HUD regulations. ECF No. 165-1 at 79 (citing *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, 115 F.4th 908, 920 (8th Cir. 2024); *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 450 (E.D. Pa. 2020)). However, unlike *Academy Mortgage Corp.*, *Quicken Loans*, and *Americus Mortgage Corp.*, neither cited authority relates to FHA insurance (instead, they relate to Medicare and Medicaid reimbursements) and neither references an "annual certification."

Only one case has stated that FCA liability could not be grounded in false annual certifications. *See United States v. Reunion Mortg., Inc.*, No. C 13-2340 SBA, 2013 WL 5944252, at *6 (N.D. Cal. Nov. 5, 2013). However, those statements "were dicta because that case did not actually involve claims based on false annual certifications." *Tutanes-Luster*, 2019 WL 6972689, at *9.

Embrace's violations. Embrace first claims that, in several cases, it submitted loans to HUD—loans that Ms. Souza alleged contained material violations of FHA requirements—and HUD nevertheless paid out those claims in full. ECF No. 165-1 at 76 (citing *Escobar II*, 579 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.")). Of course, HUD's declination to pay claims is only one non-dispositive indication of materiality. *Escobar III*, 842 F.3d at 111. Also important to note is that HUD had the opportunity to review only a fraction of the loans Ms. Souza pointed out.[11] ECF No. 165-1 at 76-77.

Relatedly, Embrace claims that Ms. Souza cannot establish materiality because HUD had "actual knowledge" of its purported violations of FHA regulations. *Id.* at 64. But the record tells a different story. For instance, with respect to its failure to timely conduct monthly QC reports, Embrace insists that "HUD was well aware of issues with timeliness of certain QC reports." *Id.* at 68. To support this proposition, the company cites the deposition transcript of HUD's 30(b)(6) representative.[12] *Id.* at 68 (citing Higgins Dep. Tr. at 220:10-22). However, in that

---

[11] Embrace contends that HUD reviewed only 28 of the 40 loans that Ms. Souza alleged contained "material violations of FHA requirements" and for which Embrace submitted a claim to HUD for payment. *Id.* at 76. The company also claims, separate from those 40 loans, HUD reviewed 64 of the 210 allegedly defective loans that Ms. Souza identified. *Id.* at 77.

[12] Rule 30(b)(6) of the Federal Rules of Civil Procedure requires a governmental agency to designate one or more individuals to testify about information known or reasonably available to the organization regarding specific topics. *See* Fed. R. Civ. P. 30(b)(6).

very same deposition, when asked point blank if "Embrace ever disclose[d] to HUD that it was late in its QC reports," the HUD representative's answer was: "I don't know."  Higgins Dep. Tr. at 220:10-22.  This is far from "actual knowledge" of Embrace's failure to comply with an important FHA guideline.

Nor does Embrace claim that it directly notified HUD of its other problematic policies and practices, including: (1) the "Do Not Decline" policy; (2) the "customer service scores" and the "monthly stats"; and (3) the improper documentation practices.  The company instead claims that, by virtue of Ms. Souza having filed this lawsuit in 2019, HUD has "actual knowledge" of the violations but "has not changed its position toward Embrace."  ECF No. 165-1 at 64.  Ms. Souza disputes this allegation.  ECF No. 191 at 61 ("[T]here is no support that FHA knew Embrace's problems were anywhere near as serious as is shown in this litigation.").

In support of its position, Embrace cites *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29 (1st Cir. 2017).  *Id.*  That case, however, is readily distinguishable from this one.  In *Nargol*, the First Circuit noted "the complaint allege[d] that Relators told the FDA about *every* aspect of the design," and that it had "acquired *full knowledge* of Relators' claims."  865 F.3d at 35-36 (emphasis added).  Here, by contrast, there is a genuine dispute of material fact regarding whether HUD has "full knowledge" of Embrace's violations.

Another argument Embrace makes is that, if it had committed any material violations, then "HUD's myriad oversight and monitoring mechanisms" would have

uncovered them by now.   ECF No. 165-1 at 65-66.   That HUD has done nothing, according to Embrace, "demonstrates the lack of materiality."   *Id.* at 65-66.

However, this argument seems to ignore a key tenet of the DE program, which is that the DE lenders are supposed to truthfully certify that the FHA loans they endorse meet governmental requirements because HUD itself "does not review applications for mortgage insurance before the mortgage is executed."   ECF No. 97 at 12 (quoting 24 C.F.R. § 203.5(a)).   HUD has previously explained that the lenders' "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, *thereby eliminating the necessity for a detailed HUD review of the loan* prior to endorsement."   *Id.* at 14 (quoting Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983) (emphasis added)).   The DE program is premised on the idea that HUD cannot catch *every single violation*, which is why DE lenders owe "an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor."   *Id.* at 13 (quoting *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank, Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966))).   Therefore, that HUD did not catch a violation of the rules does not automatically exonerate Embrace.

### iii.    Essence of the Bargain

The third and final factor—whether the noncompliance goes to the essence of the bargain or is minor and insubstantial—also weighs in favor of Ms. Souza.   The Court is again guided by other federal courts that have held in the FCA context that

"a lender's certification with FHA underwriting requirements is not 'minor or insubstantial,' as they go to the *essence of the bargain* between HUD and [the lender]." *Quicken Loans*, 239 F. Supp. 3d at 1039-40 (emphasis added); *see also Academy Mortg. Corp.*, 2018 WL 4053484, at *11 ("[T]he alleged violations which contravene [the lender's] certifications are far from trivial."). Here, violations such as directing underwriters not to decline ineligible loans, implementing practices that lead loan officers to improperly manage underwriters, hiding adverse documentation in "Miscellaneous" folders, and failing to timely submit QC reports threaten to undermine Embrace's duty to HUD under the DE program. These are not merely "technical and immaterial underwriting errors and honest mistakes," as Embrace suggests. ECF No. 165-1 at 12.

Having taken all this into consideration, the Court finds that the balance of factors favors Ms. Souza. There is also a genuine dispute of material fact over the extent of HUD's "actual knowledge" of Embrace's violations. As such, the Court finds that the materiality element has been satisfied, and it proceeds to the causation element of the analysis.

### 4. Causation

The fourth and final element of an FCA claim is causation. Here, the parties dispute which standard of causation applies and, in fairness, the jurisprudence on this matter is not definitively established.

a.    **Appropriate Causation Standard**

Embrace argues that Ms. Souza must prove both actual causation[13] and proximate causation. ECF No. 165-1 at 80 (citing *United States ex rel. Franklin v. Parke-Davis*, No. 96-cv-11651, 2003 WL 22048255, at *4 (D. Mass. Aug. 22, 2003); *Rost*, 507 F.3d at 732 n.9). By contrast, Ms. Souza claims that only a showing of "but-for" causation is required.[14] ECF No. 191 at 60 (citing *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 120 (D.D.C. 2007); *Regeneron Pharms.*, 128 F.4th at 336).

While the First Circuit has not spoken directly on which standard applies for these types of actions,[15] there seems to be growing consensus among the other circuits that both actual and proximate causation must be demonstrated. *See, e.g.*, *Calderon*, 70 F.4th at 978-79; *Fago*, 518 F. Supp. 2d at 120; *United States v. Miller*, 645 F.2d 473, 475-76 (5th Cir. 1981); *United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir. 1977); *Quicken Loans*, 239 F. Supp. 3d at 1041 ("It appears as though the Sixth Circuit has endorsed (at least implicitly) the latter proximate causation standard for damages under the False Claims Act.").

---

[13] Initially, the Defendants argued that the test for actual causation was "substantial factor." ECF No. 165-1 at 80-81. However, they later concede that "but-for" causation is the appropriate test to prove actual causation. ECF No. 200 at 55-57.

[14] In the alternative, Ms. Souza states that, if the Court were to adopt the Defendants' view and apply "the more stringent 'proximate cause' standard," her claim would prevail under that standard as well. ECF No. 191 at 61.

[15] Earlier this year in another FCA case, the First Circuit adopted the "but-for causation" standard, but that only applies where liability is premised on violations of the federal Anti-Kickback Statute. *Regeneron Pharms.*, 128 F.4th at 329-30.

The First Circuit has shown, at least implicitly, that it agrees with the other circuits.  Here, Ms. Souza has brought forth a fraudulent inducement FCA claim. ECF No. 97 at 54.  In *D'Agostino v. ev3, Inc.*, the First Circuit suggested that, with respect to these types of cases, there must be a "causal link" between the alleged misrepresentations and the payment of claims made by the government.  845 F.3d 1, 7-8 (1st Cir. 2016).  "[T]he defendant's conduct must cause the government to make a payment or to forfeit money owed."  *Id.* (citing *United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005)).  However, the court stopped short of embracing a solely but-for causation standard.  *Id.* at 9 (stating that it neither rejected nor accepted amicus curiae's fraudulent inducement theory, which "necessarily asks whether [the government] would have made a different decision absent the fraud").

In *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, the First Circuit took up the causation issue again, suggesting that proximate causation might apply. 865 F.3d at 35.  Specifically, the court opined that in cases involving "the government pay[ing] a particular claim in full despite its actual knowledge that certain requirements were violated … it is not plausible that the conduct of the [defendant] … constitute[s] a material falsehood capable of *proximately causing* the payment of a claim by the government."  *Id.* (emphasis added).

Based on these two decisions, it appears as though the First Circuit has endorsed the use of both actual causation ("but-for") and proximate causation in fraudulent inducement FCA cases. That is the standard this Court will now apply.

### b.    Application of Proximate Cause

To prove causation under the strict proximate cause standard, the plaintiff must put forward evidence showing that it was "reasonably foreseeable" that the defendant's false certification of compliance with HUD regulations "played some role in causing or increasing the risk of a subsequent default." *Calderon*, 70 F.4th at 979; *see also Hodge*, 933 F.3d at 475; *Quicken Loans*, 239 F. Supp. 3d at 1042. Simple but-for causation (i.e., that HUD would not have insured the loan "but for" the false certification) is not enough. *See United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992), *overruled by*, *United States v. Luce*, 873 F.3d 999, 1014 (7th Cir. 2017).

The defaults are important because they are "what triggers HUD's payment obligations under the federal insurance program." *Calderon*, 70 F.4th at 989; *see also Miller*, 645 F.2d at 476; *Hibbs*, 568 F.2d at 351. The false certification "need not have been the sole factor causing HUD's losses." *Spicer*, 57 F.3d at 1159. However, "[w]here a default is caused 'by a flood or some other uninsured catastrophe,' a defendant's false certifications cannot be said to have caused the government's loss."[16] *Calderon*, 70 F.4th at 989 (quoting *Hibbs*, 568 F.2d at 351).

---

[16] The Defendants claim that the Great Recession and the COVID-19 pandemic, both of which occurred during the claims period, are two significant events that break the causal chain that Ms. Souza needs to establish. ECF No. 165-1 at 82-

Here, Embrace claims that Ms. Souza "has failed to provide any evidence—via an expert opinion or otherwise—that an alleged false certification was … the proximate cause of the default for any of the 210 Allegedly Defective Loans." ECF No. 165-1 at 88. Ms. Souza counters that she can establish causation "by presenting expert testimony that show flaws in the underwriting process, and from a sample, extrapolate those factors out across all loans." ECF No. 191 at 61. She points the Court's attention to *Hodge* and *Calderon*—Fifth and Seventh Circuit cases, respectively—in which statistical sampling, expert testimony, and extrapolation were used to show proximate cause. *Id.* (citing *Hodge*, 933 F.3d at 475; *Calderon*, 70 F.4th at 980).

In *Hodge*, the Fifth Circuit held that the government (which brought the FCA action as opposed to a relator) sufficiently proved the causation element where it introduced expert evidence that linked false statements made by the defendant lender to higher risks of default. 933 F.3d at 475. The court found this to be "more than enough evidence for a jury to find that the false statements were a proximate cause of the losses." *Id.* The court further noted that "[e]ven if the defendants did not know which specific loans would eventually default, it was foreseeable that a higher percentage of them would result in claims." *Id.*

---

86. While the Court acknowledges the significance of these two macroeconomic events, these do not seem to be the "uninsured catastrophes" contemplated by the courts in *Calderon* and *Hibbs*. 70 F.4th at 989; 568 F.2d at 351. It is also important to note, again, that the false certification "need not have been the *sole* factor causing HUD's losses." *Spicer*, 57 F.3d at 1159 (emphasis added).

Meanwhile, in *Calderon*, the Seventh Circuit held that the plaintiff-relator needed to, but did not, identify the total number of FHA loans that the defendant lender serviced, determine the lender's default rates for those loans, and then compare that to the national default rate of FHA loans. 70 F.4th at 980. "Without some evidence that [the lender] had a higher-than-average default rate for its federally insured loans, a jury could not find that [the lender's] underwriting practices … had any effect on subsequent loan performance." *Id.*

Ms. Souza's experts have provided both these pieces of evidence. First, Ms. Hamrick has opined that Embrace's noncompliance with HUD regulations had the potential to increase the risk of defaults and foreclosures. *See* Hamrick Expert Report at 17-18; *see also* Bennett Rebuttal Report at 11 ("[T]he underwriting defects identified by Ms. Hamrick are generally associated with an elevated risk of default."). Additionally, Dr. Bennett has opined that "each of the 210 Defective Loans … has at least one credit-related finding that, all else equal, would elevate HUD's risk of loss." Bennett Rebuttal Report at 15; *see also id.* at 16-20 (explaining how each loan has at least "one credit-related finding" that would increase HUD's risk of loss).

Second, both Ms. Hamrick and Mr. Baev analyzed Embrace's FHA Compare Ratio, which is a metric used by FHA to measure a lender's default and claim rate on FHA loans and compare it to other lenders who participate in the DE program.[17] *See*

---

[17] The FHA Compare Ratio is used by the FHA to evaluate lenders that participate in its DE program. *See, e.g.*, Nate Shultz, *Mortgage Lenders Need to Keep an Eye on This Little-Known Mortgage Metric*, HousingWire (June 5, 2018), https://www.housingwire.com/articles/43594-mortgage-lenders-need-to-keep-an-eye-on-this-little-known-mortgage-metric.

Baev Expert Report at 17; Hamrick Rebuttal Report at 42-44.  In essence, a compare ratio over 100% means that a lender's default rate is higher than average.  *See* Hamrick Rebuttal Report at 43.  As both experts explain, Embrace's compare ratio has consistently trended above 100%, meaning that its default rates for FHA loans have been higher than average than those of its peers.  *Id.* at 43-44; Baev Expert Report at 17.

Taken together, this amounts to sufficient evidence for a reasonable juror to conclude that Ms. Souza has satisfied the causation element.  Embrace argues that this is not the case, but this constitutes a genuine issue of material fact.  As such, this FCA claim can proceed.

### 5.    Summary of FCA Analysis

To sum up, the Court GRANTS IN PART Embrace's Motion for Summary Judgment as to the following issues: (1) Embrace's GOTC Policy; (2) Embrace's manipulation of the AUS/TOTAL system; (3) Embrace management's overrides of underwriting decisions; and (4) Embrace's "Don't Ask Questions" and letters of explanation policy.  Again, the Court finds that these policies or practices do not violate HUD guidelines and therefore cannot form the basis of a "false claim."

However, the other four Embrace policies or practices do form the basis of a false claim: (1) Embrace's "Do Not Decline" policy; (2) Embrace loan officers "managing" and "pressuring" underwriters; (3) Embrace's improper documentation policies; and (4) Embrace's inadequate quality control program.  Further, Ms. Souza has met all the other elements of her FCA claim.  Accordingly, the Court DENIES IN

PART Embrace's Motion for Summary Judgment as to the remainder of Ms. Souza's FCA claim.

### B.    Retaliation Under the FCA

Ms. Souza also brings a retaliation claim against Embrace under the FCA. ECF No. 97 at 104-05. "In addition to prohibiting the submission of false claims, the FCA bars an employer from retaliating against an employee 'because of lawful acts done … in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA].'" *Guilfoile*, 913 F.3d at 187 (quoting 31 U.S.C. § 3730(h)(1)). To prevail on her retaliation claim, Ms. Souza "must show that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *Karvelas*, 360 F.3d at 235.

Under the First Circuit's *McDonnell-Douglas* burden-shifting framework, if Ms. Souza can make out a prima facie retaliation claim under the FCA, then the burden shifts to Embrace "to articulate a non-retaliatory reason for the adverse employment action." *Lestage v. Coloplast Corp.*, 982 F.3d 37, 47 (1st Cir. 2020) (citing *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). "This is merely a burden of production." *Id.* (citing *Mesnick*, 950 F.2d at 823). If the employer can produce evidence of a legitimate motive, then "the burden remains with the plaintiff to show 'that the proffered reason is a pretext calculated to mask retaliation.'" *Id.* (quoting *Harrington v. Aggregate Indus.-N.E. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012)).

The court must then "determine whether there is sufficient evidence of 'pretext and retaliatory animus' to make out a jury question." *Harrington*, 668 F.3d at 31 (quoting *Mesnick*, 950 F.2d at 827). The First Circuit has noted that "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer" can give rise to an inference of pretext. *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). "[D]eviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events" can also create such an inference. *Id.* (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168-70 (1st Cir. 1998)). Ultimately, the plaintiff can succeed by adducing "sufficient evidence to create a genuine issue as to whether retaliation was the real motive" behind the termination. *Id.* (citing *Collazo v. Bristol–Myers Squibb Mfg., Inc.*, 617 F.3d 39, 50 (1st Cir. 2010)).

### 1.    Protected Conduct

For the purposes of an FCA retaliation claim, "protected conduct" includes any "activities that 'reasonably could lead' to an FCA action," such as "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Booker*, 847 F.3d at 59 (quoting *Karvelas*, 360 F.3d at 237). "The conduct the plaintiff objects to or reports … must relate to the submission of false claims." *Elliott-Lewis v. Abbott Lab'ys, Inc.*, 411 F. Supp. 3d 195, 206 (D. Mass. 2019) (citing *Booker*, 847 F.3d at 60). However, the plaintiff need not know, or even suspect, that the conduct that she

reported violated the FCA specifically. *Karvelas*, 360 F.3d at 238-39 (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998)).

Ms. Souza contends that she engaged in protected conduct when she "alerted Embrace's management that Embrace was approving government loan files that Embrace knew did not meet the appropriate HUD regulatory and statutory requirements." ECF No. 97 at 101. Specifically, she points to an email she sent while working at Embrace in which she alerted her supervisor about an instance where she had been encouraged to manipulate information to get a loan approved and to "basically ... commit lender fraud." ECF No. 193 at 62 (quoting Ex. DL). She also cites a conversation she had with her supervisor and an executive in which she complained about underwriters being asked to approve loans that did not meet governmental requirements. *Id.* (citing Ex. AP). As described above, these communications indeed relate to the submission of false claims. As such, Ms. Souza has sufficiently established that she engaged in protected conduct.

### 2.    Employer Knowledge

The second element of an FCA retaliation claim requires that the plaintiff's protected conduct put the employer on notice of "a reasonable possibility" of FCA litigation. *Elliott-Lewis*, 411 F. Supp. 3d at 206 (quoting *Maturi v. McLaughlin Rsch. Corp.*, 413 F.3d 166, 173 (1st Cir. 2005)). Though "the employer need not know that the employee has filed or plans to file a qui tam action," it must at least be aware "that the plaintiff is engaged in protected conduct." *Id.* (quoting *Karvelas*, 360 F.3d at 238-39).

Here, Ms. Souza puts forth plenty of evidence to show that Embrace management was aware of her protected conduct. ECF No. 193 at 62. First, she cites an email chain with a supervisor where the supervisor states: "You are expressing concerns about loan manipulation and unethical behavior…." *Id.* (quoting Ex. DL). Next, she points to a conversation she had with her supervisor and an Embrace executive to discuss these concerns. *Id.* (citing Ex. DM; Ex. AP). Finally, and most notably, she cites an Embrace-prepared report sent to Embrace management that explicitly states that Ms. Souza, along with another underwriter, made comments that may "have False Claims Act Implications." *Id.* (citing Ex. BB at EHL-RFP3687817). Thus, Ms. Souza has sufficiently established the employer knowledge element.

### 3. Causation

As to the third element of an FCA retaliation claim, a plaintiff must show that her protected conduct was a "but-for" cause of the adverse employment action. *Lestage*, 982 F.3d at 46; *see also Morgan-Lee v. Therapy Res. Mgmt., LLC*, 129 F.4th 93, 98 (1st Cir. 2024). Temporal proximity between the adverse employment action and the plaintiff's protected conduct can support an inference of causation. *Harrington*, 668 F.3d at 32. As at least one court has held, "[i]n the First Circuit, termination must follow within roughly three months for temporal proximity alone to establish causation." *United States v. Shaughnessy-Kaplan Rehab. Hosp., Inc.*, 146 F. Supp. 3d 426, 429 (D. Mass. 2015).

Here, Ms. Souza alleges that, at the meeting with her supervisor and the Embrace executive, her supervisor suggested that this position "was not the right marriage for [Ms. Souza]." ECF No. 97 at 102. She also claims that another manager told her that "she simply did not fit the 'Embrace Way.'" ECF No. 193 at 32. The Court also notes that Embrace terminated Ms. Souza just over three months[18] after her manager voiced concerns to Embrace executives about her fitting in. ECF No. 165-1 at 94. This fact bolsters her claim. *Harrington*, 668 F.3d at 32; *Shaughnessy-Kaplan Rehab. Hosp.*, 146 F. Supp. 3d at 429. Ultimately, Ms. Souza has provided sufficient evidence to show that, "but for" her expressing her protected conduct to Embrace, she would not have been terminated. As such, she has established the causation element.

### 4.   *McDonnell-Douglas* Analysis

Now that Ms. Souza has successfully made out a prima facie case of retaliation under the FCA, the burden shifts to Embrace "to articulate a non-retaliatory reason" for terminating her. *Lestage*, 982 F.3d at 47; *Harrington*, 668 F.3d at 31. Embrace contends that Ms. Souza was terminated, not because of retaliation, but "as a part of a workforce reduction during a downturn in loan volume." ECF No. 165-1 at 94-95.

---

[18] The meeting with the supervisor and the Embrace executive took place on October 25, 2018. ECF No. 165-1 at 94. Embrace terminated Ms. Souza on February 5, 2019. *Id.* The time that elapsed between those dates is three months and eleven days. The Defendants claim that, because the period is *over* three months, her retaliation claim is "doom[ed]." *Id.* at 94-95. The Court notes, again, that the case on which the Defendants rely states that "termination must follow within *roughly* three months for temporal proximity alone to establish causation." *Shaughnessy-Kaplan Rehab. Hosp.*, 146 F. Supp. at 429 (emphasis added). Quite the opposite of dooming Ms. Souza's claim—it bolsters it.

An Embrace supervisor stated in her deposition that Ms. Souza had to be let go because there simply was not enough "activity to keep [the] underwriting team busy." *Id.* at 95 (quoting Ex. 23). Lending further support to its claim, Embrace asserts that two other underwriters were let go alongside Ms. Souza. *Id.* Embrace has produced sufficient evidence to show a legitimate motive.

Having done that, Ms. Souza must then show that Embrace's reasoning is "a pretext calculated to mask retaliation." *Harrington*, 668 F.3d at 31; *Mesnick*, 950 F.2d at 827. She asserts just that, stating that Embrace's grounds were pretextual given the generally positive reviews she received from her supervisors until her termination. ECF No. 193 at 63 (noting that one supervisor said Ms. Souza was "a skilled underwriter" and made "sound decisions" and another stating that she "had no complaints about the quality of her underwriting").

The Court is now tasked with determining whether Ms. Souza has adduced sufficient evidence to show that her dismissal was pretextual. *Harrington*, 668 F.3d at 31; *Mesnick*, 950 F.2d at 827. The Court finds that she has. First, the alleged statements made by Embrace management following Ms. Souza's expression of her concerns—that her position "was not the right marriage for [Ms. Souza] and that "she simply did not fit the Embrace way"—casts doubt on Embrace's purported rationale for terminating her. Second, as noted earlier, the temporal proximity between the time of Ms. Souza's meeting with management and the time of her dismissal strongly suggests pretext. Viewing the evidence in the light most favorable to Ms. Souza, as this Court must do at the summary judgment stage, there is certainly enough

evidence for a reasonable juror to conclude that Ms. Souza was terminated for retaliatory reasons.

### 5.    Summary of Retaliation Analysis

To sum up, Ms. Souza has met her burden of establishing her retaliation claim under the FCA. Accordingly, the Court DENIES Embrace's Motion for Summary Judgment as to this claim.

## V.    INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Ms. Souza also brings an FCA claim against the Individual Defendants. ECF No. 97 at 99-100. Regarding individual liability, the Supreme Court has held that the FCA's language "indicate[s] a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud…." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943), *superseded on other grounds by*, Pub. L. No. 99–562, § 5, 100 Stat. 3158 (1986), *codified at* 31 U.S.C. § 3731(b) (1988). The statute is designed to penalize individuals for their own actions, not the actions of others. *Bornstein*, 423 U.S. at 313. Therefore, because Ms. Souza has made out an FCA violation against Embrace, her claim against the Individual Defendants will necessarily depend on whether each of them: (1) acted with the requisite scienter; and (2) caused the submission of false claims.

### A.    Dennis Hardiman's Motion for Summary Judgment

Ms. Souza alleges that, as the CEO and current President of Embrace, Mr. Hardiman was responsible for implementing and overseeing the policies and practices that led to the underwriting of loans that failed to comply with HUD

regulations.  ECF No. 97 at 39, 46, 99-100.  Specifically, she claims that, as a member of Embrace's Compliance Committee, Mr. Hardiman contributed to "Embrace burying its head in the sand" as to its QC defects.  *Id.* at 39, 46, 100.  She also contends that he generally participated in causing underwriters to approve ineligible loans and for failing to self-report materially deficient loans to HUD.  *Id.* at 99-100.

### 1.  Scienter

There is a genuine dispute over whether Mr. Hardiman had the requisite knowledge of Embrace's noncompliance with HUD guidelines.  As a member of Embrace's Compliance Committee, Mr. Hardiman was personally responsible for ensuring the company's compliance with HUD regulations.  At committee meetings, members discussed findings from third-party audits and QC reviews.  ECF No. 193 at 11 (citing Lamy Dep. Tr. at 120:11-125:20).  Given the company's multiple late monthly QC reports and the various audits from Fannie Mae and Freddie Mac that uncovered problems with Embrace's QC process, Mr. Hardiman was no doubt aware or conscious of a "substantial risk" that there were inadequacies in Embrace's QC program.  *Schutte*, 598 U.S. at 751.  That the company nevertheless certified compliance with HUD regulations through its loan-level and annual certifications shows that there is enough evidence for a reasonable juror to infer that Mr. Hardiman acted with at least "reckless disregard" or even "deliberate ignorance" as to Embrace's false claims.  *Id.*; *see also United States ex rel. Martino-Fleming v. South Bay Mental Health Centers*, 540 F. Supp. 3d 103, 130-31 (D. Mass. 2021) (finding sufficient evidence to establish that director of for-profit health center acted with scienter

where he oversaw compliance operations and thus knew or should have known that health center was in noncompliance with governmental regulations).

There is also evidence in the record to show that Mr. Hardiman was at least aware of improper influence being exerted by loan officers toward underwriters. After an Embrace underwriter came forward with complaints of what she described as "the textbook definition of a False Claims Act problem," an Embrace report shows that the problem was immediately reported to Mr. Hardiman. ECF No. 191 at 45-46 (quoting Ex. BB at EHL-RFP3687817). Mr. Hardiman then followed up with the employee, and he reported back that she was "honestly describing her feelings of pressure" and acknowledged that "not properly disciplining loan officers (as an industry) has contributed to problems like this." *Id.* (quoting Ex. BB at EHL-RFP3687817). This constitutes more than enough evidence to satisfy the scienter requirement.

### 2.    Causation

For individual defendants, "[t]he causation element may be satisfied where a defendant with the power, authority, and duty to stop the submission of false claims does not intervene after learning about the existence of false claims." *Martino-Fleming*, 540 F. Supp. 3d at 131 (internal quotation marks omitted). Here, as a member of Embrace's compliance committee, Mr. Hardiman had the "power, authority, and duty to stop the submission of false claims," but he still failed to do so. As such, Ms. Souza has also satisfied the causation element.

Accordingly, because Ms. Souza has raised a genuine dispute as to Mr. Hardiman's involvement in Embrace's submission of false claims, his motion for summary judgment is DENIED.

## B.    Kurt Noyce's Motion for Summary Judgment

Ms. Souza alleges that, as President of Embrace until January 2018, Mr. Noyce was also responsible for implementing and overseeing Embrace's policies and practices. ECF No. 193 at 14-15. She claims that problematic practices, such as the "Do Not Decline" policy and the customer survey scores, are directly attributable to him. *Id.* at 46. She also claims that, because all Embrace department heads reported directly to him, Mr. Noyce was generally aware of Embrace's noncompliance with HUD regulations. *Id.* at 45-46. For instance, she claims that he was aware of Embrace's faulty QC practices because he received copies of Embrace's QC reports and attended the monthly Compliance Committee meetings. *Id.*

### 1.    Scienter

There is a genuine dispute of material fact as to Mr. Noyce's knowledge of Embrace's submission of false claims. As President, Mr. Noyce was responsible for developing and implementing the problematic policies that are at issue here. He also attended Compliance Committee meetings in which the inadequacies in Embrace's QC practices were discussed. He could not have been so deeply involved with these practices while not, at least, recklessly disregarding the fact that they led to Embrace's submission of false claims. *Schutte*, 598 U.S. at 751; *see also Martino-Fleming*, 540 F. Supp. 3d at 132 (finding sufficient evidence to establish that CEO of

for-profit health center acted with scienter where he oversaw compliance and was informed by subordinates of potential regulatory violations). As such, there is enough evidence to satisfy the scienter requirement.

### 2.    Causation

Ms. Souza has also provided sufficient evidence on the causation element. Specifically, she points to Mr. Noyce traveling to Washington, D.C. in 2013 to meet with HUD officials to discuss HUD's potential termination of Embrace's ability to underwrite FHA loans. ECF No. 193 at 47. The meeting took place in response to reports of potential HUD violations by Embrace. *Id.* (citing Exs. DB, DC, DD). Ms. Souza claims that Mr. Noyce failed to report these violations to HUD and instead falsely affirmed compliance. *Id.* at 48. Further, until he left his position as President of Embrace in January 2018, Mr. Noyce failed to adopt measures that would have prevented the submission of false claims. *See Martino-Fleming*, 540 F. Supp. 3d at 131 (finding defendant director liable under FCA until his departure from health center he oversaw). A reasonable juror could therefore conclude that he had the "power, authority, and duty to stop the submission of false claims" but nevertheless failed to do so. *Id.*

Accordingly, Ms. Souza has raised a genuine dispute as to Mr. Noyce's involvement in Embrace's submission of false claims up until his departure from

Embrace in 2018. His motion for summary judgment is therefore GRANTED IN PART[19] and DENIED IN PART.

## C.    Robert Lamy's Motion for Summary Judgment

Ms. Souza alleges that Mr. Lamy is liable under the FCA due to his position as the Director of Risk Management at Embrace. ECF No. 193 at 49. In this position, Ms. Souza claims that Mr. Lamy "was responsible for directly and/or indirectly supervising FHA underwriters" and was regarded as Embrace's FHA "underwriting expert" because he "provid[ed] guidance to underwriters, management, and QC." *Id.* at 50 (quoting Mobilia Tr. At 280:10-282:5, 281:19-25). She contends that Mr. Lamy was aware of Embrace's "high rates of defects" and even engaged in improper documentation practices himself. *Id.* at 50-51.

### 1.    Scienter

The Court also finds that Ms. Souza has provided sufficient evidence to demonstrate that Mr. Noyce had knowledge of Embrace's submission of false claims. As reasoned above, Mr. Lamy could not have been so deeply involved with the underwriting process and regarded as Embrace's "underwriting expert" while not, at least, recklessly disregarding several problematic underwriting practices within the company. *Schutte*, 598 U.S. at 751. In fact, Ms. Souza points to a specific example where Mr. Lamy allegedly directed an underwriter to remove "the 1040's from the file

---

[19] As he put it, Mr. Noyce "is entitled to partial summary judgment in his favor for any portion of Relator's claims extending past the end of 2017, given that Mr. Noyce moved out of his role of actively managing Embrace as its president in January 2018." ECF No. 167-1 at 38.

and not hit[ ] the borrower for any unreimbursed expense." ECF No. 193 at 51 (quoting Ex. EV). If true, this constitutes direct involvement with a practice that Mr. Lamy either knew or had to have known was violative of HUD guidelines. As such, this is sufficient evidence to satisfy the scienter element.

### 2.    Causation

Ms. Souza has also provided sufficient evidence as to causation. Like Mr. Noyce, Mr. Lamy traveled to Washington, D.C. to meet with HUD officials to discuss HUD's potential termination of Embrace's underwriting abilities. ECF No. 193 at 51. Ms. Souza alleged that Mr. Lamy also failed to report Embrace's HUD violations and instead falsely affirmed compliance with those regulations. *Id.* at 52. More specifically, she claims that Mr. Lamy himself caused a false certification to be submitted when he directed an underwriter to commit an improper documentation practice. *Id.* at 51. As with Mr. Noyce, a reasonable juror could conclude that—until his retirement from Embrace in December 2020—Mr. Lamy had the "power, authority, and duty to stop the submission of false claims" but nevertheless failed to do so. *Martino-Fleming*, 540 F. Supp. 3d at 131.

Accordingly, Ms. Souza has raised a genuine dispute as to Mr. Lamy's involvement in Embrace's submission of false claims up until his departure from Embrace in 2020. His motion for summary judgment is therefore GRANTED IN PART[20] and DENIED IN PART.

---

[20] As he put it, Mr. Lamy "is entitled to partial summary judgment in his favor on any portion of Relator's claims extending beyond his December 31, 2020 retirement." ECF No. 167-1 at 42.

### D.    Summary of FCA Analysis for Individual Defendants

In sum, there is a genuine dispute of material fact as to each of the Individual Defendants' involvement in the submission of false claims.   Summary judgment is therefore GRANTED IN PART as to Mr. Noyce and Mr. Lamy only to the extent that the claims period extends past their respective departure dates from Embrace.   The Court otherwise DENIES IN PART the Individual Defendants' Motion for Summary Judgment.

## VI.   CONCLUSION

For the reasons above, the Court DENIES the Defendants' Motion for Judgment on the Pleadings, ECF No. 169, and DENIES the Defendants' Motion to Strike, ECF No. 196.   The Court GRANTS IN PART and DENIES IN PART the Defendants' Motion to Exclude Expert Testimony.   ECF No. 170.   The Court GRANTS IN PART and DENIES IN PART Embrace's Motion for Summary Judgment.   ECF No. 165.   Finally, the Court GRANTS IN PART and DENIES IN PART the Individual Defendants' Motion for Summary Judgment.   ECF No. 167.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

November 3, 2025